**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

KASHYAP P. PATEL,

     *Plaintiff,*

v.

THE ATLANTIC MONTHLY GROUP
LLC, and

SARAH FITZPATRICK,

     *Defendants.*

Case No.: 1:26-cv-1329

## COMPLAINT

1.     Kashyap P. Patel, the Director of the Federal Bureau of Investigation, brings this lawsuit to hold Defendants The Atlantic Monthly Group LLC  and its staff writer, Sarah Fitzpatrick, accountable for a sweeping, malicious, and defamatory hit piece published on April 17, 2026. Defendants are of course free to criticize the leadership of the FBI, but they crossed the legal line by publishing an article replete with false and obviously fabricated allegations designed to destroy Director Patel's reputation and drive him from office. Indeed, Fitzpatrick could not get a single person to go on the record in defense of these outrageous allegations, instead relying entirely on anonymous sources she knew to be both highly partisan with an ax to grind and also not in a position to know the facts. Defendants published the Article with actual malice, despite being expressly warned, hours before publication, that the central allegations were categorically false; despite having abundant publicly available information contradicting those allegations; despite obvious and fatal defects in their own sourcing; despite *The Atlantic*'s well-documented, long-running editorial animus toward Director Patel; despite a request for additional time to respond that Defendants refused to honor; and despite

deliberately structuring the pre-publication process to avoid receiving information that would refute their narrative. Defendants cannot evade responsibility for their malicious lies by hiding behind sham sources.

## PARTIES

2.     Plaintiff Kashyap P. Patel is an individual who is a resident and citizen of Nevada. He is the Director of the Federal Bureau of Investigation.

3.     Defendant The Atlantic Monthly Group LLC ("AMG") is a media company that publishes *The Atlantic* magazine and its associated website, theatlantic.com. AMG is headquartered in Washington, D.C. No member of AMG is a citizen of Nevada.

4.     Defendant Sarah Fitzpatrick is an individual who is a resident and citizen of the District of Columbia. She is a staff writer at *The Atlantic* covering national security and the Department of Justice.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

6.     Defendants are subject to personal jurisdiction in the District of Columbia because  Defendant AMG is headquartered in this District and published the defamatory Article from this District. Defendant Fitzpatrick resides in, works in, and researched, reported, and published the Article from this District.

7.     Venue for this action is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District, and because Defendants reside in this District.

## FACTUAL BACKGROUND

### Director Patel and the FBI under his leadership.

8. Director Patel is the Director of the Federal Bureau of Investigation ("FBI"), having been sworn in on February 20, 2025.

9. Under Director Patel's leadership, the FBI has achieved historic law enforcement results, including:

a. the capture of 8 of the FBI's 10 Most Wanted fugitives (twice as many in this Administration alone as during the entirety of the prior Administration);

b. more than 40,000 violent crime arrests, reflecting a 112% increase in violent crime arrests over 2024, alongside a 20% decrease in homicide rate, a 20% decrease in robberies, and a 10% decrease in aggravated assaults;

c. the disruption of more than 2,000 gangs and criminal enterprises (up 210%);

d. the location of more than 6,300 child victims (up 30%) and the arrest of more than 2,200 child predators (up 17%), together with the termination of more than 3.8 million pedophile accounts on the Dark Web;

e. the seizure of more than 2,500 kilograms of fentanyl (up 31%), enough to kill more than 189 million people, contributing to a nearly 20% decline in U.S. opioid overdose deaths compared to 2024;

f. espionage arrests up by 43% from 2024;

g. more than 456 cyber indictments (up 27%), 257 cyber arrests, 190 cyber convictions, 358 cyber disruptions, and 29 cyber dismantlements (up 16%);

h. more than 760 counterterrorism arrests, including a 490% increase in NVE arrests and a 20% increase in arrests related to the 764 network;

i. the successful disruption of 670 individuals from conducting terrorist attacks;

j. more than 264 counterterrorism convictions; and

3

k.  the seizure of more than 275 firearms related to counterterrorism cases.

