# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

KASHYAP P. PATEL,

                       Plaintiff,

        v.

ATLANTIC MONTHLY GROUP LLC;
SARAH FITZPATRICK,

                    Defendants.

Case No.: 1:26-cv-01329-EGS

## <u>DECLARATION OF KATHERINE M. BOLGER</u>

Katherine M. Bolger, pursuant to 28 C.F.R. § 16.22, declares as follows:

1. I am a partner at Davis Wright Tremaine LLP, and counsel to Defendants Atlantic Monthly Group LLC and Sarah Fitzpatrick ("Defendants") in the above-captioned action (the "Action"). In support of their defense in this action, Defendants seek discovery from the United States Department of Justice ("DOJ") and its components, including (1) Kashyap P. Patel, Director of the Federal Bureau of Investigation ("FBI") and Plaintiff ("Director Patel") in this action; (2) the FBI; and (3) individual employees of the DOJ and FBI to be identified in the course of these discovery requests. I submit this declaration pursuant to *U.S. ex rel. Touhy v. Ragen*, 340 U.S. 462 (1951) and 28 C.F.R. §§ 16.21 et seq. to set forth the scope and relevance of this discovery.

2. In the Complaint, Director Patel asserts a defamation claim arising from an April 17, 2026 article published in *The Atlantic* titled "The FBI Director is MIA" (the "Article"). A copy of the Complaint in the Action is annexed hereto as **Exhibit A**, and a copy of the Article is annexed hereto as **Exhibit B**. As described further below, the Article reported on Director Patel's bouts of excessive drinking, unexplained absences, and impulsive actions in connection with his

official duties as FBI Director, including retaliating against FBI employees for political reasons. Ex. B. Relying on internal DOJ and/or FBI records currently unavailable to Defendants, Director Patel alleges that several statements in the Article relating to this reporting are false and defamatory. *See* Ex. A ¶¶ 18, 42. For example, in response to the Article's reporting regarding an incident involving a request for breaching equipment made because Director Patel was unreachable behind locked doors, Director Patel alleged that "[Defendants] never asked for any documentation of the supposed need to breach the Director's office, even though such an incident would have generated multiple written records." *Id.* ¶ 42. Similarly, in response to the Article's reporting that members of Director Patel's security detail had "difficulty waking" him due to apparent intoxication, Director Patel alleged that "[Defendants] never reviewed FBI security-detail protocols that would have shown the 'waking the Director' story was operationally implausible." *Id.* In short, Director Patel's own allegations in this Action repeatedly rely on information within the possession, custody, and/or control of the DOJ, FBI, and/or Director Patel in his official capacity. Given the allegations and Director Patel's leadership of the FBI, Defendants request disclosure from the DOJ, FBI, Director Patel, and individual employees of the DOJ and FBI, as set forth in the subpoenas attached as **Exhibit D** (DOJ)**, Exhibit E** (FBI), and **Exhibit F** (Director Patel).

3.      Disclosure of the requested documents and testimony is consistent with DOJ's *Touhy* regulations, which assess relevance under the governing standard in the forum where the dispute arose, here, the Federal Rules of Civil Procedure. *See* 28 C.F.R. § 16.26(a)(1) (agency must consider whether "such disclosure is appropriate under the rules of procedure governing the case or matter in which the demand arose"). Documents and testimony from the DOJ, FBI, and Director Patel in his official capacity are critical to Defendants' ability to defend themselves in

this Action, and therefore are highly relevant and proportional within the meaning of Rule 26.  As discussed further herein, in order to establish his claims, Director Patel will need to produce evidence that the challenged statements in the Article are materially false, as he has alleged in his Complaint.  *Philadelphia Newspapers v. Hepps*, 475 U.S. 767, 775-776 (1986) (plaintiff bears burden to prove material falsity in defamation action involving reporting on a public figure or matter of public concern).  Defendants are also entitled to obtain evidence that establishes the substantial truth of the Article, tests the conclusory allegations in the Complaint, and establishes Director Patel's reputation pre- and post-publication.  *Id.*  Moreover, Director Patel himself has placed this information at issue by extensively invoking internal DOJ and FBI records throughout his Complaint.  Accordingly, the information is both highly relevant and proportional to the needs of this action under the Federal Rules.

4.      The United States is not reasonably anticipated to be a party in this Action.

## FACTUAL BACKGROUND

### A.      Director Patel Stonewalls Congressional Oversight of his FBI Directorship

5.      Director Patel was sworn in as the ninth Director of the FBI on February 20, 2025.[1] Director Patel's tenure as FBI Director has been marked by significant controversy.  In response, over the last year, members of Congress have repeatedly sought investigation into and information regarding Director Patel's alleged political retaliation against employees perceived to be disloyal, misuse of FBI resources for personal purposes, and mishandling of high-profile investigations.[2] Director Patel, however, has not been forthcoming with information in response to these requests.

---

[1]  "New FBI Director Kash Patel Takes Oath of Office," FBI (Feb. 25, 2025), https://www.fbi.gov/news/stories/new-fbi-director-takes-oath-of-office.
[2] Press Release, Senator Dick Durbin, Durbin: Kash Patel Has Been Personally Directing The Ongoing Purge of FBI Officials (Feb. 11, 2025), https://www.durbin.senate.gov/newsroom/press-

6.      Most recently, on July 8, 2026, Representative Raskin and Senator Durbin sent Director Patel a letter emphasizing his repeated failures to respond to several prior bipartisan congressional requests for information related to his "misuse and mismanagement of Federal Bureau of Investigation (FBI) resources."[3]  Director Patel has not yet publicly responded to this letter.

**B.**      **The Article**

7.      Defendants published the Article on April 17, 2026.  Ex. B.  Relying on interviews with more than two dozen people and other sources, the Article reported on Director Patel's "tumultuous tenure" as FBI Director to date, including reports of his "bouts of excessive drinking," "unexplained absences" from the job, impulsive behavior while performing his official duties, and retaliation against FBI employees perceived to be disloyal.  *Id.* at 2-3, 6-7.

---

releases/durbin-kash-patel-has-been-personally-directing-the-ongoing-purge-of-fbi-officials;
Press Release, Senator Dick Durbin, Durbin Requests Probe Into Justice Department Use of Aircraft For Personal Or Political Purposes (May 7, 2025), https://www.durbin.senate.gov/newsroom/press-releases/durbin-requests-probe-into-justice-department-use-of-aircraft-for-personal-or-political-purposes; Kathryn Watson & Kaia Hubbard, "FBI Director Kash Patel Faces Questions on Charlie Kirk Probe, Epstein Files, Agent Firings at Senate Hearing," CBS (Sept. 16, 2025), https://www.cbsnews.com/live-updates/kash-patel-testimony-senate-judiciary-charlie-kirk-assassination/; Press Release, House Committee on the Judiciary Democrats, Ranking Member Raskin, Rep. Kamlager-Dove Demand FBI Director Kash Patel Reimburse Taxpayers, Produce Records After Using Government Jet for Personal Flights, Lavish Vacations, and Romantic Date Nights (Dec. 1, 2025), https://democrats-judiciary.house.gov/media-center/press-releases/ranking-member-raskin-rep-kamlager-dove-demand-fbi-director-kash-patel-reimburse-taxpayers-produce-records-after-using-government-jet-for-personal-flights-lavish-vacations-and-romantic-date-nights; Press Release, Senate Committee on the Judiciary, Durbin Reveals New Whistleblower Information For Investigation Into Kash Patel Joyriding To The Olympics (Feb. 24, 2026), https://www.judiciary.senate.gov/press/dem/releases/durbin-reveals-new-whistleblower-information-for-investigation-into-kash-patel-joyriding-to-the-olympics.
[3] Letter from Rep. Raskin and Sen. Durbin to Director Patel (July 8, 2026), https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-07-08-raskin-durbin-to-patel-fbi-re-jet-usage-letter.pdf.

8.      The Article reported on several examples emblematic of this conduct.  The Article reported that Director Patel frequently drank to the point of apparent intoxication, including at establishments such as Ned's in Washington, D.C. and the Poodle Room in Las Vegas, and his alleged drinking at times disrupted official FBI business.  *Id.* at 4.  For example, Director Patel's alcohol consumption prompted the rescheduling of meetings and briefings, led his security detail on multiple occasions to have difficulty waking him, and affected the handling of high-profile law-enforcement investigations.  *Id.* at 4-6.

9.      The Article also reported more broadly on Director Patel's job performance, including his irregular presence at FBI headquarters and field offices and impulsive handling of investigations—for example, his premature announcement that the FBI had detained a person of interest in the Brown University shooting and inaccurate sharing of information about the Charlie Kirk murder investigation.  The Article also detailed Director Patel's use of FBI aircraft for personal purposes.  *Id.* at 3-6.

10.     The Article further reported on specific incidents during Director Patel's tenure representative of these concerns, including an April 10, 2026 episode in which Director Patel appeared to have been locked out of his internal computer system, prompting his fears that he had been fired by the White House, as well as a 2025 request for "breaching equipment" after Director Patel had become unreachable behind locked doors.  *Id.* at 2-3.  As the Article reported, Director Patel's conduct overall led sources to describe his directorship as a "management failure" and his "personal behavior as a national-security vulnerability."  *Id.* at 3.

11.     The Article also reported on Director Patel's retaliatory actions against FBI employees for political reasons.  For example, the Article reported on Director Patel's firing of members of a counterintelligence squad because of their work investigating President Trump's

5

handling of classified documents, as well as Director Patel's efforts to "purge . . . people who he believes are anti-[President] Trump 'conspirators' or 'enemies' within the FBI," including those who worked on January 6 cases and other probes into President Trump. *Id.* at 7.

12.     Finally, the Article reported on Director Patel's attention to the appearance of FBI merchandise, specifically that he "recently expressed frustration" with its look because it was not sufficiently "intimidating." *Id*.

## C.     The Action

13.     On April 20, 2026, Director Patel filed the Action, alleging that several individual statements in the Article are defamatory.  These statements fall into five categories, regarding Director Patel's (1) alcohol consumption; (2) absences and unreachability in connection with his official duties; (3) retaliatory firings of those deemed to be disloyal; (4) concerns about his job security; and (5) focus on the FBI's external image, including through merchandise.  Ex. A ¶¶ 18(a)-(q).  All of the allegedly defamatory statements relate to Director Patel's role as FBI Director, and all of the allegedly defamatory statements can be proven true or false by records in the possession of the DOJ and/or FBI, and the testimony of DOJ and/or FBI employees, including Director Patel himself.  A chart setting forth the allegedly defamatory statements is annexed hereto as **Exhibit C**.

14.     In addition, in attempting to refute the Article's reporting as false, the Complaint repeatedly invokes internal DOJ and/or FBI records and information.  For example, as to the breach equipment request, Director Patel alleges that, under "standard protocol," all FBI protection details are provided with breach equipment, and asserts that "no internal incident report" or "SWAT deployment record" indicate otherwise.  Ex. A ¶¶ 21, 41.  The Complaint further relies on internal FBI information and protocols to dispute the Article's reporting regarding Director Patel's

6

attendance, conduct, and management of personnel, alleging, among other things, that Director Patel is "at FBI headquarters nearly every single day," that FBI personnel disciplinary/termination actions are taken only where employees "acted unethically or undermined the mission," that Director Patel's calendar reflects only "approximately 17 personal days," and that "FBI security-detail protocols" refute the report that security personnel had difficulty waking him. *Id.* ¶¶ 24-26. Director Patel also alleges that his security detail denied that he complained about FBI merchandise. *Id.* ¶ 25. To be clear, the presence or absence of any of these purported records or testimony cited by Director Patel does not itself establish material falsity. But Director Patel's *own allegations* make clear that his pleading theory of material falsity—and therefore his ability to proceed with this action—depends heavily on internal DOJ and FBI records and information that Defendants are entitled to test through discovery.

## REQUESTED DISCOVERY

15.    In light of Director Patel's allegations and his role within the FBI, Defendants seek documents and testimony from the DOJ, FBI, DOJ and FBI employees, and Director Patel to obtain information central to their defense in this Action regarding the Article's challenged statements.[4]

16.    Parties are entitled to discovery that is "relevant to a party's claim or defense in the underlying litigation," including from third parties, so long as the discovery is "proportional to the

---

[4] As stated in the subpoenas, at this juncture Defendants identify the following DOJ and FBI employees as relevant witnesses for depositions: (1) Director Patel; (2) members of Director Patel's security detail; (3) Director Patel's staff; (4) Director Patel's communications and public relations team(s); (5) Director Patel's IT staff; (6) DOJ and FBI polygraphers; (7) the Director's Advisory Team; (8) the Director's Special Committee; and (9) the Weaponization Working Group. Defendants reserve the right to identify, substitute, or designate additional Doe witnesses following the production and review of documents and other discovery sufficient to identify individuals with relevant knowledge.

needs of the case." *BuzzFeed v. U.S. Dep't of Just.*, 318 F. Supp. 3d 347, 356, 358 (D.D.C. 2018) (citing Fed. R. Civ. P. 26; Fed R. Civ. P. 45).

17.     Here, the requested discovery is relevant to the most basic element of Director Patel's libel claim—whether the Article is materially false. The First Amendment does not permit liability for defamation "unless *the plaintiff also demonstrates* that the defamatory statement was a false statement of fact."  *See Montgomery v. Risen*, 197 F. Supp. 3d 219, 239 (D.D.C. 2016) (emphasis in original) (citation omitted); *see also id.* ("[T]ruth, whenever discovered, serves as a complete defense [in a defamation action].") (citations omitted), *aff'd*, 875 F.3d 709 (D.C. Cir. 2017); *Chau v. Lewis*, 771 F.3d 118, 129 (2d Cir. 2014) ("Falsity of a statement is needed to make out a claim of libel.").  This Action is brought by the sitting Director of the FBI and directly concerns reporting on his management of, conduct within, and performance of that public official role.  The DOJ, FBI, and Director Patel possess information bearing directly on the truth of the Article's reporting—including documents and testimony that would establish the details surrounding his alcohol consumption, his whereabouts as FBI Director, and the details of retaliatory actions against FBI employees conducted at his behest.  Defendants therefore require discovery concerning the truth of the underlying allegations at issue to demonstrate that Director Patel cannot carry his burden of proving material falsity.

18.     Because the information held by the DOJ, FBI, and Director Patel is critical to this case, pursuant to Federal Rules of Civil Procedure 26, 30(b)(6) and 45, and 28 C.F.R. § 16.22, Defendants are herewith serving upon the DOJ, FBI, and Director Patel subpoenas for relevant and material testimony and documents. Exhibit D (DOJ), Exhibit E (FBI), and Exhibit F (Director Patel) contain the subpoenas and the precise areas of testimony sought, the specific documents

requested and the instructions and definitions that are intended to assist in the interpretation of these requests for discovery.

19.    Specifically, the annexed subpoenas seek testimony and documents related to each of the allegedly defamatory statements. *See* Exs. D-F.

20.    For example, several of the Requests (Requests 1-14, 84-86) bear on information relevant across all categories of the challenged statements by seeking to identify the identity of key individuals—for example, members of Director Patel's staff, security detail, advisory groups, and travel and calendar-access personnel—likely to have information related to Director Patel's alcohol consumption, absences and unreachability, retaliatory firings, concerns about his job security, and focus on image.  They also seek information in connection with Congress's repeated calls for information regarding Director Patel's management of the FBI, use of government resources, and termination of FBI employees, as well as information about this Action and Defendants.

21.    Several requests (Requests 47-51) relate to Category 1 (Statements 1-9) regarding Director Patel's alcohol consumption. For example, these Requests seek, among other things, disclosures and/or vetting materials in connection with Director Patel's confirmation and position; annual ethics filings such as Forms OGE 450 or OGE 278; any drug or alcohol testing, examination, or questionnaire administered to or discussed with Director Patel; reimbursements to the DOJ or FBI made by or in connection with Director Patel; Director Patel's membership or attendance at private clubs, social spaces, recreational facilities; and Director Patel's receipts in connection with these outings. *See also* Requests 44-46 (requests related to statements made by Director Patel about ongoing law enforcement investigations, as discussed in the Article); Requests 62-63 (requests related to internal and external complaints involving Director Patel or his staff).

9

22.     Several requests (Requests 15-37) relate to Category 2 (Statements 10-12) regarding Director Patel's absences and unreachability.  For example, these Requests seek information regarding Director Patel's attendance and whereabouts in connection with his official duties, as well as the specific breaching equipment and April 10, 2026 IT-lock-out incidents reported in the Article. These requests seek records like Director Patel's Calendars, schedule, and physical presence at FBI Installations; and all domestic and international travel by Director Patel and his security detail, including related expenses, per diems, reimbursements, passport use, and use of FBI or government aircraft. *See also* Requests 38-43 (seeking FBI security-detail protocols, and the storage, assignment, requisition, and use of Breaching Equipment in connection with Director Patel, his staff, or his security detail); Requests 60-61 (photo and video records showing Director Patel's entry to, exit from, or access to any FBI Installation, personal residence, or the Director's Suite.).

23.     Several requests (Requests 52, 64-83) relate to Category 3 (Statements 13-14) regarding Director Patel's retaliatory firings.  For example, these Requests seek records involving terminated employees, including the criteria, process, and approval of the terminations of Summarily Terminated Employees, and the administration of polygraphs in connection with perceived disloyalty.

24.     Several requests (Requests 7, 17-19, 61) relate to Category 4 (Statements 15-16) regarding Director Patel's job security concerns.  For example, these Requests seek information relating to the April 10, 2026 IT lock-out incident, in which Director Patel called "aides and allies to announce that he had been fired by the White House."  Ex. 1 at 2.

25.     Finally, several requests (Requests 53-59) relate to Category 5 (Statement 17), regarding Director Patel's focus on his image and that of the FBI.  For example, these Requests

seek information related to the creation, approval, production, and provision of FBI merchandise, challenge coins, or bourbon bottles depicting Director Patel's name, image, signature, or likeness, or any portion or approximation thereof (including the monikers K$H or Ka$H), and any related gifts or reimbursements, as well as bonuses awarded by Director Patel.

26.    All of these materials bear directly both on the truth of the Article, as well as Director Patel's reputation before and after the Article's publication, which, under Rule 26 are undisputedly relevant to the claims and defenses and proportional to the needs of this Action.

27.    Counsel for Defendants in this case are also open to, and indeed, invite, discussion with counsel for the Government concerning the potential scope of the testimony and other discovery sought therein.

I declare under penalty of perjury that the foregoing is true and correct.


Executed on July 27, 2026

By: _____

Katherine M. Bolger

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

KASHYAP P. PATEL,
c/o Binnall Law Group
717 King Street, Suite 200
Alexandria, Virginia 22314

   *Plaintiff,*

v.

THE ATLANTIC MONTHLY GROUP LLC,
600 New Hampshire Avenue, NW
Washington, D.C. 20037

and

SARAH FITZPATRICK,
███████████████████████

   *Defendants.*

Case No.: 1:26-cv-1329

## COMPLAINT

1.      Kashyap P. Patel, the Director of the Federal Bureau of Investigation, brings this lawsuit to hold Defendants The Atlantic Monthly Group LLC  and its staff writer, Sarah Fitzpatrick, accountable for a sweeping, malicious, and defamatory hit piece published on April 17, 2026. Defendants are of course free to criticize the leadership of the FBI, but they crossed the legal line by publishing an article replete with false and obviously fabricated allegations designed to destroy Director Patel's reputation and drive him from office. Indeed, Fitzpatrick could not get a single person to go on the record in defense of these outrageous allegations, instead relying entirely on anonymous sources she knew to be both highly partisan with an ax to grind and also not in a position to know the facts. Defendants published the Article with actual malice, despite being expressly warned, hours

before publication, that the central allegations were categorically false; despite having abundant publicly available information contradicting those allegations; despite obvious and fatal defects in their own sourcing; despite *The Atlantic*'s well-documented, long-running editorial animus toward Director Patel; despite a request for additional time to respond that Defendants refused to honor; and despite deliberately structuring the pre-publication process to avoid receiving information that would refute their narrative. Defendants cannot evade responsibility for their malicious lies by hiding behind sham sources.

## PARTIES

2.     Plaintiff Kashyap P. Patel is an individual who is a resident and citizen of Nevada. He is the Director of the Federal Bureau of Investigation.

3.     Defendant The Atlantic Monthly Group LLC ("AMG") is a media company that publishes *The Atlantic* magazine and its associated website, theatlantic.com. AMG is headquartered in Washington, D.C. No member of AMG is a citizen of Nevada.

4.     Defendant Sarah Fitzpatrick is an individual who is a resident and citizen of the District of Columbia. She is a staff writer at *The Atlantic* covering national security and the Department of Justice.

## JURISDICTION AND VENUE

5.     This Court has subject matter jurisdiction over this cause of action pursuant to 28 U.S.C. § 1332 as there is complete diversity of citizenship and the amount in controversy exceeds $75,000.

6.     Defendants are subject to personal jurisdiction in the District of Columbia because  Defendant AMG is headquartered in this District and published

2

the defamatory Article from this District. Defendant Fitzpatrick resides in, works in, and researched, reported, and published the Article from this District.

7.     Venue for this action is proper pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to this action occurred in this District, and because Defendants reside in this District.

## FACTUAL BACKGROUND

### Director Patel and the FBI under his leadership.

8.     Director Patel is the Director of the Federal Bureau of Investigation ("FBI"), having been sworn in on February 20, 2025.

9.     Under Director Patel's leadership, the FBI has achieved historic law enforcement results, including:

a. the capture of 8 of the FBI's 10 Most Wanted fugitives (twice as many in this Administration alone as during the entirety of the prior Administration);

b. more than 40,000 violent crime arrests, reflecting a 112% increase in violent crime arrests over 2024, alongside a 20% decrease in homicide rate, a 20% decrease in robberies, and a 10% decrease in aggravated assaults;

c. the disruption of more than 2,000 gangs and criminal enterprises (up 210%);

d. the location of more than 6,300 child victims (up 30%) and the arrest of more than 2,200 child predators (up 17%), together with the termination of more than 3.8 million pedophile accounts on the Dark Web;

e. the seizure of more than 2,500 kilograms of fentanyl (up 31%), enough to kill more than 189 million people, contributing to a nearly 20% decline in U.S. opioid overdose deaths compared to 2024;

f. espionage arrests up by 43% from 2024;

3

g. more than 456 cyber indictments (up 27%), 257 cyber arrests, 190 cyber convictions, 358 cyber disruptions, and 29 cyber dismantlements (up 16%);

h. more than 760 counterterrorism arrests, including a 490% increase in NVE arrests and a 20% increase in arrests related to the 764 network;

i. the successful disruption of 670 individuals from conducting terrorist attacks;

j. more than 264 counterterrorism convictions; and

k. the seizure of more than 275 firearms related to counterterrorism cases.