10.    These results have coincided with a publicly reported, historic decrease in violent crime and align with the White House's own statement, provided to Defendants before publication, that "crime across the country has plummeted to the lowest level in more than 100 years and many high-profile criminals have been put behind bars."

### *The Atlantic*'s pre-existing animus toward Director Patel.

11.    AMG, through *The Atlantic*, has for months pursued a demonstrable editorial campaign to damage Director Patel's reputation and force him from office.

12.    Prior to the publication at issue, *The Atlantic* reported that Director Patel was "on the chopping block," signaling an editorial predisposition to cast his tenure as failing.

13.    On or about April 2, 2026, Defendant Fitzpatrick and her colleague Ashley Parker authored an article predicting Director Patel's imminent firing from his position—which Fitzpatrick explicitly cites and builds upon in the April 17, 2026 Defamatory Article, self-referentially reinforcing AMG's pre-formed narrative.

14.    AMG's conduct toward Director Patel is part of a broader and well-documented pattern. Numerous *Atlantic* pieces over the past two years have characterized Director Patel as unqualified, dangerous, corrupt, or mentally unstable.

### The Defamatory Article.

15.    On April 17, 2026, at approximately 6:20 PM EDT, Defendants published an article on theatlantic.com and in AMG's associated platforms, originally headlined "Kash Patel's Erratic Behavior Could Cost Him His Job," with

the sub-headline, "The FBI director has alarmed colleagues with episodes of excessive drinking and unexplained absences" (the "Article").[1]

16. The Article's very headline telegraphed its intended outcome: it was not journalism about a subject; it was advocacy against Director Patel. Defendants made no effort to disguise their aim.

17. The Article was widely disseminated on the internet, through AMG's magazine and associated platforms, and was foreseeably republished, summarized, and discussed throughout national and international media.

18. The Article included numerous false and defamatory statements of fact concerning Director Patel, including but not limited to:

   a. That Director Patel "is known to drink to the point of obvious intoxication, in many cases at the private club Ned's in Washington, D.C., while in the presence of White House and other administration staff."

   b. That Director Patel "is also known to drink to excess at the Poodle Room in Las Vegas, where he frequently spends parts of his weekends."

   c. That "[e]arly in his tenure, meetings and briefings had to be rescheduled for later in the day as a result of his alcohol-fueled nights."

   d. That "[o]n multiple occasions in the past year, members of his security detail had difficulty waking Patel because he was seemingly intoxicated, according to information supplied to Justice Department and White House officials."

   e. That "[a] request for 'breaching equipment'—normally used by SWAT and hostage-rescue teams to quickly gain entry into buildings—was made last year because Patel had been unreachable behind locked doors."

---

[1] Defendant AMG, at some point on April 19, 2026, stealth-edited the Article's main headline, which now reads "The FBI Director is MIA".

f.  That Director Patel's alleged alcohol consumption has negatively impacted various law-enforcement investigations, including the Charlie Kirk murder investigation.

g.  That Director Patel "recently expressed frustration with the look of FBI merchandise, complaining that it isn't intimidating enough."

h.  That on April 10, 2026, Director Patel "panicked, frantically calling aides and allies to announce that he had been fired by the White House," and that his behavior was a "freak-out."

i.  That Director Patel is "often away or unreachable, delaying time-sensitive decisions needed to advance investigations," and that on several occasions, Director Patel's "delays resulted in normally unflappable agents 'losing their shit.'"

j.  That Director Patel's "drinking has been a recurring source of concern across the government."

k.  The false implication that Director Patel violated DOJ's ethics rules prohibiting "habitually using alcohol or other intoxicants to excess."

l.  That Director Patel has used his position to improperly "target political or personal adversaries of the president."

m.  The false implication that Director Patel abuses alcohol, thereby making him vulnerable to exploitation or coercion by foreign adversaries.

n.  The false implication that this alleged alcohol abuse "has become a threat to public safety," including in the context of "a domestic terrorist attack," and constitutes a national-security vulnerability.

o.  That Director Patel "is deeply concerned that his job is in jeopardy."

p.  That Director Patel has had a problem with "unexplained absences," and "spotty attendance at the office," thereby falsely implying that Director Patel has been derelict in his duties.

q.  That Director Patel left the country vulnerable because "Days before the United States launched its war with Iran, Patel fired members of a counterintelligence squad that was devoted, in part, to Iran."