10. These results have coincided with a publicly reported, historic decrease in violent crime and align with the White House's own statement, provided to Defendants before publication, that "crime across the country has plummeted to the lowest level in more than 100 years and many high-profile criminals have been put behind bars."

### *The Atlantic*'s pre-existing animus toward Director Patel.

11. AMG, through *The Atlantic*, has for months pursued a demonstrable editorial campaign to damage Director Patel's reputation and force him from office.

12. Prior to the publication at issue, *The Atlantic* reported that Director Patel was "on the chopping block," signaling an editorial predisposition to cast his tenure as failing.

13. On or about April 2, 2026, Defendant Fitzpatrick and her colleague Ashley Parker authored an article predicting Director Patel's imminent firing from his position—which Fitzpatrick explicitly cites and builds upon in the April 17, 2026 Defamatory Article, self-referentially reinforcing AMG's pre-formed narrative.

14. AMG's conduct toward Director Patel is part of a broader and well-documented pattern. Numerous *Atlantic* pieces over the past two years have

4

characterized Director Patel as unqualified, dangerous, corrupt, or mentally unstable.

### The Defamatory Article.

15.     On April 17, 2026, at approximately 6:20 PM EDT, Defendants published an article on theatlantic.com and in AMG's associated platforms, originally headlined "Kash Patel's Erratic Behavior Could Cost Him His Job," with the sub-headline, "The FBI director has alarmed colleagues with episodes of excessive drinking and unexplained absences" (the "Article").[1]

16.     The Article's very headline telegraphed its intended outcome: it was not journalism about a subject; it was advocacy against Director Patel. Defendants made no effort to disguise their aim.

17.     The Article was widely disseminated on the internet, through AMG's magazine and associated platforms, and was foreseeably republished, summarized, and discussed throughout national and international media.

18.     The Article included numerous false and defamatory statements of fact concerning Director Patel, including but not limited to:

   a.   That Director Patel "is known to drink to the point of obvious intoxication, in many cases at the private club Ned's in Washington, D.C., while in the presence of White House and other administration staff."

   b.   That Director Patel "is also known to drink to excess at the Poodle Room in Las Vegas, where he frequently spends parts of his weekends."

   c.   That "[e]arly in his tenure, meetings and briefings had to be rescheduled for later in the day as a result of his alcohol-fueled nights."

---

[1] Defendant AMG, at some point on April 19, 2026, stealth-edited the Article's main headline, which now reads "The FBI Director is MIA".

d. That "[o]n multiple occasions in the past year, members of his security detail had difficulty waking Patel because he was seemingly intoxicated, according to information supplied to Justice Department and White House officials."

e. That "[a] request for 'breaching equipment'—normally used by SWAT and hostage-rescue teams to quickly gain entry into buildings—was made last year because Patel had been unreachable behind locked doors."

f. That Director Patel's alleged alcohol consumption has negatively impacted various law-enforcement investigations, including the Charlie Kirk murder investigation.

g. That Director Patel "recently expressed frustration with the look of FBI merchandise, complaining that it isn't intimidating enough."

h. That on April 10, 2026, Director Patel "panicked, frantically calling aides and allies to announce that he had been fired by the White House," and that his behavior was a "freak-out."

i. That Director Patel is "often away or unreachable, delaying time-sensitive decisions needed to advance investigations," and that on several occasions, Director Patel's "delays resulted in normally unflappable agents 'losing their shit.'"

j. That Director Patel's "drinking has been a recurring source of concern across the government."

k. The false implication that Director Patel violated DOJ's ethics rules prohibiting "habitually using alcohol or other intoxicants to excess."

l. That Director Patel has used his position to improperly "target political or personal adversaries of the president."

m. The false implication that Director Patel abuses alcohol, thereby making him vulnerable to exploitation or coercion by foreign adversaries.

n. The false implication that this alleged alcohol abuse "has become a threat to public safety," including in the context of "a domestic terrorist attack," and constitutes a national-security vulnerability.

o. That Director Patel "is deeply concerned that his job is in jeopardy."

6

p. That Director Patel has had a problem with "unexplained absences," and "spotty attendance at the office," thereby falsely implying that Director Patel has been derelict in his duties.

q. That Director Patel left the country vulnerable because "Days before the United States launched its war with Iran, Patel fired members of a counterintelligence squad that was devoted, in part, to Iran."

19. Each of the foregoing statements and implications is false. They are so demonstrably and obviously false, or easily refuted, that it was at best reckless to publish them.

20. The Article's assertions that Director Patel drinks to the point of obvious intoxication at Ned's in Washington, D.C. and to excess at the Poodle Room in Las Vegas, and that his drinking "has been a recurring source of concern across the government," are false. Director Patel does not drink to excess at these establishments or anywhere else, and this has not, and has never been, a source of concern across the government. Prior to publication, the FBI expressly informed Defendants that each of these allegations was "totally false." The FBI further warned Defendants that these allegations echoed a similar fabrication previously aired by MSNBC's Frank Figliuzzi on *Morning Joe*—anonymously sourced reporting that was later retracted by MSNBC and that is the subject of pending defamation litigation—yet Defendants published it anyway.

21. The Article's claims that early in Director Patel's tenure meetings and briefings were rescheduled due to "alcohol-fueled nights," that members of his security detail had difficulty waking him because he was "seemingly intoxicated," and that a request for "breaching equipment" was made because he had been unreachable behind locked doors, are false. None of these events occurred. Prior to publication, the FBI expressly informed Defendants that these claims were "totally false," "made up," and "made up to the point of satire." As is standard protocol,

easily verified, and would have been known by any credible FBI source, breach equipment is provided to all FBI protection details. The claim that it was requested or provided to Director Patel's detail because he "had been unreachable behind locked doors" is pure fantasy.

22. The Article's assertions and implications that Director Patel's alleged alcohol consumption negatively impacted law-enforcement investigations (including the Charlie Kirk murder investigation), violated DOJ ethics rules against habitual intoxicant use, rendered him vulnerable to foreign adversary coercion, and constituted a threat to public safety and national security—including in the context of a domestic terrorist attack—are false. Prior to publication, the FBI expressly informed Defendants that these claims were "100% false," and that under Director Patel's leadership, the FBI has just delivered its most successful year in decades, with a historic drop in violent crime, a 20% drop in the national murder rate, a 31% increase in fentanyl seizures, and the successful disruption of multiple terror plots.

23. The Article's assertions that on April 10, 2026, Director Patel "panicked, frantically" announcing he had been fired, engaged in a "freak-out," and "is deeply concerned that his job is in jeopardy," are false. On April 10, 2026, Director Patel had a routine technical problem logging into a government system, which was quickly fixed. Director Patel's sole focus is on carrying out the administration's law enforcement priorities. Prior to publication, the FBI expressly informed Defendants that the firing rumor was a "made-up rumor," and that the "freak-out" and job-jeopardy claims were fabricated.

24. The Article's assertions that Director Patel is "often away or unreachable," causing delays that made agents "lose their shit," and that he has "unexplained absences" and "spotty attendance at the office," are false. Director Patel is at FBI headquarters nearly every single day, and when he is not at headquarters, he is visiting field offices—which he has done more frequently than

8

any of his predecessors, a fact independently verifiable through his public social media account that Defendants were specifically directed to review. Prior to publication, the FBI expressly informed Defendants that these claims were "completely made up and divorced from reality," and when pressed to identify any officials, instances, or absences supporting the claims, Defendants offered none.

25.     The Article's assertions that Director Patel has used his position to "target political or personal adversaries of the president"; that he complained that the FBI merchandise "isn't intimidating enough"; and that days before the U.S. launched its war with Iran, he "fired members of a counterintelligence squad that was devoted, in part, to Iran," leaving the country vulnerable, are each false. Director Patel has not targeted political or personal adversaries; FBI personnel actions are taken only where employees have acted unethically or undermined the mission. His security detail confirmed that he has made no such complaint about FBI merchandise. And the squad referenced was within Counterterrorism—not a dedicated Iran counterintelligence squad—with only three affected individuals even tangentially working on Iran-related matters. Prior to publication, the FBI expressly informed Defendants that each of these claims was false, including that the merchandise claim was "absolutely, 100% false" and the Iran-squad claim "is not true."

26.     Furthermore, Director Patel has taken significantly fewer personal days than either of his two immediate predecessors. In calendar year 2025, Director Patel took approximately 17 personal days—fewer than Director Wray averaged in any single year of his 7.5-year tenure, during which Wray accumulated roughly 242 personal days (including approximately 37 in 2024 alone, 31 in 2023, and 33 in 2022). Director Comey likewise took approximately 130 personal days over his 4-year tenure, including roughly 63 in 2014 and 42 in 2015, when he routinely traveled home to New York every weekend or every other weekend. Put simply,

Director Patel's personal-day usage in 2025 is less than half of Wray's yearly average and a small fraction of Comey's peak years.

27.     Even after stealth-editing their headline over the weekend, in a feable attempt to reduce the appearance of partisan animus, Defendants have doubled down on their knowingly false claims in an X post, made this very morning in the pre-dawn hours that reads:

> Kash Patel's colleagues are alarmed by what they say is erratic behavior and excessive drinking, Sarah Fitzpatrick reports. More than two dozen people she spoke with described his management failures and conduct that could harm national security.[2]

As discussed above, these claims about erratic behavior and excessive drinking are fabricated, and Defendants were on notice of this. As dicussed below, Fitzpatrick knows that her anonymous sources, unwilling to go on the record, are partisans with axes to grind and are not in a position to know the facts.

**Defendants' conduct exhibits actual malice.**

28.     Defendants' "investigation" of the claims in the Article was grossly deficient—and deliberately so. Defendants did not pursue obvious investigative leads, did not engage with publicly available counter-evidence—even evidence that was directly provided to them, did not afford a reasonable opportunity to respond, and did not conduct the most basic fact-checking that a responsible publication undertakes before attempting to destroy a public official's reputation, even after the FBI explained to Defendants, on the record, that their claims were false, as illustrated above.

29.     In fact, Defendants ignored their own policies and procedures, rushing the story to print without substantively fact-checking the allegations or giving

---

[2] *The Atlantic* (@TheAtlantic), X (Apr. 20, 2026, 3:15 AM), https://x.com/theatlantic/status/2046125479418081772?s=42.

Director Patel a meaningful opportunity to respond—all to publish before the truth could be exposed and derail the Article.

30.     On April 17, 2026, at 2:09 PM EDT—the same day of publication— AMG transmitted to the FBI Office of Public Affairs ("FBI OPA") a purported "request for comment" containing nineteen substantive claims about Director Patel. AMG imposed an arbitrary and unreasonable deadline of 4:00 PM EDT—less than two hours—for the FBI to respond to nineteen detailed allegations concerning complex issues of national security, personnel files, security-detail logs, internal facilities logs, and personal conduct.

31.     The two-hour window was pretextual. No reasonable journalist investigating such serious charges—involving alleged need for a SWAT-style breach of the Director's office, alleged alcohol abuse by the head of the nation's preeminent law-enforcement agency, alleged falsehoods about an active homicide investigation, and alleged national-security compromise—would have demanded a substantive response within 111 minutes. Defendants imposed that window precisely to manufacture a "no comment" or a summary denial, insulate themselves from the substance of the FBI response, and publish before the truth could catch up with them.

32.     FBI OPA, through Assistant Director Williamson, responded before publication that AMG's claims were "one of the most absurd things I've ever read. Completely false at a nearly 100% clip." Defendants buried this striking language, never reported it, and chose to publish the claims anyway. They included only a generic, truncated denial attributed to Director Patel ("Print it, all false, I'll see you in court - bring your checkbook"). The FBI also, as illustrated above, provided substantive refutations of Defendants' claims, which Defendants entirely ignored.

33.     Also on April 17, 2026, before publication, Director Patel's counsel sent Fitzpatrick, AMG's legal department, and AMG's senior editors a detailed letter

(the "Pre-Publication Letter") further substantively refuting AMG's false claims on the record, providing publicly available counter-evidence, and demanding that AMG not publish them.

34.     The Pre-Publication Letter expressly requested that Defendants afford Director Patel and the FBI "a full and reasonable opportunity to respond" to the nineteen allegations—necessarily requiring additional time beyond the arbitrary two-hour window Defendants had imposed.

35.     Defendants refused. They did not extend the deadline. They did not even respond to the Pre-Publication Letter. They did not acknowledge the publicly available counter-evidence identified therein. They did not retract or modify the false statements identified. They made no meaningful response at all. They simply ignored the Pre-Publication Letter and published the false claims a few hours later.

36.     Defendants' conscious decision to ignore the detailed, specific, and substantive refutations in the Pre-Publication Letter, and their refusal to give a reasonable amount of time for the FBI and Director Patel to respond, is among the strongest possible evidence of actual malice. A reporter or publisher genuinely concerned with accuracy does not brush aside a detailed, on-the-record refutation from counsel identifying specific falsehoods and offering counter-evidence; does not refuse a good-faith request for additional response time on nineteen complex allegations; and does not publish anyway, unchanged, hours later.

37.     In addition to FBI OPA's pre-publication denial, Defendants received on-the-record statements from senior administration officials that contradicted the Article's core premise.

38.     White House Press Secretary Karoline Leavitt told Defendants that under President Trump and Director Patel, "crime across the country has plummeted to the lowest level in more than 100 years and many high profile

12

criminals have been put behind bars," and that "Director Patel remains a critical player on the Administration's law and order team."

39. Acting Attorney General Todd Blanche told Defendants that "Patel has accomplished more in 14 months than the previous administration did in four years" and that "[a]nonymously sourced hit pieces do not constitute journalism."

40. Defendants included these statements in the Article only to brush them aside. They made no effort to reconcile these on-the-record denials—backed by documented, publicly reported law-enforcement successes—with the Article's central thesis that Director Patel is a derelict and erratic leader, who abuses alcohol to the point of being unfit for his duties.

41. Defendants also ignored or willfully avoided an extensive public record directly contradicting their narrative. A responsible reporter, a competent editor, or a non-reckless fact-checker would have taken notice of, among other things, the following:

a. The FBI's extensive, contemporaneous, and publicly documented operational output under Director Patel, partially detailed in Paragraph 9 above—including FBI and DOJ press releases announcing Operation Restore Justice, Operation Black Rose, the capture of the #8 Top Ten fugitive, and numerous counterterrorism and counterintelligence disruptions. These operational successes are inconsistent with a director who is "often away or unreachable" or too intoxicated to do his job.

b. Director Patel's robust public schedule and visible, documented presence at FBI headquarters, field offices, joint operations, press conferences, congressional appearances, and on-the-ground deployments to active investigations—all of which are documented in FBI public communications, photographs, video, and contemporaneous press coverage. Defendants' claim that Director Patel is "often away or unreachable" could have been tested against, and would have been refuted by, the public record of his appearances and activities, as well as by any FBI official or colleague willing to go on the record.

13

c. Director Patel's congressional testimony and briefings, which are publicly recorded and which depict a director who is engaged, substantively prepared, and actively directing bureau operations.

d. The absence of any corroborating public record for the sensational "breaching equipment" claim—no internal incident report, no SWAT deployment record, no news report, no photograph, no complaint. A single call to any knowledgeable source inside the bureau's security division, or a simple FOIA/records inquiry, would have easily exposed the fabricated nature of this claim.

e. The publicly available history of prior, substantially similar false claims that were publicly rebutted by AD Williamson and that are the subject of active defamation litigation filed by Director Patel. Defendants either knew or should have known that the sources recycling these tropes lacked credibility.

42. A minimally competent journalist investigating allegations this serious would have taken several basic, obvious steps before publication. Defendants took none of them. They never reviewed FBI security-detail protocols that would have shown the "waking the Director" story was operationally implausible. They never asked for any documentation of the supposed need to breach the Director's office, even though such an incident would have generated multiple written records. They never contacted Ned's or the Poodle Room for corroboration, nor sought credit-card records, photographs, or witness statements. They never cross-checked Director Patel's public schedule against the claim that meetings had to be rescheduled for "alcohol-fueled nights." They made no serious effort to determine whether their anonymous sources had been disciplined or removed by Director Patel and therefore had obvious motives to lie. They refused a reasonable request for additional time to respond to nineteen detailed, albeit ridiculous, allegations. They ignored a detailed pre-publication letter from counsel identifying specific falsehoods and supplying counter-evidence. And they never interviewed Director Patel himself or gave him any meaningful opportunity to address the charges in his own words. This is not negligence. It demonstrates a deliberate and malicious smear.

14

43.     The vast majority of the defamatory claims in the Article rely solely on vague, unattributed sourcing such as "people familiar with the matter," "some have characterized," "officials said," "former advisers," and similar formulations. Any such purported sources could not possibly possess firsthand knowledge of the events described, both because the sources were not in a position to know and because the events described did not occur. Defendants' complete and total reliance on these anonymous sources—Defendants could not get a *single person* to go on the record, nor could they cite a *single* email or piece of documentary evidence—for such breathtaking and scurrilous allegations, once again is not negligence. It demonstrates a deliberate and malicious smear.

44.     The Article itself reveals that Defendants understood their sources were animated by hostility. Defendants relied on "former advisers" and "political operatives"—categories of sources with obvious axes to grind. Defendant Fitzpatrick knew this. As to the allegedly current officials cited in the Article, their animus toward Director Patel is readily apparent and known to Fitzpatrick, stating that such officials "have learned to roll their eyes at" at Director Patel's actions, and one official going so far as to say "Part of me is glad he's wasting his time on bullshit, because it's less dangerous for rule of law, for the American public." Also known to Fitzpatrick was that both the former and allegedly current sources lacked any legitimate access to the specific operational, security, and personal facts they purported to describe.

45.     Contrary to these anonymous, nescient, and obviously ax-grinding sources, official representatives of the FBI, Department of Justice, and The White House all emphatically denied Defendants' allegations, on the record.

46.     Furthermore, in May 2025, a former FBI official made a suspiciously similar false claim about Director Patel on MSNBC's *Morning Joe*. That anonymously sourced claim—that Director Patel had been "visible at nightclubs far

15

more than he has been on the seventh floor of the Hoover building"—resulted in active, ongoing defamation litigation filed by Director Patel in the United States District Court for the Southern District of Texas. AD Williamson has publicly rebutted that claim and others like it, and MSNBC itself acknowledged the claim was a "misstatement" that had not been "verified."

47. Defendants were aware of both the prior false statements and Director Patel's vigorous public and legal refutation of them. The parallel between the Article's "drink to excess at the Poodle Room in Las Vegas" narrative and the defamatory *Morning Joe* claim is unmistakable. Despite this, Defendants chose to publish a similar—and even more outlandish—set of false allegations, plainly drawing on the same currents of rumor that had already been publicly discredited and were in litigation.

48. The fact that Defendants elected to republish, in different form, claims that had already been debunked and were in active litigation is additional evidence that Defendants either knew their claims were false or acted with reckless disregard for the truth.

49. The totality of these circumstances reflects a purposeful avoidance of the truth. Defendants did not simply fail to check facts. They received a detailed pre-publication letter and emails identifying those facts and ignored it. They received a request for additional time to respond and denied it. They received a categorical denial from the FBI and buried it. They deliberately structured their pre-publication process to avoid facts that would have contradicted their narrative, and then published that narrative in defiance of the facts they could not avoid.

50. The Article has been republished, summarized, and discussed in countless other media outlets, multiplying the harm to Director Patel exponentially.

16

**CAUSES OF ACTION**

**COUNT I**
**Defamation and Defamation Per Se**

51.     Plaintiff incorporates by reference the above paragraphs as though set forth fully herein.

52.     The statements identified in Paragraphs 18 and 27 are false statements of fact concerning Director Patel.

53.     Defendants published these statements to third parties by publishing them in *The Atlantic* magazine and on theatlantic.com, and by causing them to be further disseminated.

54.     These statements constitute defamation per se because their defamatory meaning is obvious on their face. The statements falsely assert that the Director of the FBI—the nation's chief federal law-enforcement officer—is a habitual drunk, unable to perform the duties of his office, is a threat to public safety, is vulnerable to foreign coercion, has violated DOJ ethics rules, is unreachable in emergencies, has required the deployment of "breaching equipment" to extract him from locked rooms, allows alcohol to influence his public statements about criminal investigations, and behaves erratically in a manner that compromises national security. These statements injure Director Patel in his profession, accuse him of misconduct in his office, and impute to him conduct incompatible with the proper exercise of his duties.

55.     Defendants published these statements with actual malice, as detailed above and as follows: (1) they were expressly warned multiple times before publication—by FBI OPA, Director Patel's counsel, the White House, and the Acting Attorney General—that the central claims were false, including a detailed pre-publication letter identifying specific falsehoods and a categorical on-the-record denial calling the allegations "completely false at a nearly 100% clip," yet they

17

ignored it all; (2) they imposed a pretextual two-hour comment window that was obviously designed to prevent meaningful response and refused to extend it when asked; (3) they relied exclusively on anonymous sources with known motives to fabricate or exaggerate and lacked credible firsthand knowledge; (4) they failed to take even the most basic investigative steps—such as records requests, scheduling cross-checks, or interviewing Director Patel and other obvious witnesses—that would have easily refuted their claims; (5) they violated their own internal policies and procedures on journalistic integrity to ensure the Article went to press before a responsible editor could reject it; (6) they ignored a substantial public record of Director Patel's operational successes that was fundamentally inconsistent with their thesis; (7) they were aware that substantially similar false claims were already in active defamation litigation but published a recycled version anyway; (8) they showed clear editorial animus toward Director Patel, having previously predicted—and apparently hoped to manifest—his ouster and repeatedly disparaged him, and the headline itself ("Kash Patel's Erratic Behavior Could Cost Him His Job") revealed their predetermined narrative; and (9) many of their allegations, notably the "breaching equipment" and "had to be woken up" claims, were inherently implausible and contradicted the known realities of how FBI protective details and headquarters security actually operate.

56.     Defendants published the statements knowingly, intentionally, willfully, wantonly, and maliciously, with intent to harm Director Patel, or in blatant disregard for the substantial likelihood of causing him harm.

57.     Defendants' statements have directly and proximately caused Director Patel to suffer actual damages, including harm to his reputation. These damages were foreseeable.

58.     As a direct and proximate result of the misconduct of Defendants, Director Patel is entitled to compensatory, special, and punitive damages, in an

amount not less than two hundred and fifty million dollars ($250,000,000), as well as disgorgement of all income Defendants have earned by virtue of their lies about Director Patel.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Kashyap P. Patel, respectfully requests this Court enter a judgment in his favor and grant relief against Defendants, jointly and severally, as follows:

a. An award of compensatory, special, and punitive damages in an amount not less than two hundred and fifty million dollars ($250,000,000); and

b. Such other and further relief as the Court deems just and appropriate to protect Director Patel's rights and interests.