6

19.    Each of the foregoing statements and implications is false. They are so demonstrably and obviously false, or easily refuted, that it was at best reckless to publish them.

20.    The Article's assertions that Director Patel drinks to the point of obvious intoxication at Ned's in Washington, D.C. and to excess at the Poodle Room in Las Vegas, and that his drinking "has been a recurring source of concern across the government," are false. Director Patel does not drink to excess at these establishments or anywhere else, and this has not, and has never been, a source of concern across the government. Prior to publication, the FBI expressly informed Defendants that each of these allegations was "totally false." The FBI further warned Defendants that these allegations echoed a similar fabrication previously aired by MSNBC's Frank Figliuzzi on *Morning Joe*—anonymously sourced reporting that was later retracted by MSNBC and that is the subject of pending defamation litigation—yet Defendants published it anyway.

21.    The Article's claims that early in Director Patel's tenure meetings and briefings were rescheduled due to "alcohol-fueled nights," that members of his security detail had difficulty waking him because he was "seemingly intoxicated," and that a request for "breaching equipment" was made because he had been unreachable behind locked doors, are false. None of these events occurred. Prior to publication, the FBI expressly informed Defendants that these claims were "totally false," "made up," and "made up to the point of satire." As is standard protocol, easily verified, and would have been known by any credible FBI source, breach equipment is provided to all FBI protection details. The claim that it was requested or provided to Director Patel's detail because he "had been unreachable behind locked doors" is pure fantasy.

22.    The Article's assertions and implications that Director Patel's alleged alcohol consumption negatively impacted law-enforcement investigations (including

the Charlie Kirk murder investigation), violated DOJ ethics rules against habitual intoxicant use, rendered him vulnerable to foreign adversary coercion, and constituted a threat to public safety and national security—including in the context of a domestic terrorist attack—are false. Prior to publication, the FBI expressly informed Defendants that these claims were "100% false," and that under Director Patel's leadership, the FBI has just delivered its most successful year in decades, with a historic drop in violent crime, a 20% drop in the national murder rate, a 31% increase in fentanyl seizures, and the successful disruption of multiple terror plots.

23.    The Article's assertions that on April 10, 2026, Director Patel "panicked, frantically" announcing he had been fired, engaged in a "freak-out," and "is deeply concerned that his job is in jeopardy," are false. On April 10, 2026, Director Patel had a routine technical problem logging into a government system, which was quickly fixed. Director Patel's sole focus is on carrying out the administration's law enforcement priorities. Prior to publication, the FBI expressly informed Defendants that the firing rumor was a "made-up rumor," and that the "freak-out" and job-jeopardy claims were fabricated.

24.    The Article's assertions that Director Patel is "often away or unreachable," causing delays that made agents "lose their shit," and that he has "unexplained absences" and "spotty attendance at the office," are false. Director Patel is at FBI headquarters nearly every single day, and when he is not at headquarters, he is visiting field offices—which he has done more frequently than any of his predecessors, a fact independently verifiable through his public social media account that Defendants were specifically directed to review. Prior to publication, the FBI expressly informed Defendants that these claims were "completely made up and divorced from reality," and when pressed to identify any officials, instances, or absences supporting the claims, Defendants offered none.

25.    The Article's assertions that Director Patel has used his position to "target political or personal adversaries of the president"; that he complained that the FBI merchandise "isn't intimidating enough"; and that days before the U.S. launched its war with Iran, he "fired members of a counterintelligence squad that was devoted, in part, to Iran," leaving the country vulnerable, are each false. Director Patel has not targeted political or personal adversaries; FBI personnel actions are taken only where employees have acted unethically or undermined the mission. His security detail confirmed that he has made no such complaint about FBI merchandise. And the squad referenced was within Counterterrorism—not a dedicated Iran counterintelligence squad—with only three affected individuals even tangentially working on Iran-related matters. Prior to publication, the FBI expressly informed Defendants that each of these claims was false, including that the merchandise claim was "absolutely, 100% false" and the Iran-squad claim "is not true."