Dated: April 20, 2026

KASHYAP P. PATEL
By Counsel

Respectfully submitted,

*/s/Jason C. Greaves*
Jesse R. Binnall, VA022
Jason C. Greaves, DC Bar No. 1033617
Jared J. Roberts, FL00153
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
jason@binnall.com
jared@binnall.com

*Counsel for Plaintiff*
*Kashyap P. Patel*

19

# EXHIBIT B

POLITICS

# The FBI Director Is MIA

Kash Patel has alarmed colleagues with episodes of excessive drinking and unexplained absences.

By Sarah Fitzpatrick



Michael M. Santiago / Getty

APRIL 17, 2026          SHARE AS GIFT 🎁     DISCUSS 1098     SAVE 🔖

*This article was featured in the One Story to Read Today newsletter. Sign up for it here.*

ON FRIDAY, APRIL 10, as FBI Director Kash Patel was preparing to leave work for the weekend, he struggled to log on to an internal computer system. He quickly became convinced that he had been locked out, and he panicked, frantically calling aides and allies to announce that he had been fired by the White House, according to nine people familiar with his outreach. Two of these people described his behavior as a "freak-out."

Patel oversees an agency that employs roughly 38,000 people, including many who are trained to investigate and verify information that can be presented under oath in a court of law. News of his emotional outburst ricocheted through the bureau, prompting chatter among officials and, in some corners of the building, expressions of relief. The White House fielded calls from the bureau and from members of Congress asking who was now in charge of the FBI.

ADVERTISEMENT



It turned out that the answer was still Patel. He had not been fired. The access problem, two people familiar with the matter said, appears to have been a technical error, and it was quickly resolved. "It was all ultimately bullshit," one FBI official told me.

But Patel, according to multiple current officials, as well as former officials who have stayed close to him, is deeply concerned that his job is in jeopardy. He has good reasons to think so—including some having to do with what witnesses described to me as bouts of excessive drinking. My colleague Ashley Parker and I reported earlier this month that Patel was among the officials expected to be fired after Attorney General Pam Bondi's ouster, on April 2. "We're all just waiting for the word" that Patel is officially out of the top job,

2

an FBI official told me this week, and a former official told my colleague Jonathan Lemire that Patel was "rightly paranoid." Senior members of the Trump administration are already discussing who might replace him, according to an administration official and two people close to the White House who were familiar with the conversations.

In response to a detailed list of 19 questions, the White House spokesperson Karoline Leavitt told me in a statement that under Donald Trump and Patel, "crime across the country has plummeted to the lowest level in more than 100 years and many high profile criminals have been put behind bars. Director Patel remains a critical player on the Administration's law and order team." Acting Attorney General Todd Blanche told me in a statement, "Patel has accomplished more in 14 months than the previous administration did in four years. Anonymously sourced hit pieces do not constitute journalism."

The FBI responded with a statement, attributed to Patel: "Print it, all false, I'll see you in court—bring your checkbook."

Read: Trump's purge may be just beginning

The IT-lockout episode is emblematic of Patel's tumultuous tenure as director of the FBI: He is erratic, suspicious of others, and prone to jumping to conclusions before he has necessary evidence, according to the more than two dozen people I interviewed about Patel's conduct, including current and former FBI officials, staff at law-enforcement and intelligence agencies, hospitality-industry workers, members of Congress, political operatives, lobbyists, and former advisers. Speaking on the condition of anonymity to discuss sensitive information and private conversations, they described Patel's tenure as a management failure and his personal behavior as a national-security vulnerability.

They said that the problems with his conduct go well beyond what has been previously known, and include both conspicuous inebriation and unexplained absences. His behavior has often alarmed officials at the FBI and the Department of Justice, even as he won support from the White House for his eager participation in Trump's effort to turn federal law enforcement against the president's perceived political enemies.

3

Several officials told me that Patel's drinking has been a recurring source of concern across the government. They said that he is known to drink to the point of obvious intoxication, in many cases at the private club Ned's in Washington, D.C., while in the presence of White House and other administration staff. He is also known to drink to excess at the Poodle Room, in Las Vegas, where he frequently spends parts of his weekends. Early in his tenure, meetings and briefings had to be rescheduled for later in the day as a result of his alcohol-fueled nights, six current and former officials and others familiar with Patel's schedule told me.

On multiple occasions in the past year, members of his security detail had difficulty waking Patel because he was seemingly intoxicated, according to information supplied to Justice Department and White House officials. A request for "breaching equipment"—normally used by SWAT and hostage-rescue teams to quickly gain entry into buildings—was made last year because Patel had been unreachable behind locked doors, according to multiple people familiar with the request.

Some of Patel's colleagues at the FBI worry that his personal behavior has become a threat to public safety. An FBI director is expected to be available and focused on his job—especially when the nation is at war with a state sponsor of terrorism. Current and former officials told me that they have long worried about what would happen in the event of a domestic terrorist attack while Patel is in office, and they said that their apprehension has increased significantly in the weeks since Trump launched his military campaign against Iran. "That's what keeps me up at night," one official said.

PATEL ARRIVED AT THE FBI in early 2025 as a deeply polarizing figure. He had risen from being a public defender in Miami to a congressional aide and, ultimately, a national-security official during the first Trump administration. During Patel's confirmation hearing to be FBI director, the Republican chairman of the Senate Judiciary Committee, Chuck Grassley, expressed optimism that Trump's nominee would implement much-needed reforms. "He's the right change agent for the FBI," the senator said, adding that the bureau was in need of "a big shake-up."

Under questioning from skeptical Democrats, Patel vowed that "there will be no retributive actions" and that he was not aware of any plans to punish FBI staff who had been part of investigations into Trump. Democrats were not the

4

only ones who were leery of Patel, who had a record of embracing far-fetched conspiracy theories—including the notion that the FBI and its informants had helped instigate the January 6, 2021, attack on the U.S. Capitol to sabotage the MAGA movement. Several Republicans wavered on whether to back him. But a pressure campaign by the White House and its allies ultimately prevailed, and Patel was confirmed by a vote of 51 to 49.

Inside the FBI, which had been wounded by a number of scandals, many hoped that Patel could give the bureau a fresh start. But even many of those who had been enthusiastic about his arrival have since been disappointed. Officials said that Patel has been an irregular presence at FBI headquarters and in field offices, and that he has compounded the agency's existing bureaucratic bottlenecks. Several current and former officials told me that Patel is often away or unreachable, delaying time-sensitive decisions needed to advance investigations. On several occasions, an official told me, Patel's delays resulted in normally unflappable agents "losing their shit."

Read: 'It's a five-alarm fire'

Patel has also earned a reputation for acting impulsively during high-stakes investigations. He announced triumphantly on social media, for instance, that the FBI had "detained a person of interest" in the Brown University shooting in December. That person was soon released while agents continued to hunt for the killer.

Still, Patel has his fans. The president has been pleased by Patel's efforts to purge agents who worked on January 6 cases and other probes into Trump. The president has also indicated that he is relatively unbothered by grumblings about Patel from within the FBI, according to White House and other administration officials. That's not surprising: Patel views many of the bureau's veterans as anti-Trump "deep state" agents who have worked against him and his followers. But Patel has, on occasion, earned the president's ire. Trump has complained that the FBI director has seemed unprepared for TV appearances and that some high-profile investigations that he directed Patel to pursue have not moved quickly enough. These include inquiries into former Biden-administration officials and other political opponents.

Patel's spotty attendance at the office and the eagerness with which he's embraced the perks and travel that come with the job have also been sources

5

of concern at the White House. Some in the West Wing have followed the headlines about Patel's use of the FBI jet for personal matters—as well as the whispers about his love of partying—and said that they fear that Trump would react badly were he to focus on those storylines.

DOJ's ETHICS HANDBOOK STATES that "an employee is prohibited from habitually using alcohol or other intoxicants to excess." The department's inspector general has warned that off-duty alcohol consumption can not only impair employees' judgment; it can also make them vulnerable to exploitation or coercion by foreign adversaries.

Patel's drinking is no secret. While on official travel to Italy in February, he was filmed chugging beer with the U.S. men's Olympic hockey team following their gold-medal victory. The incident prompted the president—who does not drink and whose brother died following a long struggle with alcoholism—to call the FBI director to convey his unhappiness, according to two officials familiar with the call. But officials told me that Patel's alcohol use goes far beyond the occasional beer. FBI officials and others in the administration have privately questioned whether alcohol played a role in the instances in which he shared inaccurate information about active law-enforcement investigations, including following the murder of Charlie Kirk.

Many of the people who spoke with me said that they have been afraid to reveal their concerns about Patel publicly or through traditional whistleblower channels, because he has been aggressive in cracking down on anyone he deems insufficiently loyal. At Patel's direction, FBI employees are polygraphed in an effort to identify leakers. One former official told me that bureau employees have been asked in these sessions for opinions about Patel's perceived "enemies," as well as whether they have ever said anything disparaging about the director or the president.

Patel has held on to his job in part because of his commitment to using the federal government to target political or personal adversaries of the president. In his 2023 book, *Government Gangsters*, Patel designated a list of government officials past and present that he alleged were corrupt or disloyal. In an interview that year on Steve Bannon's podcast, Patel said that he planned to "come after" members of the media for their 2020-election coverage with criminal or civil charges. Patel has led a purge of people who he believes are anti-Trump "conspirators" or "enemies" within the FBI. This has included

6

firing people, opening internal investigations, and pressuring agents to quit when they pushed back—or were perceived to have pushed back—against Patel's demands or questioned their legality.

Some at the FBI are concerned that Patel's behavior has left the country more vulnerable. One former senior intelligence official told me that there is a lack of experience at FBI headquarters and that the turnover rate is high in field offices, because of both voluntary departures and Patel-ordered purges. The result is an FBI workforce being asked to accomplish more with fewer resources, and with less direction from the top. "The instinctive level of muscle memory or discernment that is necessary to identify and counter a terror attack is missing," the former official said. A current official described people inside the bureau feeling besieged and disillusioned—or even angry.

Read: 'The trust has been absolutely destroyed'

Days before the United States launched its war with Iran, Patel fired members of a counterintelligence squad that was devoted, in part, to Iran. The director said in testimony before Congress that the agents had been let go because their work investigating Trump's handling of classified documents had placed them in violation of the bureau's ethics rules. But multiple officials told me that they were concerned that the firings had been rushed and would leave the U.S. shorthanded at a crucial moment.

Patel has publicly proclaimed that the FBI needs to demonstrate that it is "fierce," and officials I spoke with said that he is fixated on that image in private as well. He recently expressed frustration with the look of FBI merchandise, complaining that it isn't intimidating enough. Officials have grown accustomed to such behavior, and they have learned to roll their eyes at it. But they said that the absurdity masks real concerns about what Patel's leadership has meant for an institution that the country relies on for national security and the safety of its citizens. "Part of me is glad he's wasting his time on bullshit, because it's less dangerous for rule of law, for the American public," one official told me, "but it also means we don't have a real functioning FBI director."

*Jonathan Lemire, Isabel Ruehl, and Marie-Rose Sheinerman contributed reporting.*

View Discussion  1098

## ABOUT THE AUTHOR

**Sarah Fitzpatrick**

 Follow

Sarah Fitzpatrick is a staff writer at *The Atlantic* covering national security and the Department of Justice. Sarah can be reached on Signal at sfitz787.165.

---

**Explore More Topics**

FBI, Kash Patel

# EXHIBIT C

*Patel v. Atlantic Monthly et al.* – Chart of Plaintiff's Alleged Defamatory Statements

| Category | Alleged Defamatory Statements |
|---|---|
| **Director Patel's Alcohol Consumption ("Category 1")** | 1. "That Director Patel 'is known to drink to the point of obvious intoxication, in many cases at the private club Ned's in Washington, D.C., while in the presence of White House and other administration staff.'"  Compl. ¶ 18(a). |
| | 2. "That Director Patel 'is also known to drink to excess at the Poodle Room in Las Vegas, where he frequently spends parts of his weekends.'"  *Id.* ¶ 18(b). |
| | 3. "That 'early in [Director Patel's] tenure, meetings and briefings had to be rescheduled for later in the day as a result of his alcohol-fueled nights.'"  *Id.* ¶ 18(c). |
| | 4. "That '[o]n multiple occasions in the past year, members of his security detail had difficulty waking [Director Patel] because he was seemingly intoxicated, according to information supplied to Justice Department and White House officials.'"  *Id.* ¶ 18(d). |
| | 5. That "Director Patel's alleged alcohol consumption has negatively impacted various law-enforcement investigations, including the Charlie Kirk murder investigation."  *Id.* ¶18(f). |
| | 6. "That Director Patel's 'drinking has been a recurring source of concern across the government.'"  *Id.* ¶ 18(j). |
| | 7. "The false implication that [Director Patel] violated DOJ's ethics rules prohibiting 'habitually using alcohol or other intoxicants to excess.'"  *Id.* ¶ 18(k). |
| | 8. "The false implication that Director Patel abuses alcohol, thereby making him vulnerable to exploitation or coercion by foreign adversaries."  *Id.* ¶ 18(m). |
| | 9. "The false implication that this alleged alcohol abuse 'has become a threat to public |

| | |
|---|---|
| | safety,' including in the context of 'a domestic terrorist attack,' and constitutes a national-security vulnerability." *Id.* ¶ 18(n). |
| **Director Patel's Absences and Unreachability ("Category 2")** | 10. "That '[a] request for 'breaching equipment'—normally used by SWAT and hostage-rescue teams to quickly gain entry into buildings—was made last year because [Director Patel] had been unreachable behind locked doors.'" *Id.* ¶ 18(e). |
| | 11. "That Director Patel is 'often away or unreachable, delaying time sensitive decisions needed to advance investigations,' and that on several occasions, Director Patel's 'delays resulted in normally unflappable agents 'losing their shit.''" *Id.* ¶ 18(i). |
| | 12. "That Director Patel has had a problem with 'unexplained absences,' and 'spotty attendance at the office,' thereby falsely implying that Director Patel has been derelict in his duties." *Id.* ¶ 18(p). |
| **Director Patel's Retaliatory Firings ("Category 3")** | 13. Plaintiff has used his position to improperly "target political or personal adversaries of the president." *Id.* ¶ 18(l). |
| | 14. "That Director Patel left the country vulnerable because '[d]ays before the United States launched its war with Iran, [Director Patel] fired members of a counterintelligence squad that was devoted, in part, to Iran.'" *Id.* ¶ 18(q). |
| **Director Patel's Job Security Concerns ("Category 4")** | 15. "That on April 10, 2026, Director Patel 'panicked, frantically calling aides and allies to announce that he had been fired by the White House,' and that his behavior was a 'freak-out.' *Id.* ¶ 18(h). |
| | 16. "That Director Patel 'is deeply concerned that his job is in jeopardy.'" *Id.* ¶ 18(o). |
| **Director Patel's Focus on Image ("Category 5")** | 17. "That Director Patel 'recently expressed frustration with the look of FBI |

| | |
|---|---|
| | merchandise, complaining that it isn't intimidating enough.'" *Id.* ¶ 18(g). |

# EXHIBIT D

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | |
|---|---|
| Kashyap P. Patel | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:26-cv-01329-EGS |
| | ) |
| Atlantic Monthly Group LLC; Sarah Fitzpatrick | ) |
| *Defendant* | ) |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:    United States Department of Justice
950 Pennsylvania Ave., N.W, Washington, D.C. 20530-0001

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Davis Wright Tremaine LLP, 1301 K Street NW, Suite 500 East, Washington, D.C. 20005 | Date and Time: 10/01/2026 9:00 am |
|---|---|

The deposition will be recorded by this method:    Stenographically and video

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Schedule A (attached)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    07/27/2026

| CLERK OF COURT | |
|---|---|
| | OR |
| _____ | /s/ Katherine M. Bolger |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Defendants Atlantic Monthly Group LLC; Sarah Fitzpatrick , who issues or requests this subpoena, are:
Katherine M. Bolger, 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020
katebolger@dwt.com; (212) 489-8230

### Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.  1:26-cv-01329-EGS

### PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

 **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

 **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

 **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

 **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

 **(3) *Quashing or Modifying a Subpoena.***

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

 **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2) *Claiming Privilege or Protection.***
 **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
 **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**DEFINITIONS**

Unless context indicates otherwise, the following words and phrases are defined and used herein as follows:

1.      **Action**.  "Action" means the action captioned on the first page of this subpoena, *Patel v. Atlantic Monthly et al.*, No. 1:26-cv-01329-EGS (D.D.C.).

2.      **Article**.  "Article" means the April 17, 2026 news article published by *The Atlantic* titled "The FBI Director is MIA," available at https://www.theatlantic.com/politics/2026/04/kash-patel-fbi-director-drinking-absences/686839/ and at issue in this Action.

3.      **Breaching Equipment**.  "Breaching Equipment" means any item, object, thing, or System that can be or is used by or assigned to FBI personnel (including the Director's security detail) to access a physical space, including a battering ram, sledge hammer, axe, halligan bar, pry bar, hydraulic spreader, bolt cutter, lock breaker, cutting equipment, torch, explosive charge, and the like.

4.      **Calendars**.  "Calendars" means any calendar, agenda, or scheduling system, in any form (including electronic and paper), including Systems, used to account for, plan, or track schedules, meetings, time, entries, assignments, due outs, and other items, including Microsoft Outlook and Microsoft Teams.

5.      **Communication**.  "Communication" means any type of correspondence, including incoming and outgoing telephone calls (including landline, cellular, satellite, non-secure, secure, yellow, red, and any other type of telephonic device), voicemails, emails, instant or text messages (including messages sent over social media or messaging platforms such as Facebook, Signal, Teams, Skype, WhatsApp, Telegram, etc., whether on non-secure, secure, yellow, or red Systems), written or graphic communications, and whether in draft form or completed.  This term includes

all such Communications to which DOJ and FBI have access, whether or not on a government-issued Device or System, a personal Device or System, or other.

6. **Complaint**. "Complaint" means the operative Complaint filed by Plaintiff in this Action on April 20, 2026.

7. **Device**. "Device" means any desktop computer, laptop computer, computer of any kind, tablet, iPad, landline phone, cellular phone, satellite phone, non-secure phone, secure phone, yellow phone, red phone, electronic communication device of any kind, SIM card, and any Device or System capable of storing, sending, or receiving Communications.

8. **Director's Suite**. "Director's Suite" means Director Patel's Office, as well as the offices of Director Patel's physically proximate staff, any adjoining common areas or lobbies, and any private elevator or access point.

9. **Document**. "Document" means any and every kind of printed, typed, recorded, written, graphic or photographic matter (including audiotape and/or videotape recordings), however printed, produced, reproduced, coded, or stored (including in electronic or digitized form), of any kind or description, whether sent or received or not, including originals, copies, reproductions, facsimiles, and drafts, regardless of their author or origin, however denominated. A draft or non-identical copy is a separate Document for purposes of these requests.

10. **DOJ**. "DOJ" means the Department of Justice and any of its agents, attorneys, representatives, employees, detailees, contractors, or other persons acting on behalf of such entity, including but not limited to acting Attorney General Todd Blanche, former Attorney General Pamela Bondi, and anyone acting on their behalf.

11.    **External Complaints**.   "External Complaints" mean any informal or formal complaint made, filed, or acknowledged to, by, or within the White House or any other executive department or agency.

12.    **FBI**.   "FBI" means the Federal Bureau of Investigation and any of its agents, attorneys, representatives, employees, detailees, contractors or other persons acting on behalf of such entity.

13.    **FBI Installation**.   "FBI Installation" means FBI Headquarters, the FBI's facilities at Quantico, and any FBI field office, resident agency, operational facility, training facility, international attaché office, aircraft, vehicle, or any other location controlled or operated by the FBI for official purposes, and any part thereof.

14.    **Internal Complaints**.   "Internal Complaints" mean any informal (including "drop files") or formal complaint made, filed, or acknowledged to, by, or within the FBI Inspection Division, FBI Office of Professional Responsibility, or Department of Justice Office of Inspector General; to any member of Director Patel's staff or security detail; or to other FBI officials.

15.    **Photo/Video**.   "Photo/Video" means any photo or video (including analog and digital) from whatever source, including Devices, Systems, Body Worn Cameras ("BWCs"), surveillance cameras, security cameras, Closed Circuit Television ("CCTV"), or similar.  This term includes any FBI, or FBI-installed, or FBI-managed source, including at any FBI Installation or any personal residence.

16.    **Plaintiff** or **Director Patel**.   "Plaintiff" or "Director Patel" mean Kashyap P. Patel, and any agents, attorneys, representatives, or other persons or entities acting for or on his behalf or in concert with him.

3

17.    **Records**.  "Records" means (1) all recorded information, regardless of form or characteristics; and (2) all Documents, Communications, and Calendars.

18.    **Summarily Terminated Employees**.  "Summarily Terminated Employees" mean any FBI personnel (including Senior Executive Service, supervisor (including those as defined in the FBI Domestics and Operations Guide, Section 3.5.1), Special Agents, Intelligence Analysts, Staff Operations Specialists, or staff of any kind) whose employment was summarily terminated at the direction or instigation of, or in consultation with, Director Patel.  Summarily Terminated Employees are believed to number in excess of 50 and include at least: (1) Jamie Garman, Blaire Toleman, and Michelle Ball, the plaintiffs in *Garman et al. v. Patel et al.*, Case No. 1:26-cv-01086 (D.D.C.); (2) Brian Driscoll, Jr., Steven Jensen, and Spencer Evans, the plaintiffs in *Driscoll et al. v. Patel et al.*, Case No. 1:25-cv-03109 (D.D.C.); (3) Jane Does 1-9 and John Does 1-3, the plaintiffs *in Jane Does 1-9 et al. v. Patel et al.*, Case No. 1:25-cv-04258 (D.D.C.); (4) Walter Giardina; (5) Christopher Meyer; and (6) any other FBI personnel in any way or at any time connected or assigned to the Arctic Frost investigation, Plasmic Echo investigation, squad CR-15, squad CI-12, or intel squad ID-19 who were terminated by the FBI for any reason or no reason since January 20, 2025.

19.    **System**.  "System" means (1) any Device; (2) any program, software, application, network, database, or collection of information that permits, requires, or tracks user login or access information, including Sentinel, JCON-S, SIPRNet, BuNet, FBINET, Law Enforcement Enterprise Portal ("LEEP"), JWICS, E2, webTA, Microsoft Outlook, Microsoft Teams, Skype, any other Communications platform, or the like, regardless of whether the System is non-secure, secure, yellow, or red; and (3) any physical area, such as an FBI Installation or parts thereof (including any Sensitive Compartmented Information Facility ("SCIF")), that permits, requires, or

4

tracks access with specific credentials such as a Personal Identity Verification ("PIV") card, Blue Badge, JCON-S card, Personal Identification Number ("PIN"), Personal Access Code ("PAC"), or the like.