26.    Furthermore, Director Patel has taken significantly fewer personal days than either of his two immediate predecessors. In calendar year 2025, Director Patel took approximately 17 personal days—fewer than Director Wray averaged in any single year of his 7.5-year tenure, during which Wray accumulated roughly 242 personal days (including approximately 37 in 2024 alone, 31 in 2023, and 33 in 2022). Director Comey likewise took approximately 130 personal days over his 4-year tenure, including roughly 63 in 2014 and 42 in 2015, when he routinely traveled home to New York every weekend or every other weekend. Put simply, Director Patel's personal-day usage in 2025 is less than half of Wray's yearly average and a small fraction of Comey's peak years.

27.    Even after stealth-editing their headline over the weekend, in a feable attempt to reduce the appearance of partisan animus, Defendants have doubled

9

down on their knowingly false claims in an X post, made this very morning in the pre-dawn hours that reads:

> Kash Patel's colleagues are alarmed by what they say is erratic behavior and excessive drinking, Sarah Fitzpatrick reports. More than two dozen people she spoke with described his management failures and conduct that could harm national security.[2]

As discussed above, these claims about erratic behavior and excessive drinking are fabricated, and Defendants were on notice of this. As dicussed below, Fitzpatrick knows that her anonymous sources, unwilling to go on the record, are partisans with axes to grind and are not in a position to know the facts.

**Defendants' conduct exhibits actual malice.**

28.    Defendants' "investigation" of the claims in the Article was grossly deficient—and deliberately so. Defendants did not pursue obvious investigative leads, did not engage with publicly available counter-evidence—even evidence that was directly provided to them, did not afford a reasonable opportunity to respond, and did not conduct the most basic fact-checking that a responsible publication undertakes before attempting to destroy a public official's reputation, even after the FBI explained to Defendants, on the record, that their claims were false, as illustrated above.

29.    In fact, Defendants ignored their own politices and procedures, rushing the story to print without substantively fact-checking the allegations or giving Director Patel a meaningful opportunity to respond—all to publish before the truth could be exposed and derail the Article.

30.    On April 17, 2026, at 2:09 PM EDT—the same day of publication—AMG transmitted to the FBI Office of Public Affairs ("FBI OPA") a purported

---

[2] *The Atlantic* (@TheAtlantic), X (Apr. 20, 2026, 3:15 AM), https://x.com/theatlantic/status/2046125479418081772?s=42.

10

"request for comment" containing nineteen substantive claims about Director Patel. AMG imposed an arbitrary and unreasonable deadline of 4:00 PM EDT—less than two hours—for the FBI to respond to nineteen detailed allegations concerning complex issues of national security, personnel files, security-detail logs, internal facilities logs, and personal conduct.

31.    The two-hour window was pretextual. No reasonable journalist investigating such serious charges—involving alleged need for a SWAT-style breach of the Director's office, alleged alcohol abuse by the head of the nation's preeminent law-enforcement agency, alleged falsehoods about an active homicide investigation, and alleged national-security compromise—would have demanded a substantive response within 111 minutes. Defendants imposed that window precisely to manufacture a "no comment" or a summary denial, insulate themselves from the substance of the FBI response, and publish before the truth could catch up with them.

32.    FBI OPA, through Assistant Director Williamson, responded before publication that AMG's claims were "one of the most absurd things I've ever read. Completely false at a nearly 100% clip." Defendants buried this striking language, never reported it, and chose to publish the claims anyway. They included only a generic, truncated denial attributed to Director Patel ("Print it, all false, I'll see you in court - bring your checkbook"). The FBI also, as illustrated above, provided substantive refutations of Defendants' claims, which Defendants entirely ignored.