## INSTRUCTIONS

The following instructions apply to each and every Request set forth herein.

1. The words "and" and "or" also have the meaning "and/or".

2. The term "person" means all individuals and entities.

3. Unless otherwise indicated below, the time period for each Request is February 20, 2025 through the present.

4. Throughout these requests, the singular shall include the plural and the plural shall include the singular.

5. The following terms should be read as if they were synonymous, and each should be taken to include the meaning of all of the others: relating to, relating in any manner to, concerning, referring to, alluding to, responding to, in connection with, connected with, with respect to, commenting on, about, regarding, announcing, explaining, discussing, showing, describing, studying, reflecting, analyzing, establishing, supporting, refuting, or constituting.

6. If you contend that it would be unreasonably burdensome to produce all the documents called for in response to any request, you should:

   a. Produce all documents that are available without unreasonable burden; and

   b. Describe with particularity the reasons why production of the remaining documents would be unreasonably burdensome.

7. In the event that any responsive document cannot be produced in its entirety, you are requested to produce the document to the fullest extent possible, specifying the reasons for

your inability to produce the remainder and describing to the fullest extent possible the contents of the portion not produced.

8.    With respect to your responses to the following requests for production, if any document or any portion of any document is withheld because of a claim of privilege, please state the basis for your claim of privilege with respect to such document or portion of any document and the specific ground(s) on which the claim of privilege rests, and including, with respect to documents: the date appearing on the document, or if no date appears, the date on which the document was prepared; the name of the person(s) to whom the document was addressed; the name of each person, other than addressee(s), to whom the document, or a copy thereof, was sent or with whom the document was discussed; the name of the person(s) who signed the document, or if not signed, the name of the person(s) who prepared it; the name of each person making any contribution to the authorship of the document; and the general nature or description of the document and the number of pages of which it consists.

9.    In the event that any documents or things that would have been responsive to these requests have been destroyed, discarded or lost, please identify each such document or thing, including: the nature of the document or thing; the author(s) and addressee(s) of any document; any indicated or blind copies of any document; the document's subject matter, number of pages and attachments or appendices; all persons to whom the document was distributed or persons who have seen the thing; the date of destruction, discard or loss; and, if destroyed or discarded, the reasons therefore and the identity of the person(s) authorizing or carrying out any such destruction or discard.

## TOPICS OF TESTIMONY

At this juncture, Defendants identify the following individuals as relevant witnesses for depositions: (1) Plaintiff; (2) members of Plaintiff's security detail; (3) Plaintiff's staff and

6

personal aides; (4) Plaintiff's communications and public relations team(s); (5) Plaintiff's IT staff; (6) DOJ and FBI polygraphers; (7) the Director's Advisory Team; (8) the Director's Special Committee; and (9) the Weaponization Working Group.  Defendants reserve the right to identify, substitute, or designate additional Doe witnesses following the production and review of documents and other discovery sufficient to identify individuals with relevant knowledge.  Nothing in these Requests or this subpoena shall limit Defendants' right to seek testimony from any such witnesses identified during the course of discovery.  The topics of testimony sought are as follows:

1.      The identity, roles, responsibilities, and organizational placement of relevant DOJ and/or FBI personnel, including those individuals assigned to Director Patel's security detail, the Director's Advisory Team, and the Director's Special Committee; those involved in Director Patel's travel; those assisting with any Device or System; those with access to Director Patel's Calendars; those constituting Summarily Terminated Employees and/or personnel accessing the personnel files for any Summarily Terminated Employee; and those involved with or the target of polygraphs.

2.      Communications regarding *The Atlantic*, the Article, Ms. Fitzpatrick, and this Action.

3.      Director Patel's public statements, including social media posts, regarding the Charlie Kirk murder investigation and the Brown University mass shooting investigation.

4.      Disclosures made by or regarding Director Patel, including SF-86 forms, vetting materials, annual ethics filings such as OGE 450 or OGE 278, any drug or alcohol testing, examination, or questionnaire administered to or discussed with Director Patel, reimbursements to the DOJ made by or in connection with Director Patel, and/or Director Patel's membership or attendance at private clubs, social spaces, and/or recreational facilities.

7

5.    Internal Complaints and External Complaints involving allegations of conduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

6.    Director Patel's Calendars, schedule, and physical presence at FBI Installations, and all domestic and international travel by Director Patel and his security detail, including related expenses, per diems, reimbursements, passport use, and use of FBI or government aircraft.

7.    The Devices and Systems used by, assigned to, or accessed by Director Patel, his staff, and his security detail, including login and access records for any such Devices and Systems, as well as communications between the FBI and the White House.

8.    FBI security-detail protocols, and the storage, assignment, requisition, and use of Breaching Equipment in connection with Director Patel, his staff, or his security detail.

9.    Photo/Video records showing Director Patel's entry to, exit from, or access to any FBI Installation, personal residence, or the Director's Suite.

10.    The creation, approval, production, and provision of FBI merchandise, challenge coins, or bourbon bottles depicting Director Patel's name, image, signature, or likeness, or any portion or approximation thereof (including the monikers K$H or Ka$H), and any related gifts or reimbursements.

11.    The awarding of bonuses or other incentives to DOJ or FBI employees by Director Patel.

12.    The circumstances pertaining to, criteria, process, and approval of the terminations of Summarily Terminated Employees, including any related internal investigations, disciplinary findings, and communications with DOJ, FBI, or White House personnel.

8

13.     Polygraph scripts and examinations administered to FBI personnel concerning disclosures to reporters, Congress, or disciplinary authorities, perceived "enemies" of Director Patel, *The Atlantic*, the Article, Sarah Fitzpatrick, or this Action.

14.     Congressional oversight requests, investigations, and related communications concerning Director Patel's conduct, use of government aircraft, travel, and personnel decisions.

## DOCUMENTS REQUESTED

### A.     Relevant Witnesses

1.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personal aides (including the position informally known as "body man" or "bag man") assigned to Director Patel.

2.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to Director Patel's security detail (whether formally, informally, permanently, on detail, or on temporary duty), including any personnel assigned, seconded, or detailed from any other executive department and/or agency, including but not limited to the Department of Homeland Security and its components, including the Secret Service.

3.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to the Director's Advisory Team (whether formally, informally, permanently, on detail, or on temporary duty).  Such names and other information should include any FBI Office of Congressional Affairs Supervisory Special Agent(s) assigned to the Director's Advisory Team.

4.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to the Director's Special Committee (whether formally, informally, permanently, on detail, or on

9

temporary duty).    Such names and other information should include any FBI Office of Congressional Affairs Supervisory Special Agent(s) assigned to the Director's Special Committee.

5.    Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any pilot, first officer, or other DOJ or FBI personnel on board any FBI or government aircraft when any of the following were passengers: (1) Director Patel; (2) Alexis Wilkins; (3) members of Director Patel's security detail.

6.    Time Period: February 20, 2025, through the present:  Records sufficient to identify all personnel who had access or ability to add, edit, alter, modify, or delete anything from Director Patel's Calendars, including his schedulers and assistants.

7.    Time Period: April 10, 2026:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel whose responsibilities included assisting with any Device or System, who contacted, were contacted by, or interacted in any way with Director Patel, his staff, or his security detail, or who physically entered the Director's Suite on April 10, 2026.

8.    Time Period: January 1, 2025, through the present:  Records sufficient to identify Erica Knight's contact information, job title, job description, and pay history.

9.    Records sufficient to identify all DOJ and/or FBI personnel who accompanied Director Patel on his trip to Italy in February 2026, including any DOJ and/or FBI personnel identifiable    in    publicly    available    videos    of    the    incident,    including https://www.cnn.com/2026/02/23/politics/video/kash-patel-goes-viral-for-hockey-celebration-vrtc.

10.    Time Period: January 20, 2025, through the present:  Records sufficient to identify all Summarily Terminated Employees.

10

11.    <u>Time Period: January 20, 2025, through the present</u>:  Records, including access logs, sufficient to identify the date, time, name, contact information, job title, and job description of any individual, office, or component that accessed any personnel file or part thereof for any Summarily Terminated Employee.

12.    <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify all polygraphers (whether FBI personnel, employees, contractors, detailees, or assignees) conducting or assisting in any polygraph that used questions or topics including:

   a. Questions or topics regarding FBI personnel providing information to reporters, Congress, or any disciplinary authority (including FBI Inspections Division, FBI Office of Professional Responsibility, and DOJ Office of Inspector General);

   b. Questions or topics regarding perceived "enemies" of Director Patel; and

   c. Questions or topics regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.

13.    <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify all individuals (whether personnel, employees, or contractors) who were subject to any polygraph that used questions or topics identified in the immediately preceding Request.

14.    <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify all individuals at whose personal residences Director Patel visits, stays overnight, and/or resides, including residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida.

**B.    Devices and Systems**

15.    <u>Time Period: February 20, 2025, through April 17, 2026</u>:  All Records pertaining to all login information for all Devices and Systems Director Patel attempted to access, regardless of whether the attempted access was successful.  Records must include date, time, Internet Protocol address, Device identifier, location, and the like.

16.    Time Period: February 22, 2026, through April 17, 2026:  All Records pertaining to Communications between (1) any Device or System associated with the White House or Executive Office of the President, including any phone number beginning with the exchange 202-456-XXXX; and (2) any Device or System assigned to or used by Director Patel, his staff, his security detail, Ben Williamson, or Erica Knight.

17.    Time Period: April 10, 2026:  All Records of login information for all Devices and Systems Director Patel attempted to access on April 10, 2026, regardless of whether the attempted access was successful.  Records must include date, time, Internet Protocol address, Device identifier, location, and the like.

18.    Time Period: April 10, 2026:  All Records of all Communications from any Device or System to which Director Patel had access, including Devices or Systems assigned to him, his security detail, any staff in the Director's Office, or any FBI employee of any kind.

19.    Time Period: April 10 through April 13, 2026:  All Records of all Communications between (1) any FBI Device or System, and (2) any Device or System associated with the White House or the Executive Office of the President, including any phone number beginning with the exchange 202-456-XXXX.

20.    Time Period: April 17, 2026, through the present:  All Records of all Communications regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.  Some, but not all, relevant custodians include (1) Director Patel; (2) the Director's Chief of Staff, Acting and/or Interim Chief of Staff, Deputy Chief of Staff, and Assistant(s) Chief of Staff; (3) Andrew Bailey; (4) Christopher Raia; (5) Ben Williamson; (6) Erica Knight; (7) Jake Hemme; (8) Will Rivers; (9) Todd Blanche; (10) Katie Kenlein; (11) Emily Covington; (12) Chad Gilmartin; (13) Gates McGavick; (14) Natalie Baldassar; (15) Wyn Hornbuckle; (16) any

12

personnel assigned to the FBI's Office of Congressional Affairs (whether formally, informally, permanently, on detail, or on temporary duty); (17) any personnel assigned to the FBI's Office of Public Affairs (whether formally, informally, permanently, on detail, or on temporary duty); (18) any personnel assigned to the Director's Advisory Team (whether formally, informally, permanently, on detail, or on temporary duty); and (19) any personnel assigned to the Director's Special Committee (whether formally, informally, permanently, on detail, or on temporary duty).

21. Time Period: April 17, 2026, through the present:  All non-privileged Records of all Communications regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action between (1) Director Patel, and (2) the Binnall Law Group, including any attorneys working on Binnall Law Group's behalf, including but not limited to Jesse Binnall, Jason Greaves, and Jared Roberts.

22. Time Period: April 17, 2026, through the present:  All Records of all Communications between Ben Williamson (from any Device or System, including bdwilliamson2@fbi.gov) and Erica Knight (from any Device or System, including erica.knight@xpectsolutions.com) or any other email address at the domain "xpectsolutions.com".

### C.    Location and Travel Information

23. Time Period: February 20, 2025, through the present:  All Calendars showing Director Patel's schedule, including all meeting requests, changed meeting times, cancelled meetings, and rescheduled meetings.  Such Calendars include those on any Device and System accessible by or to Director Patel, his staff, or his security detail.

24. Time Period: February 20, 2025, through the present:  Records sufficient to show dates, times, and locations when Director Patel was physically present at any FBI Installation.

25. Time Period: February 20, 2025, through April 17, 2026:  All Records regarding Director Patel's allegation in the Complaint that "[i]n calendar year 2025, Director Patel took

13

approximately 17 personal days." Compl. ¶ 26. Such Records should include (but are not limited to) webTA records, or records of any predecessor or successor System that accounts for time and attendance.

26. <u>Time Period: February 20, 2025, through April 17, 2026</u>: All Records regarding "Director Patel's robust public schedule and visible, documented presence at FBI headquarters, field offices, joint operations, press conferences, congressional appearances, and on-the-ground deployments to active investigations," as alleged in Director Patel's Complaint. Compl. ¶ 41(b).

27. <u>Time Period: February 20, 2025, through April 17, 2026</u>: All Records regarding the location of any vehicle assigned to or used by Director Patel or his security detail. Such Records must include GPS location and information (including Events and Navigation) collected by any telematics or infotainment System.

28. <u>Time Period: February 20, 2025, through April 17, 2026</u>: All Records pertaining to the following categories of information regarding any FBI or government aircraft when any of the following were passengers: (1) Director Patel; (2) Alexis Wilkins; (3) any member of Director Patel's security detail; and (4) any member of the Director's Advisory Team:

    a. Records sufficient to show the location of the aircraft (including transponder information);

    b. All air traffic control recordings;

    c. All passenger manifests;

    d. All Communications regarding aircraft passengers or persons anticipated to be aircraft passengers;

    e. All customs declarations;

    f. All aircraft weight measurements;

    g. Whether alcohol was present on board the aircraft; and

14

    h.  All Records provided to the U.S. General Services Administration (GSA) under 41 C.F.R. §§ 102-33.

29.    <u>Time Period: February 20, 2025, through the present</u>:  To the extent not included in the preceding Request, all Records pertaining to the categories of information set forth in the preceding Request related to the following trips taken and/or reported to be planned by Director Patel:

    a.  Summer 2025 trip to Scotland;

    b.  Summer 2025 trip to Australia, New Zealand, and Hawaii, including a snorkeling excursion around the USS Arizona;

    c.  October 2025 trip to Penn State University;

    d.  October 2025 trip to "Boondoggle Ranch" in San Angelo, Texas;

    e.  February 2026 trip to Italy;

    f.  Forthcoming 2026 trip to Russia;

    g.  Any and all trips to Nashville, Tennessee;

    h.  Any and all trips involving Alexis Wilkins, including any performances by Ms. Wilkins; and

    i.  Any and all trips involving UFC fights or other sporting events.

30.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing expenses and per diems for Director Patel, his security detail, and any personnel traveling with Director Patel, whether domestically or internationally.  Such Records include paper and electronic form, including in E2 or SATO Travel records.

31.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing any reimbursement to the DOJ, the FBI, or the U.S. Department of the Treasury for Director Patel's private use, non-mission use, or required use of any FBI or government aircraft (including any Gulfstream aircraft).  Such reimbursements include those required by OMB Circular No. A-126.

15

32.    Time Period: February 20, 2025, through the present:  All Records showing use of Official Passports or Diplomatic Passports by Director Patel, his security detail, and personnel traveling internationally with Director Patel.

33.    Time Period: February 20, 2025, through the present:  Records sufficient to identify the duration, location, and purpose of all international travel by Director Patel, his security detail, and personnel traveling with them.

34.    Time Period: February 20, 2025, through the present:  All Records (including FD-772, E2 notifications and approvals, and similar) identifying notification and approval of international travel for Director Patel, his security detail, and personnel traveling with them.

35.    Time Period: July 3, 2025, through February 23, 2026:  All Communications regarding coordinating travel for Director Patel's trip to Italy in February 2026, including all Communications with Italian authorities.

36.    Time Period: July 3, 2025, through February 23, 2026:  Records (including Calendars) sufficient to identify Director Patel's official business in Italy or Europe, including the location and type of that official business.

37.    Time Period: February 20, 2025, through the present:  Records sufficient to identify the addresses of all individuals whose personal residences Director Patel visits, stays overnight, and/or resides, including residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida.

**D.    Security Detail Protocols and Breaching Equipment**

38.    Time Period: February 20, 2025, through April 17, 2026:  All Records regarding Breaching Equipment related to Director Patel, his staff, or his security detail, including policies (and dates of those policies), internal incident reports, storage locations, SWAT deployment records, news reports, photographs, Internal Complaints, and External Complaints.

16

39.　Time Period: February 20, 2025, through April 17, 2026: All Records contradicting the allegation in Director Patel's Complaint that "no internal incident report, no SWAT deployment record, no news report, no photograph, no complaint" corroborates the Article's reporting regarding Breaching Equipment.  Compl. ¶ 41(d).

40.　Time Period: February 20, 2025, through April 17, 2026:  Records sufficient to show when, from where, and what type of Breaching Equipment was purchased for, requisitioned by, used by, available to, or assigned to Director Patel, his staff, or his security detail.

41.　Time Period: February 20, 2025, through April 17, 2026:  Records sufficient to show that, as Director Patel's Complaint alleges, "breach equipment is provided to all FBI protection details."  Compl. ¶ 21.

42.　Time Period:  February 20, 2025, through April 17, 2026:  All Records (including "FBI security-detail protocols") showing, as Director Patel alleges, that "FBI security-detail protocols . . . would have shown the 'waking the Director' story was operationally implausible." Compl. ¶ 42.

43.　Time Period: February 20, 2025, through April 17, 2026:  All Communications regarding reports or concerns expressed by personnel assigned to Director Patel's security detail (whether formally, informally, permanently, on detail, or on temporary duty) about the ability to wake Director Patel and/or to access Director Patel behind a locked door.

**E.　Director Patel's Statements Regarding Law Enforcement Investigations**

44.　Time Period: September 10, 2025, through September 17, 2025:  All Records pertaining to Director Patel's public statements in connection with the Charlie Kirk murder law enforcement investigation.

17

45.    <u>Time Period: December 13, 2025, through December 20, 2025</u>:    All Records pertaining to Director Patel's public statements in connection with the Brown University mass shooting law enforcement investigation.

46.    <u>Time Period: September 10, 2025, through December 15, 2025</u>:    All Records related to the following specific social media posts, including drafts thereof, who posted the message, and who has access to or control over the relevant account to post messages.  Relevant custodians include Director Patel, Ben Williamson, Erica Knight, and any personnel assigned to FBI's Office of Public Affairs.

    a.    https://x.com/FBIDirectorKash/status/1965903392934633587;

    b.    https://x.com/FBIDirectorKash/status/1965928054712316363; and

    c.    https://x.com/FBIDirectorKash/status/2000244040667676940.

**F.    Disclosures**

47.    All Records pertaining to:

    a.    All SF-86 forms, and any additions or amendments thereto, for Director Patel, for any government positions, whether prior to or in relation to his role as FBI Director.

    b.    All Records submitted to the White House, Executive Office of the President, Department of Justice, or FBI regarding considering or vetting Director Patel for his position as FBI Director.

    c.    All annual disclosures, such as Forms OGE 450 or OGE 278, filed by or on behalf of Director Patel, for any government positions, whether prior to or in relation to his role as FBI Director.

48.    <u>Time Period: February 20, 2025, through the present</u>:    All Records regarding any drug or alcohol test, examination, questionnaire, or review (including the results) discussed with, administered to, or taken by Director Patel, including those in connection with compliance with DOJ's Ethics Handbook.  Such Records include those regarding any "Audit Test" discussed by Director Patel during the U.S. Senate Hearing on May 12, 2026.

18

49.     Time Period: February 20, 2025, through the present:  All Records showing any reimbursement to the DOJ, the FBI, or the U.S. Department of the Treasury for Director Patel's meals, alcohol, travel, and/or gifts, or any other reimbursement of any kind.

50.     Time Period: February 20, 2025, through the present:  All Records relating to any visits, reimbursements, or gifts given or received by Director Patel involving any private clubs, social spaces, and/or recreational facilities, including Ned's Club and Penn Social in Washington, D.C.; the Poodle Room in Las Vegas; CXIIIREX in Alexandria, Virginia; Landini Brothers Restaurant in Alexandria, Virginia; Butterworth's in Washington, D.C.; and Executive Branch in Washington, D.C.

51.     Time Period: February 20, 2025, through the present:  All Records relating to Director Patel's participation in a hockey league team, including at the MedStar Capitals Iceplex (as referenced in part https://www.cnn.com/2026/04/23/politics/kash-patel-hockey-fan?cid=ios_app).

**G.     Polygraphs**

52.     Time Period: February 20, 2025, through the present:  All Records pertaining to all polygraph scripts that include:

   a.  Questions or topics regarding FBI personnel providing information to reporters, Congress, or any disciplinary authority (including FBI Inspections Division, FBI Office of Professional Responsibility, and DOJ Office of Inspector General);

   b.  Questions or topics regarding perceived "enemies" of Director Patel; and

   c.  Questions or topics regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.

**H.     Merchandise and Bonuses**

53.     Time Period: February 20, 2025, through the present:  All Records related to any merchandise available for purchase at any FBI Installation approved by Director Patel, or depicting

19

Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

54.    Time Period: February 20, 2025, through the present:  All Records related to any merchandise provided as a gift or presented by Director Patel, or depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

55.    Time Period: February 20, 2025, through the present:  All Records related to any bottles of alcohol depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

56.    Time Period: February 20, 2025, through the present:  All Records related to the creation, design, approval, production, purchase, and dissemination of any "challenge coin" (or similar) in which Director Patel had involvement or which Director Patel presented to any FBI personnel, including any "challenge coin" similar in type to the one referenced in Brian Driscoll's complaint, *see Driscoll et al*., Compl. ¶ 141 (describing a challenge coin proffered by Director Patel that was "much larger, inscribed with 'Director' at the top banner of the coin and 'Ka$h Patel' at the bottom banner."), and/or as seen here[1]:

---

[1] @KDilanianMSNOW, X (Oct. 3, 2025),
https://x.com/KDilanianMSNOW/status/1974109240374484999.

20



57.    Time Period: February 20, 2025, through the present:  All Records regarding Director Patel's allegation in the Complaint—in response to the Article's reporting that Director Patel complained FBI merchandise "isn't intimidating enough"—that "[h]is security detail confirmed that he has made no such complaint about FBI merchandise."  Compl. ¶ 25.