33.    Also on April 17, 2026, before publication, Director Patel's counsel sent Fitzpatrick, AMG's legal department, and AMG's senior editors a detailed letter (the "Pre-Publication Letter") further substantively refuting AMG's false claims on the record, providing publicly available counter-evidence, and demanding that AMG not publish them.

11

34.     The Pre-Publication Letter expressly requested that Defendants afford Director Patel and the FBI "a full and reasonable opportunity to respond" to the nineteen allegations—necessarily requiring additional time beyond the arbitrary two-hour window Defendants had imposed.

35.     Defendants refused. They did not extend the deadline. They did not even respond to the Pre-Publication Letter. They did not acknowledge the publicly available counter-evidence identified therein. They did not retract or modify the false statements identified. They made no meaningful response at all. They simply ignored the Pre-Publication Letter and published the false claims a few hours later.

36.     Defendants' conscious decision to ignore the detailed, specific, and substantive refutations in the Pre-Publication Letter, and their refusal to give a reasonable amount of time for the FBI and Director Patel to respond, is among the strongest possible evidence of actual malice. A reporter or publisher genuinely concerned with accuracy does not brush aside a detailed, on-the-record refutation from counsel identifying specific falsehoods and offering counter-evidence; does not refuse a good-faith request for additional response time on nineteen complex allegations; and does not publish anyway, unchanged, hours later.

37.     In addition to FBI OPA's pre-publication denial, Defendants received on-the-record statements from senior administration officials that contradicted the Article's core premise.

38.     White House Press Secretary Karoline Leavitt told Defendants that under President Trump and Director Patel, "crime across the country has plummeted to the lowest level in more than 100 years and many high profile criminals have been put behind bars," and that "Director Patel remains a critical player on the Administration's law and order team."

12

39. Acting Attorney General Todd Blanche told Defendants that "Patel has accomplished more in 14 months than the previous administration did in four years" and that "[a]nonymously sourced hit pieces do not constitute journalism."

40. Defendants included these statements in the Article only to brush them aside. They made no effort to reconcile these on-the-record denials—backed by documented, publicly reported law-enforcement successes—with the Article's central thesis that Director Patel is a derelict and erratic leader, who abuses alcohol to the point of being unfit for his duties.

41. Defendants also ignored or willfully avoided an extensive public record directly contradicting their narrative. A responsible reporter, a competent editor, or a non-reckless fact-checker would have taken notice of, among other things, the following:

    a. The FBI's extensive, contemporaneous, and publicly documented operational output under Director Patel, partially detailed in Paragraph 9 above—including FBI and DOJ press releases announcing Operation Restore Justice, Operation Black Rose, the capture of the #8 Top Ten fugitive, and numerous counterterrorism and counterintelligence disruptions. These operational successes are inconsistent with a director who is "often away or unreachable" or too intoxicated to do his job.

    b. Director Patel's robust public schedule and visible, documented presence at FBI headquarters, field offices, joint operations, press conferences, congressional appearances, and on-the-ground deployments to active investigations—all of which are documented in FBI public communications, photographs, video, and contemporaneous press coverage. Defendants' claim that Director Patel is "often away or unreachable" could have been tested against, and would have been refuted by, the public record of his appearances and activities, as well as by any FBI official or colleague willing to go on the record.

    c. Director Patel's congressional testimony and briefings, which are publicly recorded and which depict a director who is engaged, substantively prepared, and actively directing bureau operations.

13

d. The absence of any corroborating public record for the sensational "breaching equipment" claim—no internal incident report, no SWAT deployment record, no news report, no photograph, no complaint. A single call to any knowledgeable source inside the bureau's security division, or a simple FOIA/records inquiry, would have easily exposed the fabricated nature of this claim.

e. The publicly available history of prior, substantially similar false claims that were publicly rebutted by AD Williamson and that are the subject of active defamation litigation filed by Director Patel. Defendants either knew or should have known that the sources recycling these tropes lacked credibility.