58.    Time Period: February 20, 2025, through the present:  All Records showing any reimbursement to the DOJ, the FBI, the U.S. Department of the Treasury, and/or the U.S. government for Director Patel's creation, assembly, purchase, and/or personalization of any merchandise.

59.    Time Period: February 20, 2025, through the present:  All Records reflecting any bonuses awarded by Director Patel to any DOJ or FBI employees, including Forms FD-255, Forms SF-50s, Category D cash bonuses, on the spot awards, SES bonuses, Director's Awards, or any other incentive awards.

**I.    Photo / Video**

60.    Time Period: February 20, 2025, through the present:  All Photo/Video showing Director Patel entering, exiting, or accessing (1) any FBI Installation; (2) any personal residence,

21

whether or not owned by Director Patel, including personal residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida, and (3) the Director's Suite.

61.     Time Period: April 10, 2026:  All Photo/Video showing any entrance to the Director's Suite (including the private elevator from the garage), including Photo/Video of Director Patel, his staff, his security detail, and any personnel whose responsibilities include assisting with any Device or System.

### J.     Internal and External Complaints

62.     Time Period: February 20, 2025, through the present:  All Records of Internal Complaints involving allegations of misconduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

63.     Time Period: February 20, 2025, through the present:  All Records of External Complaints involving allegations of misconduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

### K.     Summarily Terminated Employees

64.     Time Period: January 20, 2017, through the present:  All Documents pertaining to personnel files (including Annual Performance Reviews, Records showing performance ratings, SF-50s, and termination letters) for all Summarily Terminated Employees.

65.     Time Period: November 6, 2024, through the present:  All Communications related to all Summarily Terminated Employees to, with, between, or involving (1) James McHenry; (2) Pamela Bondi; (3) Todd Blanche; (4) Emil Bove; (5) Stephen Miller; (6) Paul Ingrassia; (7) Director Patel (including prior to his confirmation as FBI Director); (8) Michael Clark; (9) Christopher-James DeLorenz; (10) Colin McDonald; (11) Ed Martin; (12) any personnel assigned to the Director's Advisory Team (including Greg Menser and Tom Ferguson); (13) any personnel

22

assigned to the Director's Special Committee; (14) any personnel assigned to the FBI Office of Congressional Affairs; (15) any personnel assigned to the FBI Office of Public Affairs; (16) any personnel assigned to the FBI Human Resources Division; (17) any personnel assigned to FBI Office of General Counsel; (18) any Division Counsel or Assistant Division Counsel in any Field Office or Resident Agency; and (19) any personnel assigned to DOJ Weaponization Working Group.

66.    Time Period: January 20, 2025, through the present:  All Communications regarding discipline or termination for any Summarily Terminated Employee to, from, with, or involving (1) any person identified in the immediately preceding Request, and (2) any supervisor of any Summarily Terminated Employee.

67.    Time Period: January 20, 2025, to February 20, 2025:  All Records shared by the Director's Advisory Team (including Menser) with Brian Driscoll and Robert Kissane at a meeting in January or February 2025, including "a list of names and field offices" that "were marked to be removed or terminated." *Driscoll et al.*, Compl. ¶¶ 56-60, 80-82.

68.    Time Period: January 20, 2025, through April 17, 2026:  Records sufficient to show the placement of squad CI-12 within the FBI organizational structure.

69.    Time Period: January 20, 2025, through April 17, 2026:  Records sufficient to show the countries or geographic regions implicated by investigations in which CI-12 was involved, including Iran.

70.    Time Period: January 20, 2025, through the present:  All Records regarding any criminal or administrative assessment or investigation regarding any Summarily Terminated Employee, including opening ECs and 263 files.

23

71.    Time Period: January 20, 2025, through the present:  All Records of Internal Complaints involving allegations of conduct by or on behalf of Summarily Terminated Employees.

72.    Time Period: January 20, 2025, through the present:  All Records of Internal Complaints made by or on behalf of Summarily Terminated Employees.

73.    Time Period: January 20, 2025, to the present:  All Records showing that any Summarily Terminated Employee was, as Director Patel alleges, "found to have acted unethically or undermined the mission."  Compl. ¶ 25.

74.    Time Period: February 20, 2025, to the present:  All Records showing Director Patel's compliance with the FBI Office of Professional Responsibility Policy Guide and FBI disciplinary policy regarding the Summarily Terminated Employees.

75.    Time Period: February 20, 2025, to the present:  All Records showing that any Summarily Terminated Employee was found to have violated an FBI Offense Code, and who made such a finding.

76.    Time Period: February 20, 2025, through the present:  All Records prepared for or by Director Patel in anticipation of or preparation for the U.S. House Select Committee on Intelligence Hearing on March 19, 2026, regarding Director Patel's statement that "the FBI, every time there is someone who violates our Code of Conduct or ethical standards, conducts an internal investigation with the careers there and they present a decision point to me" (available at https://www.c-span.org/program/house-committee/national-security-officials-testify-on-global-threats-to-the-us/675647 around minute mark 1:45-1:49).

77.    Time Period: February 20, 2025, through the present:  All Records regarding any "internal investigation" referenced in the immediately preceding Request, the identities of any

24

"careers" (or any FBI personnel) who presented Director Patel with a "decision point" regarding any Summarily Terminated Employee, and what that "decision point" was.

78.     Time Period: August 1, 2025, to the present:  All Records related to a meeting between Director Patel and Brian Driscoll on or about August 5, 2025, in which Director Patel stated, in sum and substance, "'all FBI employees who they identified had worked on the cases against President Trump would be removed from their jobs' and that [Patel] needed to fire agents who worked on cases against President Trump in order to keep his own position" and also during which Director Patel "acknowledged that the firings would be in direct violation of internal FBI process, that they were likely illegal, and that he could be sued and deposed" and also during which Director "Patel explained that he had to fire the people his superiors told him to fire, because his ability to keep his own job depended on the removal of the agents who worked on cases involving the President." *See Garman et al.*, Compl. ¶¶ 135, 137; *Driscoll et al.*, Compl. ¶¶ 4-5.

79.     Time Period: October 1, 2025, through October 10, 2025:  All Records related to the following social media post, including drafts thereof, who posted the message, who has access to or control over the relevant account to post messages, and the provenance of, and substantiation for, the statement by Director Patel that "We fired those who acted unethically, dismantled the corrupt CR-15 squad, and launched an investigation" (available at https://x.com/FBIDirectorKash/status/1975615124556632540).

80.     Time Period: February 20, 2025, to the present:  All Records regarding the "investigation" Director Patel described in the immediately preceding Request.

81.     Time Period: October 7, 2025, to the present:  All Records pertaining to the letter to Michelle Ball from FBI Human Resources Division that stated, in sum and substance, that Ball

25

separated from the FBI in good standing and without any open disciplinary or administrative action.

82.    Time Period: March 4, 2026, through the present:    All Records and Communications, including from custodians within FBI's Office of Congressional Affairs, related to the March 4, 2026, letter to Director Patel from Grace Meng, seeking information and documents regarding "the firing of at least 10 counterintelligence agents and support staff, including those who served in the unit known as CI-12—the elite unit within the FBI that conducts counter-espionage    and    counterintelligence    in    the    Middle    East"    (available    at https://meng.house.gov/sites/evo-subsites/meng.house.gov/files/evo-media-document/3.4.26-meng-letter-to-fbi-director.pdf).

83.    Time Period: February 20, 2025, through the present:  Records sufficient to show turnover rates and number of departed employees (whether from voluntary departures, terminations, or otherwise) in each FBI Field Office.  Such information may come, at least in part, from each Field Office's semi-annual program reviews in 2025 and 2026.

**L.    Congressional and Public Oversight**

84.    Time Period: December 1, 2025, through the present:  All Records, including from custodians within FBI's Office of Congressional Affairs, regarding the following Congressional requests for information and investigations, including all Records produced to Congress in response to the requests for information and investigations:

   a.  The May 7, 2025 letter from Sen. Durbin requesting a GAO review (available at https://www.judiciary.senate.gov/imo/media/doc/2025-5-07%20Letter%20to%20GAO%20re%20Executives%20use%20of%20aircraft%20for%20nonmission%20purposes.pdf);

   b.  The December 1, 2025 letter to Director Patel from Rep. Jamie Raskin and Rep. Sydney Kamlager-Dove    (available    at    https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-12-01-raskin-kamlager-dove-to-patel-fbi-re-plane.pdf);

26

c.  The February 24, 2026 letter from Sen. Durbin in further support of his request for GAO and DOJ OIG review (available at https://www.judiciary.senate.gov/imo/media/doc/2026-02-24%20Letter%20to%20GAO%20and%20DOJ%20IG%20on%20Kash%20Patel%20Olympic%20Travel.pdf)

d.  The May 5, 2026 letter to Director Patel from Sen. Chuck Grassley (as reported on, https://democrats-judiciary.house.gov/media-center/press-releases/ranking-members-raskin-durbin-launch-bicameral-investigation-into-kash-patel-s-abuse-of-fbi-jets-and-tax-dollars-following-private-senate-gop-letter-questioning-patel-s-spending-travel); and

e.  The July 8, 2026 letter to Director Patel from Sen. Richard Durbin and Rep. Jamie Raskin (available at https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-07-08-raskin-durbin-to-patel-fbi-re-jet-usage-letter.pdf).

85.    Time Period: May 1, 2026, through the present:  All Records prepared for or by Director Patel in anticipation of or preparation for the U.S. Senate Appropriations Committee Hearing on May 12, 2026, related to Director Patel's alcohol use, *The Atlantic*, the Article, and/or this Action.

86.    All Records prepared in response to and/or in connection with the following Freedom of Information Act ("FOIA") lawsuits: *Democracy Forward Found. v. FBI et al.*, No. 1:26-cv-02075 (D.D.C. filed June 11, 2026); *Pub. Citizen v. FBI*, No. 1:26-cv-01952 (D.D.C. filed June 3, 2026); *Democracy Defenders Fund v. FBI*, No. 1:26-cv-01935 (D.D.C. filed June 2, 2026).

# EXHIBIT E

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | |
|---|---|
| Kashyap P. Patel | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.  1:26-cv-01329-EGS |
| | ) |
| Atlantic Monthly Group LLC; Sarah Fitzpatrick | ) |
| | ) |
| *Defendant* | ) |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:        Federal Bureau of Investigation
935 Pennsylvania Avenue, NW, Washington, D.C. 20535-0001

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Davis Wright Tremaine LLP, 1301 K Street NW, Suite 500 East, Washington, D.C. 20005 | Date and Time:  10/01/2026 9:00 am |
|---|---|

The deposition will be recorded by this method:   Stenographically and video

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Schedule A (attached)

        The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     07/27/2026

| CLERK OF COURT | |
|---|---|
| | OR |
| | /s/ Katherine M. Bolger |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*   Defendants Atlantic Monthly Group LLC; Sarah Fitzpatrick                , who issues or requests this subpoena, are:
Katherine M. Bolger, 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020
katebolger@dwt.com; (212) 489-8230

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:26-cv-01329-EGS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❐ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❐ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $    0.00    .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**<u>DEFINITIONS</u>**

Unless context indicates otherwise, the following words and phrases are defined and used herein as follows:

1.    **Action**.  "Action" means the action captioned on the first page of this subpoena, *Patel v. Atlantic Monthly et al.*, No. 1:26-cv-01329-EGS (D.D.C.).

2.    **Article**.  "Article" means the April 17, 2026 news article published by *The Atlantic* titled "The FBI Director is MIA," available at https://www.theatlantic.com/politics/2026/04/kash-patel-fbi-director-drinking-absences/686839/ and at issue in this Action.

3.    **Breaching Equipment**.  "Breaching Equipment" means any item, object, thing, or System that can be or is used by or assigned to FBI personnel (including the Director's security detail) to access a physical space, including a battering ram, sledge hammer, axe, halligan bar, pry bar, hydraulic spreader, bolt cutter, lock breaker, cutting equipment, torch, explosive charge, and the like.

4.    **Calendars**.  "Calendars" means any calendar, agenda, or scheduling system, in any form (including electronic and paper), including Systems, used to account for, plan, or track schedules, meetings, time, entries, assignments, due outs, and other items, including Microsoft Outlook and Microsoft Teams.

5.    **Communication**.  "Communication" means any type of correspondence, including incoming and outgoing telephone calls (including landline, cellular, satellite, non-secure, secure, yellow, red, and any other type of telephonic device), voicemails, emails, instant or text messages (including messages sent over social media or messaging platforms such as Facebook, Signal, Teams, Skype, WhatsApp, Telegram, etc., whether on non-secure, secure, yellow, or red Systems), written or graphic communications, and whether in draft form or completed.  This term includes

all such Communications to which DOJ and FBI have access, whether or not on a government-issued Device or System, a personal Device or System, or other.

6.      **Complaint**. "Complaint" means the operative Complaint filed by Plaintiff in this Action on April 20, 2026.

7.      **Device**. "Device" means any desktop computer, laptop computer, computer of any kind, tablet, iPad, landline phone, cellular phone, satellite phone, non-secure phone, secure phone, yellow phone, red phone, electronic communication device of any kind, SIM card, and any Device or System capable of storing, sending, or receiving Communications.

8.      **Director's Suite**. "Director's Suite" means Director Patel's Office, as well as the offices of Director Patel's physically proximate staff, any adjoining common areas or lobbies, and any private elevator or access point.

9.      **Document**. "Document" means any and every kind of printed, typed, recorded, written, graphic or photographic matter (including audiotape and/or videotape recordings), however printed, produced, reproduced, coded, or stored (including in electronic or digitized form), of any kind or description, whether sent or received or not, including originals, copies, reproductions, facsimiles, and drafts, regardless of their author or origin, however denominated. A draft or non-identical copy is a separate Document for purposes of these requests.

10.     **DOJ**. "DOJ" means the Department of Justice and any of its agents, attorneys, representatives, employees, detailees, contractors, or other persons acting on behalf of such entity, including but not limited to acting Attorney General Todd Blanche, former Attorney General Pamela Bondi, and anyone acting on their behalf.

2

11. **External Complaints**. "External Complaints" mean any informal or formal complaint made, filed, or acknowledged to, by, or within the White House or any other executive department or agency.

12. **FBI**. "FBI" means the Federal Bureau of Investigation and any of its agents, attorneys, representatives, employees, detailees, contractors or other persons acting on behalf of such entity.

13. **FBI Installation**. "FBI Installation" means FBI Headquarters, the FBI's facilities at Quantico, and any FBI field office, resident agency, operational facility, training facility, international attaché office, aircraft, vehicle, or any other location controlled or operated by the FBI for official purposes, and any part thereof.

14. **Internal Complaints**. "Internal Complaints" mean any informal (including "drop files") or formal complaint made, filed, or acknowledged to, by, or within the FBI Inspection Division, FBI Office of Professional Responsibility, or Department of Justice Office of Inspector General; to any member of Director Patel's staff or security detail; or to other FBI officials.

15. **Photo/Video**. "Photo/Video" means any photo or video (including analog and digital) from whatever source, including Devices, Systems, Body Worn Cameras ("BWCs"), surveillance cameras, security cameras, Closed Circuit Television ("CCTV"), or similar. This term includes any FBI, or FBI-installed, or FBI-managed source, including at any FBI Installation or any personal residence.

16. **Plaintiff** or **Director Patel**. "Plaintiff" or "Director Patel" mean Kashyap P. Patel, and any agents, attorneys, representatives, or other persons or entities acting for or on his behalf or in concert with him.

17.    **Records**.  "Records" means (1) all recorded information, regardless of form or characteristics; and (2) all Documents, Communications, and Calendars.

18.    **Summarily Terminated Employees**.  "Summarily Terminated Employees" mean any FBI personnel (including Senior Executive Service, supervisor (including those as defined in the FBI Domestics and Operations Guide, Section 3.5.1), Special Agents, Intelligence Analysts, Staff Operations Specialists, or staff of any kind) whose employment was summarily terminated at the direction or instigation of, or in consultation with, Director Patel.  Summarily Terminated Employees are believed to number in excess of 50 and include at least: (1) Jamie Garman, Blaire Toleman, and Michelle Ball, the plaintiffs in *Garman et al. v. Patel et al.*, Case No. 1:26-cv-01086 (D.D.C.); (2) Brian Driscoll, Jr., Steven Jensen, and Spencer Evans, the plaintiffs in *Driscoll et al. v. Patel et al.*, Case No. 1:25-cv-03109 (D.D.C.); (3) Jane Does 1-9 and John Does 1-3, the plaintiffs *in Jane Does 1-9 et al. v. Patel et al.*, Case No. 1:25-cv-04258 (D.D.C.); (4) Walter Giardina; (5) Christopher Meyer; and (6) any other FBI personnel in any way or at any time connected or assigned to the Arctic Frost investigation, Plasmic Echo investigation, squad CR-15, squad CI-12, or intel squad ID-19 who were terminated by the FBI for any reason or no reason since January 20, 2025.

19.    **System**.  "System" means (1) any Device; (2) any program, software, application, network, database, or collection of information that permits, requires, or tracks user login or access information, including Sentinel, JCON-S, SIPRNet, BuNet, FBINET, Law Enforcement Enterprise Portal ("LEEP"), JWICS, E2, webTA, Microsoft Outlook, Microsoft Teams, Skype, any other Communications platform, or the like, regardless of whether the System is non-secure, secure, yellow, or red; and (3) any physical area, such as an FBI Installation or parts thereof (including any Sensitive Compartmented Information Facility ("SCIF")), that permits, requires, or

tracks access with specific credentials such as a Personal Identity Verification ("PIV") card, Blue Badge, JCON-S card, Personal Identification Number ("PIN"), Personal Access Code ("PAC"), or the like.

## INSTRUCTIONS

The following instructions apply to each and every Request set forth herein.

1.    The words "and" and "or" also have the meaning "and/or".

2.    The term "person" means all individuals and entities.

3.    Unless otherwise indicated below, the time period for each Request is February 20, 2025 through the present.

4.    Throughout these requests, the singular shall include the plural and the plural shall include the singular.

5.    The following terms should be read as if they were synonymous, and each should be taken to include the meaning of all of the others: relating to, relating in any manner to, concerning, referring to, alluding to, responding to, in connection with, connected with, with respect to, commenting on, about, regarding, announcing, explaining, discussing, showing, describing, studying, reflecting, analyzing, establishing, supporting, refuting, or constituting.

6.    If you contend that it would be unreasonably burdensome to produce all the documents called for in response to any request, you should:

    a.    Produce all documents that are available without unreasonable burden; and

    b.    Describe with particularity the reasons why production of the remaining documents would be unreasonably burdensome.

7.    In the event that any responsive document cannot be produced in its entirety, you are requested to produce the document to the fullest extent possible, specifying the reasons for

5

your inability to produce the remainder and describing to the fullest extent possible the contents of the portion not produced.

8.      With respect to your responses to the following requests for production, if any document or any portion of any document is withheld because of a claim of privilege, please state the basis for your claim of privilege with respect to such document or portion of any document and the specific ground(s) on which the claim of privilege rests, and including, with respect to documents: the date appearing on the document, or if no date appears, the date on which the document was prepared; the name of the person(s) to whom the document was addressed; the name of each person, other than addressee(s), to whom the document, or a copy thereof, was sent or with whom the document was discussed; the name of the person(s) who signed the document, or if not signed, the name of the person(s) who prepared it; the name of each person making any contribution to the authorship of the document; and the general nature or description of the document and the number of pages of which it consists.

9.      In the event that any documents or things that would have been responsive to these requests have been destroyed, discarded or lost, please identify each such document or thing, including: the nature of the document or thing; the author(s) and addressee(s) of any document; any indicated or blind copies of any document; the document's subject matter, number of pages and attachments or appendices; all persons to whom the document was distributed or persons who have seen the thing; the date of destruction, discard or loss; and, if destroyed or discarded, the reasons therefore and the identity of the person(s) authorizing or carrying out any such destruction or discard.

**<u>TOPICS OF TESTIMONY</u>**

At this juncture, Defendants identify the following individuals as relevant witnesses for depositions: (1) Plaintiff; (2) members of Plaintiff's security detail; (3) Plaintiff's staff and

6

personal aides; (4) Plaintiff's communications and public relations team(s); (5) Plaintiff's IT staff; (6) DOJ and FBI polygraphers; (7) the Director's Advisory Team; (8) the Director's Special Committee; and (9) the Weaponization Working Group.  Defendants reserve the right to identify, substitute, or designate additional Doe witnesses following the production and review of documents and other discovery sufficient to identify individuals with relevant knowledge.  Nothing in these Requests or this subpoena shall limit Defendants' right to seek testimony from any such witnesses identified during the course of discovery.  The topics of testimony sought are as follows:

1.      The identity, roles, responsibilities, and organizational placement of relevant DOJ and/or FBI personnel, including those individuals assigned to Director Patel's security detail, the Director's Advisory Team, and the Director's Special Committee; those involved in Director Patel's travel; those assisting with any Device or System; those with access to Director Patel's Calendars; those constituting Summarily Terminated Employees and/or personnel accessing the personnel files for any Summarily Terminated Employee; and those involved with or the target of polygraphs.

2.      Communications regarding *The Atlantic*, the Article, Ms. Fitzpatrick, and this Action.

3.      Director Patel's public statements, including social media posts, regarding the Charlie Kirk murder investigation and the Brown University mass shooting investigation.

4.      Disclosures made by or regarding Director Patel, including SF-86 forms, vetting materials, annual ethics filings such as OGE 450 or OGE 278, any drug or alcohol testing, examination, or questionnaire administered to or discussed with Director Patel, reimbursements to the DOJ made by or in connection with Director Patel, and/or Director Patel's membership or attendance at private clubs, social spaces, and/or recreational facilities.

7

5. Internal Complaints and External Complaints involving allegations of conduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

6. Director Patel's Calendars, schedule, and physical presence at FBI Installations, and all domestic and international travel by Director Patel and his security detail, including related expenses, per diems, reimbursements, passport use, and use of FBI or government aircraft.

7. The Devices and Systems used by, assigned to, or accessed by Director Patel, his staff, and his security detail, including login and access records for any such Devices and Systems, as well as communications between the FBI and the White House.

8. FBI security-detail protocols, and the storage, assignment, requisition, and use of Breaching Equipment in connection with Director Patel, his staff, or his security detail.

9. Photo/Video records showing Director Patel's entry to, exit from, or access to any FBI Installation, personal residence, or the Director's Suite.

10. The creation, approval, production, and provision of FBI merchandise, challenge coins, or bourbon bottles depicting Director Patel's name, image, signature, or likeness, or any portion or approximation thereof (including the monikers K$H or Ka$H), and any related gifts or reimbursements.