42.    A minimally competent journalist investigating allegations this serious would have taken several basic, obvious steps before publication. Defendants took none of them. They never reviewed FBI security-detail protocols that would have shown the "waking the Director" story was operationally implausible. They never asked for any documentation of the supposed need to breach the Director's office, even though such an incident would have generated multiple written records. They never contacted Ned's or the Poodle Room for corroboration, nor sought credit-card records, photographs, or witness statements. They never cross-checked Director Patel's public schedule against the claim that meetings had to be rescheduled for "alcohol-fueled nights." They made no serious effort to determine whether their anonymous sources had been disciplined or removed by Director Patel and therefore had obvious motives to lie. They refused a reasonable request for additional time to respond to nineteen detailed, albeit ridiculous, allegations. They ignored a detailed pre-publication letter from counsel identifying specific falsehoods and supplying counter-evidence. And they never interviewed Director Patel himself or gave him any meaningful opportunity to address the charges in his own words. This is not negligence. It demonstrates a deliberate and malicious smear.

43.    The vast majority of the defamatory claims in the Article rely solely on vague, unattributed sourcing such as "people familiar with the matter," "some have

14

characterized," "officials said," "former advisers," and similar formulations. Any such purported sources could not possibly possess firsthand knowledge of the events described, both because the sources were not in a position to know and because the events described did not occur. Defendants' complete and total reliance on these anonymous sources—Defendants could not get a *single person* to go on the record, nor could they cite a *single* email or piece of documentary evidence—for such breathtaking and scurrilous allegations, once again is not negligence. It demonstrates a deliberate and malicious smear.

44.    The Article itself reveals that Defendants understood their sources were animated by hostility. Defendants relied on "former advisers" and "political operatives"—categories of sources with obvious axes to grind. Defendant Fitzpatrick knew this. As to the allegedly current officials cited in the Article, their animus toward Director Patel is readily apparent and known to Fitzpatrick, stating that such officials "have learned to roll their eyes at" at Director Patel's actions, and one official going so far as to say "Part of me is glad he's wasting his time on bullshit, because it's less dangerous for rule of law, for the American public." Also known to Fitzpatrick was that both the former and allegedly current sources lacked any legitimate access to the specific operational, security, and personal facts they purported to describe.

45.    Contrary to these anonymous, nescient, and obviously ax-grinding sources, official representatives of the FBI, Department of Justice, and The White House all emphatically denied Defendants' allegations, on the record.

46.    Furthermore, in May 2025, a former FBI official made a suspiciously similar false claim about Director Patel on MSNBC's *Morning Joe*. That anonymously sourced claim—that Director Patel had been "visible at nightclubs far more than he has been on the seventh floor of the Hoover building"—resulted in active, ongoing defamation litigation filed by Director Patel in the United States

15

District Court for the Southern District of Texas. AD Williamson has publicly rebutted that claim and others like it, and MSNBC itself acknowledged the claim was a "misstatement" that had not been "verified."

47.  Defendants were aware of both the prior false statements and Director Patel's vigorous public and legal refutation of them. The parallel between the Article's "drink to excess at the Poodle Room in Las Vegas" narrative and the defamatory *Morning Joe* claim is unmistakable. Despite this, Defendants chose to publish a similar—and even more outlandish—set of false allegations, plainly drawing on the same currents of rumor that had already been publicly discredited and were in litigation.

48.  The fact that Defendants elected to republish, in different form, claims that had already been debunked and were in active litigation is additional evidence that Defendants either knew their claims were false or acted with reckless disregard for the truth.

49.  The totality of these circumstances reflects a purposeful avoidance of the truth. Defendants did not simply fail to check facts. They received a detailed pre-publication letter and emails identifying those facts and ignored it. They received a request for additional time to respond and denied it. They received a categorical denial from the FBI and buried it. They deliberately structured their pre-publication process to avoid facts that would have contradicted their narrative, and then published that narrative in defiance of the facts they could not avoid.

50.  The Article has been republished, summarized, and discussed in countless other media outlets, multiplying the harm to Director Patel exponentially.