11. The awarding of bonuses or other incentives to DOJ or FBI employees by Director Patel.

12. The circumstances pertaining to, criteria, process, and approval of the terminations of Summarily Terminated Employees, including any related internal investigations, disciplinary findings, and communications with DOJ, FBI, or White House personnel.

8

13.     Polygraph scripts and examinations administered to FBI personnel concerning disclosures to reporters, Congress, or disciplinary authorities, perceived "enemies" of Director Patel, *The Atlantic*, the Article, Sarah Fitzpatrick, or this Action.

14.     Congressional oversight requests, investigations, and related communications concerning Director Patel's conduct, use of government aircraft, travel, and personnel decisions.

## DOCUMENTS REQUESTED

### A.     Relevant Witnesses

1.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personal aides (including the position informally known as "body man" or "bag man") assigned to Director Patel.

2.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to Director Patel's security detail (whether formally, informally, permanently, on detail, or on temporary duty), including any personnel assigned, seconded, or detailed from any other executive department and/or agency, including but not limited to the Department of Homeland Security and its components, including the Secret Service.

3.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to the Director's Advisory Team (whether formally, informally, permanently, on detail, or on temporary duty).  Such names and other information should include any FBI Office of Congressional Affairs Supervisory Special Agent(s) assigned to the Director's Advisory Team.

4.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to the Director's Special Committee (whether formally, informally, permanently, on detail, or on

9

temporary duty). Such names and other information should include any FBI Office of Congressional Affairs Supervisory Special Agent(s) assigned to the Director's Special Committee.

5. Time Period: February 20, 2025, through the present: Records sufficient to identify the names, contact information, job titles, and job descriptions of any pilot, first officer, or other DOJ or FBI personnel on board any FBI or government aircraft when any of the following were passengers: (1) Director Patel; (2) Alexis Wilkins; (3) members of Director Patel's security detail.

6. Time Period: February 20, 2025, through the present: Records sufficient to identify all personnel who had access or ability to add, edit, alter, modify, or delete anything from Director Patel's Calendars, including his schedulers and assistants.

7. Time Period: April 10, 2026: Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel whose responsibilities included assisting with any Device or System, who contacted, were contacted by, or interacted in any way with Director Patel, his staff, or his security detail, or who physically entered the Director's Suite on April 10, 2026.

8. Time Period: January 1, 2025, through the present: Records sufficient to identify Erica Knight's contact information, job title, job description, and pay history.

9. Records sufficient to identify all DOJ and/or FBI personnel who accompanied Director Patel on his trip to Italy in February 2026, including any DOJ and/or FBI personnel identifiable in publicly available videos of the incident, including https://www.cnn.com/2026/02/23/politics/video/kash-patel-goes-viral-for-hockey-celebration-vrtc.

10. Time Period: January 20, 2025, through the present: Records sufficient to identify all Summarily Terminated Employees.

10

11.     Time Period: January 20, 2025, through the present:  Records, including access logs, sufficient to identify the date, time, name, contact information, job title, and job description of any individual, office, or component that accessed any personnel file or part thereof for any Summarily Terminated Employee.

12.     Time Period: February 20, 2025, through the present: Records sufficient to identify all polygraphers (whether FBI personnel, employees, contractors, detailees, or assignees) conducting or assisting in any polygraph that used questions or topics including:

   a. Questions or topics regarding FBI personnel providing information to reporters, Congress, or any disciplinary authority (including FBI Inspections Division, FBI Office of Professional Responsibility, and DOJ Office of Inspector General);

   b. Questions or topics regarding perceived "enemies" of Director Patel; and

   c. Questions or topics regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.

13.     Time Period: February 20, 2025, through the present: Records sufficient to identify all individuals (whether personnel, employees, or contractors) who were subject to any polygraph that used questions or topics identified in the immediately preceding Request.

14.     Time Period: February 20, 2025, through the present: Records sufficient to identify all individuals at whose personal residences Director Patel visits, stays overnight, and/or resides, including residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida.

   **B.     Devices and Systems**

15.     Time Period: February 20, 2025, through April 17, 2026:  All Records pertaining to all login information for all Devices and Systems Director Patel attempted to access, regardless of whether the attempted access was successful.  Records must include date, time, Internet Protocol address, Device identifier, location, and the like.

11

16.     Time Period: February 22, 2026, through April 17, 2026:  All Records pertaining to Communications between (1) any Device or System associated with the White House or Executive Office of the President, including any phone number beginning with the exchange 202-456-XXXX; and (2) any Device or System assigned to or used by Director Patel, his staff, his security detail, Ben Williamson, or Erica Knight.

17.     Time Period: April 10, 2026:  All Records of login information for all Devices and Systems Director Patel attempted to access on April 10, 2026, regardless of whether the attempted access was successful.   Records must include date, time, Internet Protocol address, Device identifier, location, and the like.

18.     Time Period: April 10, 2026:  All Records of all Communications from any Device or System to which Director Patel had access, including Devices or Systems assigned to him, his security detail, any staff in the Director's Office, or any FBI employee of any kind.

19.     Time Period: April 10 through April 13, 2026:  All Records of all Communications between (1) any FBI Device or System, and (2) any Device or System associated with the White House or the Executive Office of the President, including any phone number beginning with the exchange 202-456-XXXX.

20.     Time Period: April 17, 2026, through the present:   All Records of all Communications regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.  Some, but not all, relevant custodians include (1) Director Patel; (2) the Director's Chief of Staff, Acting and/or Interim Chief of Staff, Deputy Chief of Staff, and Assistant(s) Chief of Staff; (3) Andrew Bailey; (4) Christopher Raia; (5) Ben Williamson; (6) Erica Knight; (7) Jake Hemme; (8) Will Rivers; (9) Todd Blanche; (10) Katie Kenlein; (11) Emily Covington; (12) Chad Gilmartin; (13) Gates McGavick; (14) Natalie Baldassar; (15) Wyn Hornbuckle; (16) any

12

personnel assigned to the FBI's Office of Congressional Affairs (whether formally, informally, permanently, on detail, or on temporary duty); (17) any personnel assigned to the FBI's Office of Public Affairs (whether formally, informally, permanently, on detail, or on temporary duty); (18) any personnel assigned to the Director's Advisory Team (whether formally, informally, permanently, on detail, or on temporary duty); and (19) any personnel assigned to the Director's Special Committee (whether formally, informally, permanently, on detail, or on temporary duty).

21.     Time Period: April 17, 2026, through the present:  All non-privileged Records of all Communications regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action between (1) Director Patel, and (2) the Binnall Law Group, including any attorneys working on Binnall Law Group's behalf, including but not limited to Jesse Binnall, Jason Greaves, and Jared Roberts.

22.     Time Period: April 17, 2026, through the present:  All Records of all Communications between Ben Williamson (from any Device or System, including bdwilliamson2@fbi.gov) and Erica Knight (from any Device or System, including erica.knight@xpectsolutions.com) or any other email address at the domain "xpectsolutions.com".

**C.     Location and Travel Information**

23.     Time Period: February 20, 2025, through the present:  All Calendars showing Director Patel's schedule, including all meeting requests, changed meeting times, cancelled meetings, and rescheduled meetings.  Such Calendars include those on any Device and System accessible by or to Director Patel, his staff, or his security detail.

24.     Time Period: February 20, 2025, through the present:  Records sufficient to show dates, times, and locations when Director Patel was physically present at any FBI Installation.

25.     Time Period: February 20, 2025, through April 17, 2026:  All Records regarding Director Patel's allegation in the Complaint that "[i]n calendar year 2025, Director Patel took

13

approximately 17 personal days." Compl. ¶ 26. Such Records should include (but are not limited to) webTA records, or records of any predecessor or successor System that accounts for time and attendance.

26.    Time Period: February 20, 2025, through April 17, 2026: All Records regarding "Director Patel's robust public schedule and visible, documented presence at FBI headquarters, field offices, joint operations, press conferences, congressional appearances, and on-the-ground deployments to active investigations," as alleged in Director Patel's Complaint. Compl. ¶ 41(b).

27.    Time Period: February 20, 2025, through April 17, 2026: All Records regarding the location of any vehicle assigned to or used by Director Patel or his security detail. Such Records must include GPS location and information (including Events and Navigation) collected by any telematics or infotainment System.

28.    Time Period: February 20, 2025, through April 17, 2026: All Records pertaining to the following categories of information regarding any FBI or government aircraft when any of the following were passengers: (1) Director Patel; (2) Alexis Wilkins; (3) any member of Director Patel's security detail; and (4) any member of the Director's Advisory Team:

   a. Records sufficient to show the location of the aircraft (including transponder information);

   b. All air traffic control recordings;

   c. All passenger manifests;

   d. All Communications regarding aircraft passengers or persons anticipated to be aircraft passengers;

   e. All customs declarations;

   f. All aircraft weight measurements;

   g. Whether alcohol was present on board the aircraft; and

14

    h.  All Records provided to the U.S. General Services Administration (GSA) under 41 C.F.R. §§ 102-33.

29.    <u>Time Period: February 20, 2025, through the present</u>:  To the extent not included in the preceding Request, all Records pertaining to the categories of information set forth in the preceding Request related to the following trips taken and/or reported to be planned by Director Patel:

    a.  Summer 2025 trip to Scotland;

    b.  Summer 2025 trip to Australia, New Zealand, and Hawaii, including a snorkeling excursion around the USS Arizona;

    c.  October 2025 trip to Penn State University;

    d.  October 2025 trip to "Boondoggle Ranch" in San Angelo, Texas;

    e.  February 2026 trip to Italy;

    f.  Forthcoming 2026 trip to Russia;

    g.  Any and all trips to Nashville, Tennessee;

    h.  Any and all trips involving Alexis Wilkins, including any performances by Ms. Wilkins; and

    i.  Any and all trips involving UFC fights or other sporting events.

30.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing expenses and per diems for Director Patel, his security detail, and any personnel traveling with Director Patel, whether domestically or internationally.  Such Records include paper and electronic form, including in E2 or SATO Travel records.

31.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing any reimbursement to the DOJ, the FBI, or the U.S. Department of the Treasury for Director Patel's private use, non-mission use, or required use of any FBI or government aircraft (including any Gulfstream aircraft).  Such reimbursements include those required by OMB Circular No. A-126.

15

32.    Time Period: February 20, 2025, through the present:  All Records showing use of Official Passports or Diplomatic Passports by Director Patel, his security detail, and personnel traveling internationally with Director Patel.

33.    Time Period: February 20, 2025, through the present:  Records sufficient to identify the duration, location, and purpose of all international travel by Director Patel, his security detail, and personnel traveling with them.

34.    Time Period: February 20, 2025, through the present:  All Records (including FD-772, E2 notifications and approvals, and similar) identifying notification and approval of international travel for Director Patel, his security detail, and personnel traveling with them.

35.    Time Period: July 3, 2025, through February 23, 2026:  All Communications regarding coordinating travel for Director Patel's trip to Italy in February 2026, including all Communications with Italian authorities.

36.    Time Period: July 3, 2025, through February 23, 2026:  Records (including Calendars) sufficient to identify Director Patel's official business in Italy or Europe, including the location and type of that official business.

37.    Time Period: February 20, 2025, through the present:  Records sufficient to identify the addresses of all individuals whose personal residences Director Patel visits, stays overnight, and/or resides, including residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida.

**D.    Security Detail Protocols and Breaching Equipment**

38.    Time Period: February 20, 2025, through April 17, 2026:  All Records regarding Breaching Equipment related to Director Patel, his staff, or his security detail, including policies (and dates of those policies), internal incident reports, storage locations, SWAT deployment records, news reports, photographs, Internal Complaints, and External Complaints.

16

39.    Time Period: February 20, 2025, through April 17, 2026: All Records contradicting the allegation in Director Patel's Complaint that "no internal incident report, no SWAT deployment record, no news report, no photograph, no complaint" corroborates the Article's reporting regarding Breaching Equipment.  Compl. ¶ 41(d).

40.    Time Period: February 20, 2025, through April 17, 2026:  Records sufficient to show when, from where, and what type of Breaching Equipment was purchased for, requisitioned by, used by, available to, or assigned to Director Patel, his staff, or his security detail.

41.    Time Period: February 20, 2025, through April 17, 2026:  Records sufficient to show that, as Director Patel's Complaint alleges, "breach equipment is provided to all FBI protection details."  Compl. ¶ 21.

42.    Time Period:  February 20, 2025, through April 17, 2026:  All Records (including "FBI security-detail protocols") showing, as Director Patel alleges, that "FBI security-detail protocols . . . would have shown the 'waking the Director' story was operationally implausible." Compl. ¶ 42.

43.    Time Period: February 20, 2025, through April 17, 2026:  All Communications regarding reports or concerns expressed by personnel assigned to Director Patel's security detail (whether formally, informally, permanently, on detail, or on temporary duty) about the ability to wake Director Patel and/or to access Director Patel behind a locked door.

**E.    Director Patel's Statements Regarding Law Enforcement Investigations**

44.    Time Period: September 10, 2025, through September 17, 2025:  All Records pertaining to Director Patel's public statements in connection with the Charlie Kirk murder law enforcement investigation.

17

45.    Time Period: December 13, 2025, through December 20, 2025:    All Records pertaining to Director Patel's public statements in connection with the Brown University mass shooting law enforcement investigation.

46.    Time Period: September 10, 2025, through December 15, 2025:    All Records related to the following specific social media posts, including drafts thereof, who posted the message, and who has access to or control over the relevant account to post messages.    Relevant custodians include Director Patel, Ben Williamson, Erica Knight, and any personnel assigned to FBI's Office of Public Affairs.

   a.    https://x.com/FBIDirectorKash/status/1965903392934633587;

   b.    https://x.com/FBIDirectorKash/status/1965928054712316363; and

   c.    https://x.com/FBIDirectorKash/status/2000244040667676940.

**F.    Disclosures**

47.    All Records pertaining to:

   a.    All SF-86 forms, and any additions or amendments thereto, for Director Patel, for any government positions, whether prior to or in relation to his role as FBI Director.

   b.    All Records submitted to the White House, Executive Office of the President, Department of Justice, or FBI regarding considering or vetting Director Patel for his position as FBI Director.

   c.    All annual disclosures, such as Forms OGE 450 or OGE 278, filed by or on behalf of Director Patel, for any government positions, whether prior to or in relation to his role as FBI Director.

48.    Time Period: February 20, 2025, through the present:    All Records regarding any drug or alcohol test, examination, questionnaire, or review (including the results) discussed with, administered to, or taken by Director Patel, including those in connection with compliance with DOJ's Ethics Handbook.    Such Records include those regarding any "Audit Test" discussed by Director Patel during the U.S. Senate Hearing on May 12, 2026.

18

49.      Time Period: February 20, 2025, through the present:  All Records showing any reimbursement to the DOJ, the FBI, or the U.S. Department of the Treasury for Director Patel's meals, alcohol, travel, and/or gifts, or any other reimbursement of any kind.

50.      Time Period: February 20, 2025, through the present:  All Records relating to any visits, reimbursements, or gifts given or received by Director Patel involving any private clubs, social spaces, and/or recreational facilities, including Ned's Club and Penn Social in Washington, D.C.; the Poodle Room in Las Vegas; CXIIIREX in Alexandria, Virginia; Landini Brothers Restaurant in Alexandria, Virginia; Butterworth's in Washington, D.C.; and Executive Branch in Washington, D.C.

51.      Time Period: February 20, 2025, through the present:  All Records relating to Director Patel's participation in a hockey league team, including at the MedStar Capitals Iceplex (as referenced in part https://www.cnn.com/2026/04/23/politics/kash-patel-hockey-fan?cid=ios_app).

**G.      Polygraphs**

52.      Time Period: February 20, 2025, through the present:  All Records pertaining to all polygraph scripts that include:

a.  Questions or topics regarding FBI personnel providing information to reporters, Congress, or any disciplinary authority (including FBI Inspections Division, FBI Office of Professional Responsibility, and DOJ Office of Inspector General);

b.  Questions or topics regarding perceived "enemies" of Director Patel; and

c.  Questions or topics regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.

**H.      Merchandise and Bonuses**

53.      Time Period: February 20, 2025, through the present:  All Records related to any merchandise available for purchase at any FBI Installation approved by Director Patel, or depicting

19

Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

54.    Time Period: February 20, 2025, through the present:  All Records related to any merchandise provided as a gift or presented by Director Patel, or depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

55.    Time Period: February 20, 2025, through the present:  All Records related to any bottles of alcohol depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

56.    Time Period: February 20, 2025, through the present:  All Records related to the creation, design, approval, production, purchase, and dissemination of any "challenge coin" (or similar) in which Director Patel had involvement or which Director Patel presented to any FBI personnel, including any "challenge coin" similar in type to the one referenced in Brian Driscoll's complaint, *see Driscoll et al.*, Compl. ¶ 141 (describing a challenge coin proffered by Director Patel that was "much larger, inscribed with 'Director' at the top banner of the coin and 'Ka$h Patel' at the bottom banner."), and/or as seen here[1]:

---

[1] @KDilanianMSNOW, X (Oct. 3, 2025),
https://x.com/KDilanianMSNOW/status/1974109240374484999.



57.    Time Period: February 20, 2025, through the present:  All Records regarding Director Patel's allegation in the Complaint—in response to the Article's reporting that Director Patel complained FBI merchandise "isn't intimidating enough"—that "[h]is security detail confirmed that he has made no such complaint about FBI merchandise."  Compl. ¶ 25.

58.    Time Period: February 20, 2025, through the present:  All Records showing any reimbursement to the DOJ, the FBI, the U.S. Department of the Treasury, and/or the U.S. government for Director Patel's creation, assembly, purchase, and/or personalization of any merchandise.

59.    Time Period: February 20, 2025, through the present:  All Records reflecting any bonuses awarded by Director Patel to any DOJ or FBI employees, including Forms FD-255, Forms SF-50s, Category D cash bonuses, on the spot awards, SES bonuses, Director's Awards, or any other incentive awards.

**I.      Photo / Video**

60.    Time Period: February 20, 2025, through the present:  All Photo/Video showing Director Patel entering, exiting, or accessing (1) any FBI Installation; (2) any personal residence,

21

whether or not owned by Director Patel, including personal residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida, and (3) the Director's Suite.

61. <u>Time Period: April 10, 2026</u>:  All Photo/Video showing any entrance to the Director's Suite (including the private elevator from the garage), including Photo/Video of Director Patel, his staff, his security detail, and any personnel whose responsibilities include assisting with any Device or System.

**J.      Internal and External Complaints**

62. <u>Time Period: February 20, 2025, through the present</u>:  All Records of Internal Complaints involving allegations of misconduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

63. <u>Time Period: February 20, 2025, through the present</u>:  All Records of External Complaints involving allegations of misconduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

**K.      Summarily Terminated Employees**

64. <u>Time Period: January 20, 2017, through the present</u>:  All Documents pertaining to personnel files (including Annual Performance Reviews, Records showing performance ratings, SF-50s, and termination letters) for all Summarily Terminated Employees.

65. <u>Time Period: November 6, 2024, through the present</u>:  All Communications related to all Summarily Terminated Employees to, with, between, or involving (1) James McHenry; (2) Pamela Bondi; (3) Todd Blanche; (4) Emil Bove; (5) Stephen Miller; (6) Paul Ingrassia; (7) Director Patel (including prior to his confirmation as FBI Director); (8) Michael Clark; (9) Christopher-James DeLorenz; (10) Colin McDonald; (11) Ed Martin; (12) any personnel assigned to the Director's Advisory Team (including Greg Menser and Tom Ferguson); (13) any personnel

22

assigned to the Director's Special Committee; (14) any personnel assigned to the FBI Office of Congressional Affairs; (15) any personnel assigned to the FBI Office of Public Affairs; (16) any personnel assigned to the FBI Human Resources Division; (17) any personnel assigned to FBI Office of General Counsel; (18) any Division Counsel or Assistant Division Counsel in any Field Office or Resident Agency; and (19) any personnel assigned to DOJ Weaponization Working Group.

66.    Time Period: January 20, 2025, through the present:    All Communications regarding discipline or termination for any Summarily Terminated Employee to, from, with, or involving (1) any person identified in the immediately preceding Request, and (2) any supervisor of any Summarily Terminated Employee.

67.    Time Period: January 20, 2025, to February 20, 2025:    All Records shared by the Director's Advisory Team (including Menser) with Brian Driscoll and Robert Kissane at a meeting in January or February 2025, including "a list of names and field offices" that "were marked to be removed or terminated." *Driscoll et al.*, Compl. ¶¶ 56-60, 80-82.

68.    Time Period: January 20, 2025, through April 17, 2026:    Records sufficient to show the placement of squad CI-12 within the FBI organizational structure.

69.    Time Period: January 20, 2025, through April 17, 2026:    Records sufficient to show the countries or geographic regions implicated by investigations in which CI-12 was involved, including Iran.

70.    Time Period: January 20, 2025, through the present:    All Records regarding any criminal or administrative assessment or investigation regarding any Summarily Terminated Employee, including opening ECs and 263 files.

71.    Time Period: January 20, 2025, through the present:  All Records of Internal Complaints involving allegations of conduct by or on behalf of Summarily Terminated Employees.

72.    Time Period: January 20, 2025, through the present:  All Records of Internal Complaints made by or on behalf of Summarily Terminated Employees.

73.    Time Period: January 20, 2025, to the present:  All Records showing that any Summarily Terminated Employee was, as Director Patel alleges, "found to have acted unethically or undermined the mission."  Compl. ¶ 25.

74.    Time Period: February 20, 2025, to the present:  All Records showing Director Patel's compliance with the FBI Office of Professional Responsibility Policy Guide and FBI disciplinary policy regarding the Summarily Terminated Employees.

75.    Time Period: February 20, 2025, to the present:  All Records showing that any Summarily Terminated Employee was found to have violated an FBI Offense Code, and who made such a finding.

76.    Time Period: February 20, 2025, through the present:  All Records prepared for or by Director Patel in anticipation of or preparation for the U.S. House Select Committee on Intelligence Hearing on March 19, 2026, regarding Director Patel's statement that "the FBI, every time there is someone who violates our Code of Conduct or ethical standards, conducts an internal investigation with the careers there and they present a decision point to me" (available at https://www.c-span.org/program/house-committee/national-security-officials-testify-on-global-threats-to-the-us/675647 around minute mark 1:45-1:49).

77.    Time Period: February 20, 2025, through the present:  All Records regarding any "internal investigation" referenced in the immediately preceding Request, the identities of any

24

"careers" (or any FBI personnel) who presented Director Patel with a "decision point" regarding any Summarily Terminated Employee, and what that "decision point" was.