## CAUSES OF ACTION

### COUNT I
### Defamation and Defamation Per Se

51.    Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

52.    The statements identified in Paragraphs 18 and 27 are false statements of fact concerning Director Patel.

53.    Defendants published these statements to third parties by publishing them in *The Atlantic* magazine and on theatlantic.com, and by causing them to be further disseminated.

54.    These statements constitute defamation per se because their defamatory meaning is obvious on their face. The statements falsely assert that the Director of the FBI—the nation's chief federal law-enforcement officer—is a habitual drunk, unable to perform the duties of his office, is a threat to public safety, is vulnerable to foreign coercion, has violated DOJ ethics rules, is unreachable in emergencies, has required the deployment of "breaching equipment" to extract him from locked rooms, allows alcohol to influence his public statements about criminal investigations, and behaves erratically in a manner that compromises national security. These statements injure Director Patel in his profession, accuse him of misconduct in his office, and impute to him conduct incompatible with the proper exercise of his duties.

55.    Defendants published these statements with actual malice, as detailed above and as follows: (1) they were expressly warned multiple times before publication—by FBI OPA, Director Patel's counsel, the White House, and the Acting Attorney General—that the central claims were false, including a detailed pre-publication letter identifying specific falsehoods and a categorical on-the-record denial calling the allegations "completely false at a nearly 100% clip," yet they

17

ignored it all; (2) they imposed a pretextual two-hour comment window that was obviously designed to prevent meaningful response and refused to extend it when asked; (3) they relied exclusively on anonymous sources with known motives to fabricate or exaggerate and lacked credible firsthand knowledge; (4) they failed to take even the most basic investigative steps—such as records requests, scheduling cross-checks, or interviewing Director Patel and other obvious witnesses—that would have easily refuted their claims; (5) they violated their own internal policies and procedures on journalistic integrity to ensure the Article went to press before a responsible editor could reject it; (6) they ignored a substantial public record of Director Patel's operational successes that was fundamentally inconsistent with their thesis; (7) they were aware that substantially similar false claims were already in active defamation litigation but published a recycled version anyway; (8) they showed clear editorial animus toward Director Patel, having previously predicted—and apparently hoped to manifest—his ouster and repeatedly disparaged him, and the headline itself ("Kash Patel's Erratic Behavior Could Cost Him His Job") revealed their predetermined narrative; and (9) many of their allegations, notably the "breaching equipment" and "had to be woken up" claims, were inherently implausible and contradicted the known realities of how FBI protective details and headquarters security actually operate.

56.    Defendants published the statements knowingly, intentionally, willfully, wantonly, and maliciously, with intent to harm Director Patel, or in blatant disregard for the substantial likelihood of causing him harm.

57.    Defendants' statements have directly and proximately caused Director Patel to suffer actual damages, including harm to his reputation. These damages were foreseeable.

58.    As a direct and proximate result of the misconduct of Defendants, Director Patel is entitled to compensatory, special, and punitive damages, in an

18

amount not less than two hundred and fifty million dollars ($250,000,000), as well as disgorgement of all income Defendants have earned by virtue of their lies about Director Patel.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Kashyap P. Patel, respectfully requests this Court enter a judgment in his favor and grant relief against Defendants, jointly and severally, as follows:

a.    An award of compensatory, special, and punitive damages in an amount not less than two hundred and fifty million dollars ($250,000,000); and

b.    Such other and further relief as the Court deems just and appropriate to protect Director Patel's rights and interests.

Dated: April 20, 2026                          KASHYAP P. PATEL
                                                By Counsel

                                                Respectfully submitted,

                                                */s/Jason C. Greaves*
                                                Jesse R. Binnall, VA022
                                                Jason C. Greaves, DC Bar No. 1033617
                                                Jared J. Roberts, FL00153
                                                BINNALL LAW GROUP
                                                717 King Street, Suite 200
                                                Alexandria, Virginia 22314
                                                Tel:  (703) 888-1943
                                                Fax: (703) 888-1930
                                                jesse@binnall.com
                                                jason@binnall.com
                                                jared@binnall.com

                                                *Counsel for Plaintiff*
                                                *Kashyap P. Patel*

19