78.    Time Period: August 1, 2025, to the present:  All Records related to a meeting between Director Patel and Brian Driscoll on or about August 5, 2025, in which Director Patel stated, in sum and substance, "'all FBI employees who they identified had worked on the cases against President Trump would be removed from their jobs' and that [Patel] needed to fire agents who worked on cases against President Trump in order to keep his own position" and also during which Director Patel "acknowledged that the firings would be in direct violation of internal FBI process, that they were likely illegal, and that he could be sued and deposed" and also during which Director "Patel explained that he had to fire the people his superiors told him to fire, because his ability to keep his own job depended on the removal of the agents who worked on cases involving the President." *See Garman et al.*, Compl. ¶¶ 135, 137; *Driscoll et al.*, Compl. ¶¶ 4-5.

79.    Time Period: October 1, 2025, through October 10, 2025:  All Records related to the following social media post, including drafts thereof, who posted the message, who has access to or control over the relevant account to post messages, and the provenance of, and substantiation for, the statement by Director Patel that "We fired those who acted unethically, dismantled the corrupt    CR-15    squad,    and    launched    an    investigation"    (available    at https://x.com/FBIDirectorKash/status/1975615124556632540).

80.    Time Period: February 20, 2025, to the present:  All Records regarding the "investigation" Director Patel described in the immediately preceding Request.

81.    Time Period: October 7, 2025, to the present:  All Records pertaining to the letter to Michelle Ball from FBI Human Resources Division that stated, in sum and substance, that Ball

25

separated from the FBI in good standing and without any open disciplinary or administrative action.

82.    Time Period: March 4, 2026, through the present:    All Records and Communications, including from custodians within FBI's Office of Congressional Affairs, related to the March 4, 2026, letter to Director Patel from Grace Meng, seeking information and documents regarding "the firing of at least 10 counterintelligence agents and support staff, including those who served in the unit known as CI-12—the elite unit within the FBI that conducts counter-espionage and counterintelligence in the Middle East" (available at https://meng.house.gov/sites/evo-subsites/meng.house.gov/files/evo-media-document/3.4.26-meng-letter-to-fbi-director.pdf).

83.    Time Period: February 20, 2025, through the present:  Records sufficient to show turnover rates and number of departed employees (whether from voluntary departures, terminations, or otherwise) in each FBI Field Office.  Such information may come, at least in part, from each Field Office's semi-annual program reviews in 2025 and 2026.

**L.    Congressional and Public Oversight**

84.    Time Period: December 1, 2025, through the present:  All Records, including from custodians within FBI's Office of Congressional Affairs, regarding the following Congressional requests for information and investigations, including all Records produced to Congress in response to the requests for information and investigations:

    a. The May 7, 2025 letter from Sen. Durbin requesting a GAO review (available at https://www.judiciary.senate.gov/imo/media/doc/2025-5-07%20Letter%20to%20GAO%20re%20Executives%20use%20of%20aircraft%20for%20nonmission%20purposes.pdf);

    b. The December 1, 2025 letter to Director Patel from Rep. Jamie Raskin and Rep. Sydney Kamlager-Dove (available at https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-12-01-raskin-kamlager-dove-to-patel-fbi-re-plane.pdf);

c.  The February 24, 2026 letter from Sen. Durbin in further support of his request for GAO and DOJ OIG review (available at https://www.judiciary.senate.gov/imo/media/doc/2026-02-24%20Letter%20to%20GAO%20and%20DOJ%20IG%20on%20Kash%20Patel%20Olympic%20Travel.pdf)

d.  The May 5, 2026 letter to Director Patel from Sen. Chuck Grassley (as reported on, https://democrats-judiciary.house.gov/media-center/press-releases/ranking-members-raskin-durbin-launch-bicameral-investigation-into-kash-patel-s-abuse-of-fbi-jets-and-tax-dollars-following-private-senate-gop-letter-questioning-patel-s-spending-travel); and

e.  The July 8, 2026 letter to Director Patel from Sen. Richard Durbin and Rep. Jamie Raskin (available at https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-07-08-raskin-durbin-to-patel-fbi-re-jet-usage-letter.pdf).

85.    <u>Time Period: May 1, 2026, through the present</u>:  All Records prepared for or by Director Patel in anticipation of or preparation for the U.S. Senate Appropriations Committee Hearing on May 12, 2026, related to Director Patel's alcohol use, *The Atlantic*, the Article, and/or this Action.

86.    All Records prepared in response to and/or in connection with the following Freedom of Information Act ("FOIA") lawsuits: *Democracy Forward Found. v. FBI et al.*, No. 1:26-cv-02075 (D.D.C. filed June 11, 2026); *Pub. Citizen v. FBI*, No. 1:26-cv-01952 (D.D.C. filed June 3, 2026); *Democracy Defenders Fund v. FBI*, No. 1:26-cv-01935 (D.D.C. filed June 2, 2026).

# EXHIBIT F

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
## for the
District of Columbia

| | | |
|---|---|---|
| Kashyap P. Patel | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    1:26-cv-01329-EGS |
| | ) | |
| Atlantic Monthly Group LLC; Sarah Fitzpatrick | ) | |
| *Defendant* | ) | |

### SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:
Kashyap P. Patel, Director, Federal Bureau of Investigation
935 Pennsylvania Avenue, NW, Washington, D.C. 20535-0001

*(Name of person to whom this subpoena is directed)*

☑ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:

| Place:  Davis Wright Tremaine LLP, 1301 K Street NW, Suite 500 East, Washington, D.C. 20005 | Date and Time:  10/01/2026 9:00 am |
|---|---|

The deposition will be recorded by this method:  Stenographically and video

☑ *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Schedule A (attached)

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:    07/27/2026

|  | | |
|---|---|---|
| *CLERK OF COURT* | | |
| | OR | /s/ Katherine M. Bolger |
| _____ | | _____ |
| *Signature of Clerk or Deputy Clerk* | | *Attorney's signature* |

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)*  Defendants Atlantic Monthly Group LLC; Sarah Fitzpatrick                                        , who issues or requests this subpoena, are:
Katherine M. Bolger, 1251 Avenue of the Americas, 42nd Floor, New York, NY 10020
katebolger@dwt.com; (212) 489-8230

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 1:26-cv-01329-EGS

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named individual as follows: _____

_____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ ___0.00___ .

I declare under penalty of perjury that this information is true.

Date: _____        _____
                                              *Server's signature*

                                              _____
                                              *Printed name and title*

                                              _____
                                              *Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:

      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

**SCHEDULE A**

**DEFINITIONS**

Unless context indicates otherwise, the following words and phrases are defined and used herein as follows:

1.    **Action**.  "Action" means the action captioned on the first page of this subpoena, *Patel v. Atlantic Monthly et al.*, No. 1:26-cv-01329-EGS (D.D.C.).

2.    **Article**.  "Article" means the April 17, 2026 news article published by *The Atlantic* titled "The FBI Director is MIA," available at https://www.theatlantic.com/politics/2026/04/kash-patel-fbi-director-drinking-absences/686839/ and at issue in this Action.

3.    **Breaching Equipment**.  "Breaching Equipment" means any item, object, thing, or System that can be or is used by or assigned to FBI personnel (including the Director's security detail) to access a physical space, including a battering ram, sledge hammer, axe, halligan bar, pry bar, hydraulic spreader, bolt cutter, lock breaker, cutting equipment, torch, explosive charge, and the like.

4.    **Calendars**.  "Calendars" means any calendar, agenda, or scheduling system, in any form (including electronic and paper), including Systems, used to account for, plan, or track schedules, meetings, time, entries, assignments, due outs, and other items, including Microsoft Outlook and Microsoft Teams.

5.    **Communication**.  "Communication" means any type of correspondence, including incoming and outgoing telephone calls (including landline, cellular, satellite, non-secure, secure, yellow, red, and any other type of telephonic device), voicemails, emails, instant or text messages (including messages sent over social media or messaging platforms such as Facebook, Signal, Teams, Skype, WhatsApp, Telegram, etc., whether on non-secure, secure, yellow, or red Systems), written or graphic communications, and whether in draft form or completed.  This term includes

all such Communications to which DOJ and FBI have access, whether or not on a government-issued Device or System, a personal Device or System, or other.

6.     **Complaint**.  "Complaint" means the operative Complaint filed by Plaintiff in this Action on April 20, 2026.

7.     **Device**.  "Device" means any desktop computer, laptop computer, computer of any kind, tablet, iPad, landline phone, cellular phone, satellite phone, non-secure phone, secure phone, yellow phone, red phone, electronic communication device of any kind, SIM card, and any Device or System capable of storing, sending, or receiving Communications.

8.     **Director's Suite**.  "Director's Suite" means Director Patel's Office, as well as the offices of Director Patel's physically proximate staff, any adjoining common areas or lobbies, and any private elevator or access point.

9.     **Document**.  "Document" means any and every kind of printed, typed, recorded, written, graphic or photographic matter (including audiotape and/or videotape recordings), however printed, produced, reproduced, coded, or stored (including in electronic or digitized form), of any kind or description, whether sent or received or not, including originals, copies, reproductions, facsimiles, and drafts, regardless of their author or origin, however denominated. A draft or non-identical copy is a separate Document for purposes of these requests.

10.    **DOJ**.  "DOJ" means the Department of Justice and any of its agents, attorneys, representatives, employees, detailees, contractors, or other persons acting on behalf of such entity, including but not limited to acting Attorney General Todd Blanche, former Attorney General Pamela Bondi, and anyone acting on their behalf.

11.    **External Complaints**.  "External Complaints" mean any informal or formal complaint made, filed, or acknowledged to, by, or within the White House or any other executive department or agency.

12.    **FBI**.  "FBI" means the Federal Bureau of Investigation and any of its agents, attorneys, representatives, employees, detailees, contractors or other persons acting on behalf of such entity.

13.    **FBI Installation**.  "FBI Installation" means FBI Headquarters, the FBI's facilities at Quantico, and any FBI field office, resident agency, operational facility, training facility, international attaché office, aircraft, vehicle, or any other location controlled or operated by the FBI for official purposes, and any part thereof.

14.    **Internal Complaints**.  "Internal Complaints" mean any informal (including "drop files") or formal complaint made, filed, or acknowledged to, by, or within the FBI Inspection Division, FBI Office of Professional Responsibility, or Department of Justice Office of Inspector General; to any member of Director Patel's staff or security detail; or to other FBI officials.

15.    **Photo/Video**.  "Photo/Video" means any photo or video (including analog and digital) from whatever source, including Devices, Systems, Body Worn Cameras ("BWCs"), surveillance cameras, security cameras, Closed Circuit Television ("CCTV"), or similar.  This term includes any FBI, or FBI-installed, or FBI-managed source, including at any FBI Installation or any personal residence.

16.    **Plaintiff** or **Director Patel**.  "Plaintiff" or "Director Patel" mean Kashyap P. Patel, and any agents, attorneys, representatives, or other persons or entities acting for or on his behalf or in concert with him.

3

17.    **Records**.  "Records" means (1) all recorded information, regardless of form or characteristics; and (2) all Documents, Communications, and Calendars.

18.    **Summarily Terminated Employees**.  "Summarily Terminated Employees" mean any FBI personnel (including Senior Executive Service, supervisor (including those as defined in the FBI Domestics and Operations Guide, Section 3.5.1), Special Agents, Intelligence Analysts, Staff Operations Specialists, or staff of any kind) whose employment was summarily terminated at the direction or instigation of, or in consultation with, Director Patel.  Summarily Terminated Employees are believed to number in excess of 50 and include at least: (1) Jamie Garman, Blaire Toleman, and Michelle Ball, the plaintiffs in *Garman et al. v. Patel et al.*, Case No. 1:26-cv-01086 (D.D.C.); (2) Brian Driscoll, Jr., Steven Jensen, and Spencer Evans, the plaintiffs in *Driscoll et al. v. Patel et al.*, Case No. 1:25-cv-03109 (D.D.C.); (3) Jane Does 1-9 and John Does 1-3, the plaintiffs *in Jane Does 1-9 et al. v. Patel et al.*, Case No. 1:25-cv-04258 (D.D.C.); (4) Walter Giardina; (5) Christopher Meyer; and (6) any other FBI personnel in any way or at any time connected or assigned to the Arctic Frost investigation, Plasmic Echo investigation, squad CR-15, squad CI-12, or intel squad ID-19 who were terminated by the FBI for any reason or no reason since January 20, 2025.

19.    **System**.  "System" means (1) any Device; (2) any program, software, application, network, database, or collection of information that permits, requires, or tracks user login or access information, including Sentinel, JCON-S, SIPRNet, BuNet, FBINET, Law Enforcement Enterprise Portal ("LEEP"), JWICS, E2, webTA, Microsoft Outlook, Microsoft Teams, Skype, any other Communications platform, or the like, regardless of whether the System is non-secure, secure, yellow, or red; and (3) any physical area, such as an FBI Installation or parts thereof (including any Sensitive Compartmented Information Facility ("SCIF")), that permits, requires, or

tracks access with specific credentials such as a Personal Identity Verification ("PIV") card, Blue Badge, JCON-S card, Personal Identification Number ("PIN"), Personal Access Code ("PAC"), or the like.

## INSTRUCTIONS

The following instructions apply to each and every Request set forth herein.

1. The words "and" and "or" also have the meaning "and/or".

2. The term "person" means all individuals and entities.

3. Unless otherwise indicated below, the time period for each Request is February 20, 2025 through the present.

4. Throughout these requests, the singular shall include the plural and the plural shall include the singular.

5. The following terms should be read as if they were synonymous, and each should be taken to include the meaning of all of the others: relating to, relating in any manner to, concerning, referring to, alluding to, responding to, in connection with, connected with, with respect to, commenting on, about, regarding, announcing, explaining, discussing, showing, describing, studying, reflecting, analyzing, establishing, supporting, refuting, or constituting.

6. If you contend that it would be unreasonably burdensome to produce all the documents called for in response to any request, you should:

    a. Produce all documents that are available without unreasonable burden; and

    b. Describe with particularity the reasons why production of the remaining documents would be unreasonably burdensome.

7. In the event that any responsive document cannot be produced in its entirety, you are requested to produce the document to the fullest extent possible, specifying the reasons for

5

your inability to produce the remainder and describing to the fullest extent possible the contents of the portion not produced.

8.     With respect to your responses to the following requests for production, if any document or any portion of any document is withheld because of a claim of privilege, please state the basis for your claim of privilege with respect to such document or portion of any document and the specific ground(s) on which the claim of privilege rests, and including, with respect to documents: the date appearing on the document, or if no date appears, the date on which the document was prepared; the name of the person(s) to whom the document was addressed; the name of each person, other than addressee(s), to whom the document, or a copy thereof, was sent or with whom the document was discussed; the name of the person(s) who signed the document, or if not signed, the name of the person(s) who prepared it; the name of each person making any contribution to the authorship of the document; and the general nature or description of the document and the number of pages of which it consists.

9.     In the event that any documents or things that would have been responsive to these requests have been destroyed, discarded or lost, please identify each such document or thing, including: the nature of the document or thing; the author(s) and addressee(s) of any document; any indicated or blind copies of any document; the document's subject matter, number of pages and attachments or appendices; all persons to whom the document was distributed or persons who have seen the thing; the date of destruction, discard or loss; and, if destroyed or discarded, the reasons therefore and the identity of the person(s) authorizing or carrying out any such destruction or discard.

## **TOPICS OF TESTIMONY**

The topics of testimony sought are as follows:

6

1.      The identity, roles, responsibilities, and organizational placement of relevant DOJ and/or FBI personnel, including those individuals assigned to Director Patel's security detail, the Director's Advisory Team, and the Director's Special Committee; those involved in Director Patel's travel; those assisting with any Device or System; those with access to Director Patel's Calendars; those constituting Summarily Terminated Employees and/or personnel accessing the personnel files for any Summarily Terminated Employee; and those involved with or the target of polygraphs.

2.      Communications regarding *The Atlantic*, the Article, Ms. Fitzpatrick, and this Action.

3.      Director Patel's public statements, including social media posts, regarding the Charlie Kirk murder investigation and the Brown University mass shooting investigation.

4.      Disclosures made by or regarding Director Patel, including SF-86 forms, vetting materials, annual ethics filings such as OGE 450 or OGE 278, any drug or alcohol testing, examination, or questionnaire administered to or discussed with Director Patel, reimbursements to the DOJ made by or in connection with Director Patel, and/or Director Patel's membership or attendance at private clubs, social spaces, and/or recreational facilities.

5.      Internal Complaints and External Complaints involving allegations of conduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

6.      Director Patel's Calendars, schedule, and physical presence at FBI Installations, and all domestic and international travel by Director Patel and his security detail, including related expenses, per diems, reimbursements, passport use, and use of FBI or government aircraft.

7.      The Devices and Systems used by, assigned to, or accessed by Director Patel, his staff, and his security detail, including login and access records for any such Devices and Systems, as well as communications between the FBI and the White House.

8.      FBI security-detail protocols, and the storage, assignment, requisition, and use of Breaching Equipment in connection with Director Patel, his staff, or his security detail.

9.      Photo/Video records showing Director Patel's entry to, exit from, or access to any FBI Installation, personal residence, or the Director's Suite.

10.     The creation, approval, production, and provision of FBI merchandise, challenge coins, or bourbon bottles depicting Director Patel's name, image, signature, or likeness, or any portion or approximation thereof (including the monikers K$H or Ka$H), and any related gifts or reimbursements.

11.     The awarding of bonuses or other incentives to DOJ or FBI employees by Director Patel.

12.     The circumstances pertaining to, criteria, process, and approval of the terminations of Summarily Terminated Employees, including any related internal investigations, disciplinary findings, and communications with DOJ, FBI, or White House personnel.

13.     Polygraph scripts and examinations administered to FBI personnel concerning disclosures to reporters, Congress, or disciplinary authorities, perceived "enemies" of Director Patel, *The Atlantic*, the Article, Sarah Fitzpatrick, or this Action.

14.     Congressional oversight requests, investigations, and related communications concerning Director Patel's conduct, use of government aircraft, travel, and personnel decisions.

**DOCUMENTS REQUESTED**

8

A.      **Relevant Witnesses**

1.      <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personal aides (including the position informally known as "body man" or "bag man") assigned to Director Patel.

2.      <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to Director Patel's security detail (whether formally, informally, permanently, on detail, or on temporary duty), including any personnel assigned, seconded, or detailed from any other executive department and/or agency, including but not limited to the Department of Homeland Security and its components, including the Secret Service.

3.      <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to the Director's Advisory Team (whether formally, informally, permanently, on detail, or on temporary duty).  Such names and other information should include any FBI Office of Congressional Affairs Supervisory Special Agent(s) assigned to the Director's Advisory Team.

4.      <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel assigned to the Director's Special Committee (whether formally, informally, permanently, on detail, or on temporary duty).   Such names and other information should include any FBI Office of Congressional Affairs Supervisory Special Agent(s) assigned to the Director's Special Committee.

5.      <u>Time Period: February 20, 2025, through the present</u>:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any pilot, first officer, or other DOJ or FBI personnel on board any FBI or government aircraft when any of the following were passengers: (1) Director Patel; (2) Alexis Wilkins; (3) members of Director Patel's security detail.

9

6.      Time Period: February 20, 2025, through the present:  Records sufficient to identify all personnel who had access or ability to add, edit, alter, modify, or delete anything from Director Patel's Calendars, including his schedulers and assistants.

7.      Time Period: April 10, 2026:  Records sufficient to identify the names, contact information, job titles, and job descriptions of any personnel whose responsibilities included assisting with any Device or System, who contacted, were contacted by, or interacted in any way with Director Patel, his staff, or his security detail, or who physically entered the Director's Suite on April 10, 2026.

8.      Time Period: January 1, 2025, through the present:  Records sufficient to identify Erica Knight's contact information, job title, job description, and pay history.

9.      Records sufficient to identify all DOJ and/or FBI personnel who accompanied Director Patel on his trip to Italy in February 2026, including any DOJ and/or FBI personnel identifiable in publicly available videos of the incident, including https://www.cnn.com/2026/02/23/politics/video/kash-patel-goes-viral-for-hockey-celebration-vrtc.

10.      Time Period: January 20, 2025, through the present:  Records sufficient to identify all Summarily Terminated Employees.

11.      Time Period: January 20, 2025, through the present:  Records, including access logs, sufficient to identify the date, time, name, contact information, job title, and job description of any individual, office, or component that accessed any personnel file or part thereof for any Summarily Terminated Employee.

12.     Time Period: February 20, 2025, through the present:  Records sufficient to identify all polygraphers (whether FBI personnel, employees, contractors, detailees, or assignees) conducting or assisting in any polygraph that used questions or topics including:

   a. Questions or topics regarding FBI personnel providing information to reporters, Congress, or any disciplinary authority (including FBI Inspections Division, FBI Office of Professional Responsibility, and DOJ Office of Inspector General);

   b. Questions or topics regarding perceived "enemies" of Director Patel; and

   c. Questions or topics regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.

13.     Time Period: February 20, 2025, through the present:  Records sufficient to identify all individuals (whether personnel, employees, or contractors) who were subject to any polygraph that used questions or topics identified in the immediately preceding Request.

14.     Time Period: February 20, 2025, through the present:  Records sufficient to identify all individuals at whose personal residences Director Patel visits, stays overnight, and/or resides, including residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida.

   **B.     Devices and Systems**

15.     Time Period: February 20, 2025, through April 17, 2026:  All Records pertaining to all login information for all Devices and Systems Director Patel attempted to access, regardless of whether the attempted access was successful.  Records must include date, time, Internet Protocol address, Device identifier, location, and the like.

16.     Time Period: February 22, 2026, through April 17, 2026:  All Records pertaining to Communications between (1) any Device or System associated with the White House or Executive Office of the President, including any phone number beginning with the exchange 202-

11

456-XXXX; and (2) any Device or System assigned to or used by Director Patel, his staff, his security detail, Ben Williamson, or Erica Knight.

17.    Time Period: April 10, 2026:  All Records of login information for all Devices and Systems Director Patel attempted to access on April 10, 2026, regardless of whether the attempted access was successful.  Records must include date, time, Internet Protocol address, Device identifier, location, and the like.

18.    Time Period: April 10, 2026:  All Records of all Communications from any Device or System to which Director Patel had access, including Devices or Systems assigned to him, his security detail, any staff in the Director's Office, or any FBI employee of any kind.

19.    Time Period: April 10 through April 13, 2026:  All Records of all Communications between (1) any FBI Device or System, and (2) any Device or System associated with the White House or the Executive Office of the President, including any phone number beginning with the exchange 202-456-XXXX.

20.    Time Period: April 17, 2026, through the present:  All Records of all Communications regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.  Some, but not all, relevant custodians include (1) Director Patel; (2) the Director's Chief of Staff, Acting and/or Interim Chief of Staff, Deputy Chief of Staff, and Assistant(s) Chief of Staff; (3) Andrew Bailey; (4) Christopher Raia; (5) Ben Williamson; (6) Erica Knight; (7) Jake Hemme; (8) Will Rivers; (9) Todd Blanche; (10) Katie Kenlein; (11) Emily Covington; (12) Chad Gilmartin; (13) Gates McGavick; (14) Natalie Baldassar; (15) Wyn Hornbuckle; (16) any personnel assigned to the FBI's Office of Congressional Affairs (whether formally, informally, permanently, on detail, or on temporary duty); (17) any personnel assigned to the FBI's Office of Public Affairs (whether formally, informally, permanently, on detail, or on temporary duty);

12

(18) any personnel assigned to the Director's Advisory Team (whether formally, informally, permanently, on detail, or on temporary duty); and (19) any personnel assigned to the Director's Special Committee (whether formally, informally, permanently, on detail, or on temporary duty).

21.    Time Period: April 17, 2026, through the present:  All non-privileged Records of all Communications regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action between (1) Director Patel, and (2) the Binnall Law Group, including any attorneys working on Binnall Law Group's behalf, including but not limited to Jesse Binnall, Jason Greaves, and Jared Roberts.

22.    Time Period: April 17, 2026, through the present:  All Records of all Communications between Ben Williamson (from any Device or System, including bdwilliamson2@fbi.gov) and Erica Knight (from any Device or System, including erica.knight@xpectsolutions.com) or any other email address at the domain "xpectsolutions.com".

## C.    Location and Travel Information

23.    Time Period: February 20, 2025, through the present:  All Calendars showing Director Patel's schedule, including all meeting requests, changed meeting times, cancelled meetings, and rescheduled meetings.  Such Calendars include those on any Device and System accessible by or to Director Patel, his staff, or his security detail.

24.    Time Period: February 20, 2025, through the present:  Records sufficient to show dates, times, and locations when Director Patel was physically present at any FBI Installation.

25.    Time Period: February 20, 2025, through April 17, 2026:  All Records regarding Director Patel's allegation in the Complaint that "[i]n calendar year 2025, Director Patel took approximately 17 personal days."  Compl. ¶ 26.  Such Records should include (but are not limited to) webTA records, or records of any predecessor or successor System that accounts for time and attendance.

13

26.     Time Period: February 20, 2025, through April 17, 2026:  All Records regarding "Director Patel's robust public schedule and visible, documented presence at FBI headquarters, field offices, joint operations, press conferences, congressional appearances, and on-the-ground deployments to active investigations," as alleged in Director Patel's Complaint.  Compl. ¶ 41(b).

27.     Time Period: February 20, 2025, through April 17, 2026:  All Records regarding the location of any vehicle assigned to or used by Director Patel or his security detail.  Such Records must include GPS location and information (including Events and Navigation) collected by any telematics or infotainment System.

28.     Time Period: February 20, 2025, through April 17, 2026:  All Records pertaining to the following categories of information regarding any FBI or government aircraft when any of the following were passengers: (1) Director Patel; (2) Alexis Wilkins; (3) any member of Director Patel's security detail; and (4) any member of the Director's Advisory Team:

   a. Records sufficient to show the location of the aircraft (including transponder information);

   b. All air traffic control recordings;

   c. All passenger manifests;

   d. All Communications regarding aircraft passengers or persons anticipated to be aircraft passengers;

   e. All customs declarations;

   f. All aircraft weight measurements;

   g. Whether alcohol was present on board the aircraft; and

   h. All Records provided to the U.S. General Services Administration (GSA) under 41 C.F.R. §§ 102-33.

29.     Time Period: February 20, 2025, through the present:  To the extent not included in the preceding Request, all Records pertaining to the categories of information set forth in the

14

preceding Request related to the following trips taken and/or reported to be planned by Director Patel:

    a.  Summer 2025 trip to Scotland;

    b.  Summer 2025 trip to Australia, New Zealand, and Hawaii, including a snorkeling excursion around the USS Arizona;

    c.  October 2025 trip to Penn State University;

    d.  October 2025 trip to "Boondoggle Ranch" in San Angelo, Texas;

    e.  February 2026 trip to Italy;

    f.  Forthcoming 2026 trip to Russia;

    g.  Any and all trips to Nashville, Tennessee;

    h.  Any and all trips involving Alexis Wilkins, including any performances by Ms. Wilkins; and

    i.  Any and all trips involving UFC fights or other sporting events.

30.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing expenses and per diems for Director Patel, his security detail, and any personnel traveling with Director Patel, whether domestically or internationally.  Such Records include paper and electronic form, including in E2 or SATO Travel records.

31.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing any reimbursement to the DOJ, the FBI, or the U.S. Department of the Treasury for Director Patel's private use, non-mission use, or required use of any FBI or government aircraft (including any Gulfstream aircraft).  Such reimbursements include those required by OMB Circular No. A-126.

32.    <u>Time Period: February 20, 2025, through the present</u>:  All Records showing use of Official Passports or Diplomatic Passports by Director Patel, his security detail, and personnel traveling internationally with Director Patel.

15

33.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the duration, location, and purpose of all international travel by Director Patel, his security detail, and personnel traveling with them.

34.     Time Period: February 20, 2025, through the present:  All Records (including FD-772, E2 notifications and approvals, and similar) identifying notification and approval of international travel for Director Patel, his security detail, and personnel traveling with them.

35.     Time Period: July 3, 2025, through February 23, 2026:  All Communications regarding coordinating travel for Director Patel's trip to Italy in February 2026, including all Communications with Italian authorities.

36.     Time Period: July 3, 2025, through February 23, 2026:  Records (including Calendars) sufficient to identify Director Patel's official business in Italy or Europe, including the location and type of that official business.

37.     Time Period: February 20, 2025, through the present:  Records sufficient to identify the addresses of all individuals whose personal residences Director Patel visits, stays overnight, and/or resides, including residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida.

**D.     Security Detail Protocols and Breaching Equipment**

38.     Time Period: February 20, 2025, through April 17, 2026:  All Records regarding Breaching Equipment related to Director Patel, his staff, or his security detail, including policies (and dates of those policies), internal incident reports, storage locations, SWAT deployment records, news reports, photographs, Internal Complaints, and External Complaints.

39.     Time Period: February 20, 2025, through April 17, 2026: All Records contradicting the allegation in Director Patel's Complaint that "no internal incident report, no SWAT

16

deployment record, no news report, no photograph, no complaint" corroborates the Article's reporting regarding Breaching Equipment.  Compl. ¶ 41(d).

40.    Time Period: February 20, 2025, through April 17, 2026:  Records sufficient to show when, from where, and what type of Breaching Equipment was purchased for, requisitioned by, used by, available to, or assigned to Director Patel, his staff, or his security detail.

41.    Time Period: February 20, 2025, through April 17, 2026:  Records sufficient to show that, as Director Patel's Complaint alleges, "breach equipment is provided to all FBI protection details."  Compl. ¶ 21.

42.    Time Period:  February 20, 2025, through April 17, 2026:  All Records (including "FBI security-detail protocols") showing, as Director Patel alleges, that "FBI security-detail protocols . . . would have shown the 'waking the Director' story was operationally implausible."  Compl. ¶ 42.

43.    Time Period: February 20, 2025, through April 17, 2026:  All Communications regarding reports or concerns expressed by personnel assigned to Director Patel's security detail (whether formally, informally, permanently, on detail, or on temporary duty) about the ability to wake Director Patel and/or to access Director Patel behind a locked door.

### E.    Director Patel's Statements Regarding Law Enforcement Investigations

44.    Time Period: September 10, 2025, through September 17, 2025:  All Records pertaining to Director Patel's public statements in connection with the Charlie Kirk murder law enforcement investigation.

45.    Time Period: December 13, 2025, through December 20, 2025:  All Records pertaining to Director Patel's public statements in connection with the Brown University mass shooting law enforcement investigation.

17

46.    Time Period: September 10, 2025, through December 15, 2025:  All Records related to the following specific social media posts, including drafts thereof, who posted the message, and who has access to or control over the relevant account to post messages.  Relevant custodians include Director Patel, Ben Williamson, Erica Knight, and any personnel assigned to FBI's Office of Public Affairs.

    a.    https://x.com/FBIDirectorKash/status/1965903392934633587;

    b.    https://x.com/FBIDirectorKash/status/1965928054712316363; and

    c.    https://x.com/FBIDirectorKash/status/2000244040667676940.

**F.    Disclosures**

47.    All Records pertaining to:

    a.    All SF-86 forms, and any additions or amendments thereto, for Director Patel, for any government positions, whether prior to or in relation to his role as FBI Director.

    b.    All Records submitted to the White House, Executive Office of the President, Department of Justice, or FBI regarding considering or vetting Director Patel for his position as FBI Director.

    c.    All annual disclosures, such as Forms OGE 450 or OGE 278, filed by or on behalf of Director Patel, for any government positions, whether prior to or in relation to his role as FBI Director.

48.    Time Period: February 20, 2025, through the present:  All Records regarding any drug or alcohol test, examination, questionnaire, or review (including the results) discussed with, administered to, or taken by Director Patel, including those in connection with compliance with DOJ's Ethics Handbook.  Such Records include those regarding any "Audit Test" discussed by Director Patel during the U.S. Senate Hearing on May 12, 2026.

49.    Time Period: February 20, 2025, through the present:  All Records showing any reimbursement to the DOJ, the FBI, or the U.S. Department of the Treasury for Director Patel's meals, alcohol, travel, and/or gifts, or any other reimbursement of any kind.

18

50.    Time Period: February 20, 2025, through the present:  All Records relating to any visits, reimbursements, or gifts given or received by Director Patel involving any private clubs, social spaces, and/or recreational facilities, including Ned's Club and Penn Social in Washington, D.C.; the Poodle Room in Las Vegas; CXIIIREX in Alexandria, Virginia; Landini Brothers Restaurant in Alexandria, Virginia; Butterworth's in Washington, D.C.; and Executive Branch in Washington, D.C.

51.    Time Period: February 20, 2025, through the present:  All Records relating to Director Patel's participation in a hockey league team, including at the MedStar Capitals Iceplex (as referenced in part https://www.cnn.com/2026/04/23/politics/kash-patel-hockey-fan?cid=ios_app).

**G.    Polygraphs**

52.    Time Period: February 20, 2025, through the present:  All Records pertaining to all polygraph scripts that include:

   a.    Questions or topics regarding FBI personnel providing information to reporters, Congress, or any disciplinary authority (including FBI Inspections Division, FBI Office of Professional Responsibility, and DOJ Office of Inspector General);

   b.    Questions or topics regarding perceived "enemies" of Director Patel; and

   c.    Questions or topics regarding (1) *The Atlantic*; (2) the Article; (3) Sarah Fitzpatrick; and (4) this Action.

**H.    Merchandise and Bonuses**

53.    Time Period: February 20, 2025, through the present:  All Records related to any merchandise available for purchase at any FBI Installation approved by Director Patel, or depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

19

54.    Time Period: February 20, 2025, through the present:  All Records related to any merchandise provided as a gift or presented by Director Patel, or depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

55.    Time Period: February 20, 2025, through the present:  All Records related to any bottles of alcohol depicting Director Patel's name, image, signature, likeness or any portion or approximation thereof (including the monikers K$H or Ka$H), including the creation, storage, maintenance, provision of, sale, and/or reimbursements of such merchandise.

56.    Time Period: February 20, 2025, through the present:  All Records related to the creation, design, approval, production, purchase, and dissemination of any "challenge coin" (or similar) in which Director Patel had involvement or which Director Patel presented to any FBI personnel, including any "challenge coin" similar in type to the one referenced in Brian Driscoll's complaint, *see Driscoll et al.*, Compl. ¶ 141 (describing a challenge coin proffered by Director Patel that was "much larger, inscribed with 'Director' at the top banner of the coin and 'Ka$h Patel' at the bottom banner."), and/or as seen here[1]:

---

[1] @KDilanianMSNOW, X (Oct. 3, 2025),
https://x.com/KDilanianMSNOW/status/1974109240374484999.

20



57.    Time Period: February 20, 2025, through the present:  All Records regarding Director Patel's allegation in the Complaint—in response to the Article's reporting that Director Patel complained FBI merchandise "isn't intimidating enough"—that "[h]is security detail confirmed that he has made no such complaint about FBI merchandise."  Compl. ¶ 25.

58.    Time Period: February 20, 2025, through the present:  All Records showing any reimbursement to the DOJ, the FBI, the U.S. Department of the Treasury, and/or the U.S. government for Director Patel's creation, assembly, purchase, and/or personalization of any merchandise.

59.    Time Period: February 20, 2025, through the present:  All Records reflecting any bonuses awarded by Director Patel to any DOJ or FBI employees, including Forms FD-255, Forms SF-50s, Category D cash bonuses, on the spot awards, SES bonuses, Director's Awards, or any other incentive awards.

**I.    Photo / Video**

60.    Time Period: February 20, 2025, through the present:  All Photo/Video showing Director Patel entering, exiting, or accessing (1) any FBI Installation; (2) any personal residence,

21

whether or not owned by Director Patel, including personal residences in Washington, D.C.; Las Vegas, Nevada; Nashville, Tennessee; and Palm Beach or West Palm Beach, Florida, and (3) the Director's Suite.

61.    Time Period: April 10, 2026:  All Photo/Video showing any entrance to the Director's Suite (including the private elevator from the garage), including Photo/Video of Director Patel, his staff, his security detail, and any personnel whose responsibilities include assisting with any Device or System.

### J.    Internal and External Complaints

62.    Time Period: February 20, 2025, through the present:  All Records of Internal Complaints involving allegations of misconduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

63.    Time Period: February 20, 2025, through the present:  All Records of External Complaints involving allegations of misconduct by or on behalf of Director Patel, his staff, his security detail, the Director's Advisory Team, or the Director's Special Committee.

### K.    Summarily Terminated Employees

64.    Time Period: January 20, 2017, through the present:  All Documents pertaining to personnel files (including Annual Performance Reviews, Records showing performance ratings, SF-50s, and termination letters) for all Summarily Terminated Employees.

65.    Time Period: November 6, 2024, through the present:  All Communications related to all Summarily Terminated Employees to, with, between, or involving (1) James McHenry; (2) Pamela Bondi; (3) Todd Blanche; (4) Emil Bove; (5) Stephen Miller; (6) Paul Ingrassia; (7) Director Patel (including prior to his confirmation as FBI Director); (8) Michael Clark; (9) Christopher-James DeLorenz; (10) Colin McDonald; (11) Ed Martin; (12) any personnel assigned to the Director's Advisory Team (including Greg Menser and Tom Ferguson); (13) any personnel

22

assigned to the Director's Special Committee; (14) any personnel assigned to the FBI Office of Congressional Affairs; (15) any personnel assigned to the FBI Office of Public Affairs; (16) any personnel assigned to the FBI Human Resources Division; (17) any personnel assigned to FBI Office of General Counsel; (18) any Division Counsel or Assistant Division Counsel in any Field Office or Resident Agency; and (19) any personnel assigned to DOJ Weaponization Working Group.

66.    Time Period: January 20, 2025, through the present:  All Communications regarding discipline or termination for any Summarily Terminated Employee to, from, with, or involving (1) any person identified in the immediately preceding Request, and (2) any supervisor of any Summarily Terminated Employee.

67.    Time Period: January 20, 2025, to February 20, 2025:  All Records shared by the Director's Advisory Team (including Menser) with Brian Driscoll and Robert Kissane at a meeting in January or February 2025, including "a list of names and field offices" that "were marked to be removed or terminated." *Driscoll et al.*, Compl. ¶¶ 56-60, 80-82.

68.    Time Period: January 20, 2025, through April 17, 2026:  Records sufficient to show the placement of squad CI-12 within the FBI organizational structure.

69.    Time Period: January 20, 2025, through April 17, 2026:  Records sufficient to show the countries or geographic regions implicated by investigations in which CI-12 was involved, including Iran.

70.    Time Period: January 20, 2025, through the present:  All Records regarding any criminal or administrative assessment or investigation regarding any Summarily Terminated Employee, including opening ECs and 263 files.

23

71.      Time Period: January 20, 2025, through the present:  All Records of Internal Complaints involving allegations of conduct by or on behalf of Summarily Terminated Employees.

72.      Time Period: January 20, 2025, through the present:  All Records of Internal Complaints made by or on behalf of Summarily Terminated Employees.

73.      Time Period: January 20, 2025, to the present:  All Records showing that any Summarily Terminated Employee was, as Director Patel alleges, "found to have acted unethically or undermined the mission."  Compl. ¶ 25.

74.      Time Period: February 20, 2025, to the present:  All Records showing Director Patel's compliance with the FBI Office of Professional Responsibility Policy Guide and FBI disciplinary policy regarding the Summarily Terminated Employees.

75.      Time Period: February 20, 2025, to the present:  All Records showing that any Summarily Terminated Employee was found to have violated an FBI Offense Code, and who made such a finding.

76.      Time Period: February 20, 2025, through the present:  All Records prepared for or by Director Patel in anticipation of or preparation for the U.S. House Select Committee on Intelligence Hearing on March 19, 2026, regarding Director Patel's statement that "the FBI, every time there is someone who violates our Code of Conduct or ethical standards, conducts an internal investigation with the careers there and they present a decision point to me" (available at https://www.c-span.org/program/house-committee/national-security-officials-testify-on-global-threats-to-the-us/675647 around minute mark 1:45-1:49).

77.      Time Period: February 20, 2025, through the present:  All Records regarding any "internal investigation" referenced in the immediately preceding Request, the identities of any

"careers" (or any FBI personnel) who presented Director Patel with a "decision point" regarding any Summarily Terminated Employee, and what that "decision point" was.

78.     Time Period: August 1, 2025, to the present:  All Records related to a meeting between Director Patel and Brian Driscoll on or about August 5, 2025, in which Director Patel stated, in sum and substance, "'all FBI employees who they identified had worked on the cases against President Trump would be removed from their jobs' and that [Patel] needed to fire agents who worked on cases against President Trump in order to keep his own position" and also during which Director Patel "acknowledged that the firings would be in direct violation of internal FBI process, that they were likely illegal, and that he could be sued and deposed" and also during which Director "Patel explained that he had to fire the people his superiors told him to fire, because his ability to keep his own job depended on the removal of the agents who worked on cases involving the President."  *See Garman et al.*, Compl. ¶¶ 135, 137; *Driscoll et al.*, Compl. ¶¶ 4-5.

79.     Time Period: October 1, 2025, through October 10, 2025:  All Records related to the following social media post, including drafts thereof, who posted the message, who has access to or control over the relevant account to post messages, and the provenance of, and substantiation for, the statement by Director Patel that "We fired those who acted unethically, dismantled the corrupt    CR-15    squad,    and    launched    an    investigation"    (available    at https://x.com/FBIDirectorKash/status/1975615124556632540).

80.     Time Period: February 20, 2025, to the present:  All Records regarding the "investigation" Director Patel described in the immediately preceding Request.

81.     Time Period: October 7, 2025, to the present:  All Records pertaining to the letter to Michelle Ball from FBI Human Resources Division that stated, in sum and substance, that Ball

25

separated from the FBI in good standing and without any open disciplinary or administrative action.

82.    Time Period: March 4, 2026, through the present:    All Records and Communications, including from custodians within FBI's Office of Congressional Affairs, related to the March 4, 2026, letter to Director Patel from Grace Meng, seeking information and documents regarding "the firing of at least 10 counterintelligence agents and support staff, including those who served in the unit known as CI-12—the elite unit within the FBI that conducts counter-espionage and counterintelligence in the Middle East" (available at https://meng.house.gov/sites/evo-subsites/meng.house.gov/files/evo-media-document/3.4.26-meng-letter-to-fbi-director.pdf).

83.    Time Period: February 20, 2025, through the present:  Records sufficient to show turnover rates and number of departed employees (whether from voluntary departures, terminations, or otherwise) in each FBI Field Office.  Such information may come, at least in part, from each Field Office's semi-annual program reviews in 2025 and 2026.

**L.    Congressional and Public Oversight**

84.    Time Period: December 1, 2025, through the present:  All Records, including from custodians within FBI's Office of Congressional Affairs, regarding the following Congressional requests for information and investigations, including all Records produced to Congress in response to the requests for information and investigations:

a. The May 7, 2025 letter from Sen. Durbin requesting a GAO review (available at https://www.judiciary.senate.gov/imo/media/doc/2025-5-07%20Letter%20to%20GAO%20re%20Executives%20use%20of%20aircraft%20for%20nonmission%20purposes.pdf);

b. The December 1, 2025 letter to Director Patel from Rep. Jamie Raskin and Rep. Sydney Kamlager-Dove (available at https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2025-12-01-raskin-kamlager-dove-to-patel-fbi-re-plane.pdf);

26

c.  The February 24, 2026 letter from Sen. Durbin in further support of his request for GAO and DOJ OIG review (available at https://www.judiciary.senate.gov/imo/media/doc/2026-02-24%20Letter%20to%20GAO%20and%20DOJ%20IG%20on%20Kash%20Patel%20Olympic%20Travel.pdf)

d.  The May 5, 2026 letter to Director Patel from Sen. Chuck Grassley (as reported on, https://democrats-judiciary.house.gov/media-center/press-releases/ranking-members-raskin-durbin-launch-bicameral-investigation-into-kash-patel-s-abuse-of-fbi-jets-and-tax-dollars-following-private-senate-gop-letter-questioning-patel-s-spending-travel); and

e.  The July 8, 2026 letter to Director Patel from Sen. Richard Durbin and Rep. Jamie Raskin (available at https://democrats-judiciary.house.gov/sites/evo-subsites/democrats-judiciary.house.gov/files/evo-media-document/2026-07-08-raskin-durbin-to-patel-fbi-re-jet-usage-letter.pdf).

85.     Time Period: May 1, 2026, through the present:  All Records prepared for or by Director Patel in anticipation of or preparation for the U.S. Senate Appropriations Committee Hearing on May 12, 2026, related to Director Patel's alcohol use, *The Atlantic*, the Article, and/or this Action.

86.     All Records prepared in response to and/or in connection with the following Freedom of Information Act ("FOIA") lawsuits: *Democracy Forward Found. v. FBI et al.*, No. 1:26-cv-02075 (D.D.C. filed June 11, 2026); *Pub. Citizen v. FBI*, No. 1:26-cv-01952 (D.D.C. filed June 3, 2026); *Democracy Defenders Fund v. FBI*, No. 1:26-cv-01935 (D.D.C. filed June 2, 2026).