IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KASHYAP P. PATEL**,<br><br>*Plaintiff*,<br><br>v.<br><br>**ATLANTIC MONTHLY GROUP LLC; SARAH FITZPATRICK**<br><br>*Defendants.* | Case No.: 1:26-cv-01329-EGS |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

Jesse R. Binnall, VA022
Jason C. Greaves, DC1033617
Jared J. Roberts, FL00153
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com
jason@binnall.com
jared@binnall.com

*Counsel for Plaintiff*

# TABLE OF CONTENTS

*TABLE OF CONTENTS* ........ *i*

*TABLE OF AUTHORITIES* ........ *ii*

*BACKGROUND* ........ *2*

*Standard of Review* ........ *4*

*Argument* ........ *5*

*I. Defendants' request for judicial notice is improper.* ........ *5*

*II. Dir. Patel has stated a claim for defamation.* ........ *5*

a. Defendants' statements are false and defamatory. ........ 6

1. Defendants' statements are false. ........ 6

2. Defendants' statements have a defamatory meaning. ........ 10

b. Defendants published the statements without any privilege. ........ 14

c. Defendants acted with actual malice. ........ 16

1. Defendants were aware of the falsity in their statements, or, minimally, acted with reckless disregard. ........ 18

2. Defendants' supposed sources reliance does not change the conclusion. ........ 22

3. Defendants purposefully avoided the actual truth. ........ 25

4. Additional circumstantial evidence supports a finding of actual malice. ........ 29

5. The totality of the evidence supports actual malice. ........ 30

*CONCLUSION* ........ *31*

*CERTIFICATE OF SERVICE* ........ *33*

## TABLE OF AUTHORITIES

### Cases

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 4

*Associated Press v. NLRB*,
301 U.S. 103 (1937) ........ 1

*Atherton v. D.C. Office of the Mayor*,
567 F.3d 672 (D.C. Cir. 2009) ........ 4

*Barrett v. Atlantic Monthly Grp. LLC*,
No. 22-cv-49, 2024 WL 4119400 (D.D.C. Sept. 9, 2024) ........ 5

*Bauman v. Butowsky*,
377 F. Supp. 3d 1 (D.D.C. 2019) ........ 6

*Benic v. Reuters America, Inc.*,
357 F.Supp.2d 216 (D.D.C. 2004) ........ 7

*Bentley v. Bunton*,
94 S.W.3d 561 (Tex. 2002) ........ 11

*Bose Corp. v. Consumers Union of United States, Inc.*,
692 F.2d 189 (1st Cir.1982) ........ 16

*Branzburg v. Hayes*,
408 U.S. 665 (1972) ........ 1

*Brimelow v. New York Times Co.*,
2021 WL 4901969 (2d Cir. Oct. 21, 2021) ........ 31

**Carson v. Allied News Co.*,
529 F.2d 206 (7th Cir. 1976) ........ 18, 20

**Celle v. Filipino Reporter Enterprises, Inc.*,
209 F.3d 163 (2d Cir. 2000) ........ 16

*Couch v. Verizon Communications Inc.*,
105 F.4th 425 (D.C. Cir. 2024) ........ 31

*Crowley v. North Am. Telecomms. Ass'n*,
691 A.2d 1169 (D.C. 1997) ........ 5

*Curtis Pub. Co. v. Butts*,
388 U.S. 130 (1967) ........ 31

*Curtis Publishing Co. v. Vaughan*,
278 F.2d 23 (D.C. Cir. 1960) ........ 14

**Dameron v. Washington Magazine, Inc.*,
779 F.2d 736 (D.C. Cir. 1985) ........ 14, 16

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
472 U.S. 749 (1985) ........ 1

*Echtenkamp v. Loudon Cnty. Pub. Schs.*,
263 F. Supp. 2d 1043 (E.D. Va. 2003) ........ 13

*Eramo v. Rolling Stone, LLC*,
2016 WL 5234688 (W.D. Va. 2016) ........ 30

*Fairfax v. CBS Corp.*,
2 F.4th 286 (4th Cir. 2021) ........ 23

*Gertz v Robert Welch, Inc.*,
680 F.2d 527 (7th Cir. 1982) ........ 24

*Goldwater v. Ginzburg*,
414 F.2d 324 (2d Cir. 1969) ........ 17

**Harte-Hanks Communications, Inc. v. Connaughton*,
491 U.S. 657 (1989) ........ 16, 25, 28, 30

*Harvey v. CNN, Inc.*,
48 F.4th 257 (4th Cir. 2022) ........ 23

**Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ........ 16, 24, 27

*Hustler Magazine, Inc. v. Falwell*,
495 U.S. 46 (1988) ........ 11

*Jankovic v. Int'l Crisis Grp.*,
593 F.3d 22 (D.C. Cir. 2010) ........ 14

*Jewell v. NYP Holdings, Inc.*,
23 F. Supp. 2d 348 (S.D.N.Y. 1998) ........ 10

*Jolevare v. Alpha Kappa Alpha Sorority, Inc.*,
521 F. Supp. 2d 1 (D.D.C. 2007) ........ 7

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*,
909 F.3d 446 (D.C. Cir. 2018) .......... 5

*Levy v. American Mutual Ins. Co.*,
196 A.2d 475 (D.C. 1964) .......... 10

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003) .......... 28, 29

*Masek v. United States*,
No. 22-cv-3574, 2024 WL 1240093 (D.D.C. Mar. 22, 2024) .......... 5

*Masson v. New Yorker Magazine, Inc.*,
501 U.S. 496 (1991) .......... 7

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) .......... 19

*McKee v. Cosby*,
586 U.S. 1172 (2019) .......... 1

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) .......... 11

*Moldea v. New York Times Co.*,
15 F.3d 1137 (D.C. 1994) .......... 11

*Moldea v. New York Times Co.*,
22 F.3d 310 (D.C. Cir. 1994) .......... 6

*New York Times Co. v. Sullivan*,
376 U.S. 254 (1964) .......... 16

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
387 F. Supp. 2d 20 (D.D.C. 2005) .......... 29

*Oparaugo v. Watts*,
884 A.2d 63 (D.C. 2005) .......... 5

*Perk v. Reader's Digest Ass'n, Inc.*,
931 F.2d 408 (6th Cir. 1991) .......... 23

*Phillips v. Evening Star Newspaper Co.*,
424 A.2d 78 (D.C. App. 1980) .......... 14

**Prins v. Int'l Tel. and Tel. Corp.*,
757 F. Supp. 87 (D.D.C. 1991) .......... 7, 10

*Rosen v. American Israel Public Affairs Comm., Inc.*,
41 A.3d 1250 (D.C. 2012) ........ 6

*Ruifang Hu v. K4 Solutions, Inc.*,
No. 18-cv-1240, 2020 WL 1189297 (D.D.C. Mar. 12, 2020) ........ 4

*Secord v. Cockburn*,
747 F. Supp. 779 (D.D.C. 1990) ........ 29

**St. Amant v. Thompson*,
390 U.S. 727 (1968) ........ passim

*Tah v. Global Witness Publishing, Inc.*,
991 F.3d 231 (D.C. Cir. 2021) ........ 28

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. 1987) (en banc) ........ 10, 17, 30

*Vandenburg v. Newsweek Inc.*,
441 F.2d 378 (5th Cir. 1971) ........ 24

*Vox Media, Inc. v. Mansfield*,
322 F. Supp. 3d 19 (D.D.C. 2018) ........ 4

*Weyrich v. New Republic, Inc.*,
235 F.3d 617 (D.C. Cir. 2001) ........ 12

**White v. Fraternal Order of Police*,
909 F.2d 512 (D.C. 1990) ........ 10, 11

**Treatises**

3 W. Blackstone, Commentaries ........ 1

Defendants published a hit piece. They knew it was false when they published it. They were repeatedly told it was false by multiple official sources with firsthand knowledge. Yet, they published it anyway. Defendants cannot now retreat behind the First Amendment and ask this Court to believe that their conduct constituted legitimate journalism. It did not.

The press has no "special immunity from the application of general laws," nor does it have a "special privilege to invade the rights and liberties of others." *Branzburg v. Hayes*, 408 U.S. 665, 684 (1972) (quoting *Associated Press v. NLRB*, 301 U.S. 103, 132–133 (1937)). As Justice White wrote:

> In a country like ours, where the people purport to be able to govern themselves through their elected representatives, adequate information about their government is of transcendent importance. That flow of intelligence deserves full First Amendment protection. Criticism and assessment of the performance of public officials and of government in general are not subject to penalties imposed by law. But these First Amendment values are not at all served by circulating false statements of fact about public officials. On the contrary, erroneous information frustrates these values. They are even more disserved when the statements falsely impugn the honesty of those men and women and hence lessen the confidence in government.

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 767 (1985) (White., J., Concurring). And as Justice Thomas observed, statements tending to scandalize a public figure are "reputed more. highly injurious than when spoken of a private man." *McKee v. Cosby*, 586 U.S. 1172, 1177 (2019) (Thomas, J., Concurring) (quoting 3 W. Blackstone, Commentaries * 124)).

Defendants manufactured a narrative to destroy Dir. Patel. One that they knew to be a lie. Each statement is a lie, and provably so. While Dir. Patel has a

profound and deep respect for the Constitution, Defendants' lies are not protected under the guise of the First Amendment. At this stage, where all inferences must be drawn in Director Patel's favor, Defendants' motion must be denied.

## BACKGROUND

Plaintiff Kashyap P. Patel is the Director of the Federal Bureau of Investigation, having been sworn in on February 20, 2025. Compl. ¶¶ 2, 8. On April 17, 2026, Defendants published a demonstratable false, defamatory hit piece against Dir. Patel (the "Article"). Before publishing the Article, Defendants had, for months, pursued a demonstrable editorial campaign against Dir. Patel. Compl. ¶ 11.

Defendants published the Article under the original headline "Kash Patel's Erratic Behavior Could Cost Him His Job," with the sub-headline, "The FBI director has alarmed colleagues with episodes of excessive drinking and unexplained absences." Compl. ¶ 15. The Article included numerous false statements, including that Director Patel "is known to drink to the point of obvious intoxication" at a Washington, D.C. club and "to excess at the Poodle Room in Las Vegas"; that meetings were rescheduled due to "alcohol-fueled nights"; that his security detail had difficulty waking him because he was "seemingly intoxicated"; that "breaching equipment" was requested because he was "unreachable behind locked doors"; that his drinking negatively impacted investigations; that he "panicked, frantically calling aides" to announce he had been fired; and that he is "often away or unreachable, delaying time-sensitive decisions." Compl. ¶ 18. Each of these statements is false. Compl. ¶¶ 19–26.

On the same day of publication, Defendants sent the FBI a "request for comment" containing nineteen substantive allegations and imposed a deadline of less than two hours to respond to claims involving national security, personnel files, and security-detail logs. Compl. ¶¶ 30–31. FBI Assistant Director Williamson responded before publication that the claims were "one of the most absurd things I've ever read. Completely false at a nearly 100% clip." Compl. ¶ 32. Defendants buried this response and published anyway, including only a truncated denial. Compl. ¶ 32. Director Patel's counsel also sent a detailed Pre-Publication Letter refuting the claims on the record and requesting additional time to respond. Compl. ¶¶ 33–34. Defendants refused to extend the deadline, never responded to the letter, and ignored the counter-evidence entirely. Compl. ¶ 35. White House Press Secretary Karoline Leavitt and Acting Attorney General Todd Blanche each provided on-the-record statements contradicting the Article's premise, which Defendants included only to brush aside Compl. ¶¶ 38–40.

Defendants never reviewed FBI security-detail protocols, never asked for documentation of the alleged breach, never contacted the establishments named for corroboration, never cross-checked Director Patel's public schedule, made no effort to determine whether their sources had been disciplined by Director Patel and therefore had motives to lie, and never interviewed Director Patel himself. Compl. ¶ 42. The Article relies almost entirely on vague, unattributed sourcing—"people familiar with the matter," "officials said," "former advisers"—and Defendants could not get a single person to go on the record or cite a single piece of documentary evidence. Compl. ¶ 43.

The Article itself reveals that Defendants knew their sources were hostile, relying on "former advisers" and "political operatives" with obvious axes to grind who lacked legitimate access to the facts they purported to describe. Compl. ¶ 44.

Still, Defendants pressed forward with the Article. The Article has been republished and discussed in countless media outlets, multiplying the harm exponentially. Compl. ¶ 50. Accordingly, Dir. Patel brought this action to repair his reputation from the harm that Defendants' lies have caused it.

**STANDARD OF REVIEW**

The federal pleading standard is a liberal one. *Vox Media, Inc. v. Mansfield*, 322 F. Supp. 3d 19, 23 (D.D.C. 2018). "[T]o survive a motion to dismiss, a complaint 'must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.'" *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim is facially plausible when the facts pled in the complaint allow the court to 'draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Id.* "The standard does not amount to a 'probability requirement,' but it does require more than a 'sheer possibility that a defendant has acted unlawfully." *Id.* "[W]hen ruling on a defendant's motion to dismiss [pursuant to Rule 12(b)(6)], a judge must accept as true all of the factual allegations contained in the complaint." *Id.* (quoting *Atherton v. D.C. Office of the Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009)).

"[T]he District of Columbia does not use a heightened pleading standard for defamation claims." *Ruifang Hu v. K4 Solutions, Inc.*, No. 18-cv-1240, 2020 WL 1189297, at *11 (D.D.C. Mar. 12, 2020) (citing *Oparaugo v. Watts*, 884 A.2d 63, 77

(D.C. 2005) (citing *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1172–73 (D.C. 1997)). "A plaintiff need only allege facts that permit the opposing party to form responsive pleadings, including the language or substance of the claim for defamation." *Id.* (internal quotations omitted).

## ARGUMENT

### I. Defendants' request for judicial notice is improper.

In their motion to dismiss, Defendants rely on various news articles, filings in other courts, congressional hearing transcripts, and congressional press releases to supplement the record, asking the Court to take judicial notice of the same. While the Court may take judicial notice of the *existence* of these items, it may not take judicial notice of the *truth* as to any of the assertions contained within these items. *See Barrett v. Atlantic Monthly Grp. LLC*, No. 22-cv-49, 2024 WL 4119400, at *7 (D.D.C. Sept. 9, 2024) (news articles); *Masek v. United States*, No. 22-cv-3574, 2024 WL 1240093, at *7 (D.D.C. Mar. 22, 2024) (court filings); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (congressional hearings and legislative materials). Accordingly, Defendants may not supplement the factual record of this case, on motion to dismiss, with any of the assertions contained within these cited materials.

### II. Dir. Patel has stated a claim for defamation.

A defamation claim in Washington, D.C. has four elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the

defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 10 (D.D.C. 2019) (quoting *Rosen v. American Israel Public Affairs Comm., Inc.*, 41 A.3d 1250, 1255–56 (D.C. 2012)). Here, Defendants challenge elements one and two as to some of the defamatory statements, and element four as to all the defamatory statements.

**a. Defendants' statements are false and defamatory.**

***1. Defendants' statements are false.***

Defendants argue that the defamatory statements they include in Category 3 are not defamatory because they are substantially true. Dkt. No. 15.1 at 29. This includes two statements: (1) that Dir. Patel has used his position to improperly "target political or personal adversaries of the president," and (2) that Dir. Patel left the country vulnerable because "Days before the United States launched its war with Iran, Patel fired members of a counterintelligence squad that was devoted, in part, to Iran." As pled, and accepted as true, each of these statements are false. Compl. at ¶ 25. Instead, "FBI personnel actions are taken only where employees have acted unethically or undermined the mission." *Id.*

As the D.C. Circuit explained in citing the Supreme Court, "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Moldea v. New York Times Co.*, 22 F.3d 310, 318 (D.C. Cir. 1994) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517

(1991)). "'Substantially true' means that the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience." *Jolevare v. Alpha Kappa Alpha Sorority, Inc.*, 521 F. Supp. 2d 1, 13 (D.D.C. 2007) (quoting *Benic v. Reuters America, Inc.*, 357 F.Supp.2d 216, 221 (D.D.C. 2004)). This governing standard is fatal to the defense. The intended audience here would understand targeting adversaries as corrupt official misconduct—not ordinary personnel management. That is the Article's sting, and it is false.

*Prins v. Int'l Tel. and Tel. Corp.*, 757 F. Supp. 87 (D.D.C. 1991) is illustrative. In *Prins*, the plaintiff's executive's position had been eliminated months earlier as part of a routine corporate restructuring, and the employee received generous separation benefits and continued office access. 757 F. Supp. at 89. But when the plaintiff subsequently pled guilty to conspiracy charges, a newspaper reported that the executive had been "fired," in the context of a story about fraud and illegal gratuities, it implied he was discharged for the misconduct. *Id.* at 89–92. The court rejected the substantial-truth defense, holding that "the published statement about the plaintiff having been fired was not merely an inoffensive detail of secondary importance" because the label "could reasonably be construed as implying a link between the government's charges against the plaintiff and ITT's adverse personnel action, thus placing this powerful corporation's imprimatur upon the government's unsubstantiated allegations." *Id.* at 92. The court could not say as a matter of law that the word "fired" "could have produced no worse an effect on the mind of a reader than the truth." *Id.* (internal citations and quotations omitted).

There is a similar parallel to this case. Here, Dir. Patel's personnel decisions may have occurred. But just as the word "fired" in the context of a fraud story converted a routine restructuring into an implication of guilt, *id.* at 91–92, the Article's characterization of Dir. Patel's decisions as retaliatory firings and targeting political adversaries converts lawful personnel decisions into an implication of corrupt, official misconduct. Combined with the other allegations in the article, they also convey the unstable actions of an alcoholic. The defamatory sting is not the fact that personnel changes occurred, but the attributed or suggested reasons created by the Article. Like *Prins*, when a publisher creates a false characterization that creates a defamatory sting—linking an otherwise lawful personnel actions over employees engaged in misconduct to alleged wrongdoing—a defendant may not rely on a substantial truth defense. Characterizing lawful personnel decisions as retaliatory firings and targeting political adversaries does not get a minor detail wrong; it converts routine personnel management into corrupt official misconduct and materially alters the sting.

Defendants' collection of public-record material about personnel decisions does not establish substantial truth. As described in Section I, *supra*, the truth of any of the allegations in those materials is not part of the record at the stage in the litigation. Even if the Court were to consider this material—which it should not—they establish, at most, that Director Patel made personnel changes which were criticized by political opponents and by disgruntled former employees. Those propositions are radically different from the Article's characterization that he

engaged in retaliatory firings targeting adversaries. The first describes an exercise of official discretion; the second imputes corrupt intent and unlawful retaliation. The gist/sting distinction is therefore decisive. A statement that an official made personnel changes that some deemed controversial may be substantially true; a statement that he used his office to punish political enemies is a different charge. The Article's language did not merely report what happened. It cast the decisions as corrupt retaliation.

Furthermore, as to the claim concerning the Iran "counterintelligence squad," Defendants argue Dir. Patel "admits" that he terminated the affected employees. Dkt. No. 15.1 at 31. The Article conflated counterterrorism with counterintelligence and inflated the scope of the action even though only three affected individuals worked even tangentially on matters involving Iran. These are not harmless labels. Restructuring a counterterrorism unit conveys one thing; dismantling Iran counterintelligence on the eve of war, leaving the country vulnerable for political reasons, conveys another. Dir. Patel's allegation is therefore not that Defendants misstated an immaterial detail. It is that they selected a false description that transformed a limited personnel decision into a charge of corruptly weakening national security.

The question here is whether the Complaint plausibly alleges falsity. It does. The Complaint alleges that the retaliatory characterization is false, that the personnel decisions rested on legitimate policy grounds, that the Article misstated the relevant FBI functions and the number of affected employees, and that

Defendants chose the framing to maximize the defamatory sting. Defendants cannot substitute their preferred narrative for the Complaint's well-pleaded one.

### *2. Defendants' statements have a defamatory meaning.*

Defendants argue that statements describing Director Patel as "panick[ing]" or experiencing a "freak-out" about his job security (Category 4), and statements about his alleged focus on personal merchandise (Category 5), are not capable of defamatory meaning. Dkt. No. 15.1 at 28. This argument ignores the context in which the statements appeared.

"[A] court making the determination of whether a statement is capable of bearing a defamatory meaning must 'consider both the words themselves and the entire context in which the statement occurs.'" *Prins*, 757 F. Supp. at 91 (quoting *Tavoulareas v. Piro*, 817 F.2d 762, 779 (D.C. 1987) (en banc)). "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule as a matter of law, that it was not libelous." *White v. Fraternal Order of Police*, 909 F.2d 512, 518 (D.C. 1990) (quoting *Levy v. American Mutual Ins. Co.*, 196 A.2d 475, 476 (D.C. 1964)). Thus, "a court's power to find that a statement is not defamatory as a matter of law is limited." *Id. See also Jewell v. NYP Holdings, Inc.*, 23 F. Supp. 2d 348, 363 (S.D.N.Y. 1998) (finding that the defendant's statement that the plaintiff was "seeking media attention" could be construed as defamatory because it was in the context of the defendant discussing why the plaintiff lost their job, and when a "statement complained of is susceptible of more than one meaning, at least

one of which is defamatory, the claim must go to the jury."); *Bentley v. Bunton*, 94 S.W.3d 561, 579 (Tex. 2002) (finding that even the term "corrupt" can be defamatory depending on the context in which it was made).

Further, a statement, even one couched as opinion, "can be actionable if they imply a provably false fact." *Moldea v. New York Times Co.*, 15 F.3d 1137, 1143 (D.C. 1994) (citing *White*, 909 F.2d at 522). The Supreme Court has not provided categorical protection for all expressions of opinion. Rather, the Supreme Court has held that a statement merits protection if it "cannot 'reasonably [be] interpreted as stating actual facts about an individual.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990) (alteration in original) (quoting *Hustler Magazine, Inc. v. Falwell*, 495 U.S. 46, 50 (1988)).

The Category 4 statements do not merely say Director Patel was "concerned" about his job. They describe him as "panick[ing]" and having a "freak-out"—unmistakably implying instability and unfitness for the prestigious office. In the context of the Article's thesis, that Dir. Patel is on the outs, that he abuses alcohol, and has been "MIA," they impute a lack of the temperament and competence necessary for the position, exposing him to contempt and ridicule in his profession.

Similarly, the Category 5 statements—characterizing Director Patel as frivolously focused on personal merchandise and self-promotion—are defamatory in context. These statements do not exist in isolation; they are part of an Article whose entire thesis is that Director Patel is unfit for office. In that context, characterizing

the FBI Director as preoccupied with selling merchandise, likewise exposes him to contempt and ridicule.

Defendants' reliance on *Dragulescu* is misplaced. Dkt. No. 15.1 at 28. Calling a professor's reaction a "meltdown" may, in the context of that case, have been loose shorthand for an emotional episode; it did not necessarily assert that the professor was incapable of performing his profession. This Article did something materially different. It reported that the FBI Director "panicked" and "freaked out" because he believed he had been fired. Applied to the Director of the FBI, those statements do not merely describe a passing emotion. They imply instability, inability to manage pressure, and unfitness for the most demanding law-enforcement position in the country, particularly when combined with allegations of severe alcohol abuse. The defamatory sting is not that Dir. Patel experienced an ordinary human reaction to bad news. It is that he supposedly loses control in circumstances requiring judgment and leadership, and that his instability threatens his capacity to lead the FBI. Whether the Article's wording would reasonably carry that professional implication is not a question the Court can resolve by isolating the statements from the surrounding narrative. At minimum, the statements are capable of a defamatory meaning, making it a question for the jury. *See Weyrich v. New Republic, Inc.,* 235 F.3d 617, 627 (D.C. Cir. 2001) ("Although we do not here dissect each verifiable statement to provide an exhaustive list for the District Court, potential candidates include the author's observation that appellant, in response to Bill Pascoe's perceived betrayal, 'snapped,' erupted in a 'volcano of screaming,' 'froth[ed] at the mouth,' and

'dispatched a letter to Pascoe's fiancee, questioning Pascoe's loyalty and implying that he was unfit for marriage.' If indeed the story is fabricated, we cannot say that it is not reasonably capable of any defamatory meaning—it arguably makes appellant appear highly volatile, irrational, unsound and otherwise 'odious, infamous, or ridiculous.'"); *Echtenkamp v. Loudon Cnty. Pub. Schs.*, 263 F. Supp. 2d 1043, 1064 (E.D. Va. 2003) (statements that a "plaintiff misinterprets a lot and lies," or "was abrasive, unprofessional, and rude," "could be construed either to imply or to state directly that plaintiff lacks integrity or is unfit for her profession").

Category 5 statements are defamatory for similar reasons. Defendants cite *Guilford Transportation* for the proposition that saying someone lacks seriousness is opinion. Dkt. No. 15.1 at 29. But the Article did not simply opine that Director Patel was unserious. It reported a purported fact about how he spent his time and what he prioritized: focusing on merchandise design and personal image rather than the operations of the FBI. That is an assertion capable of proof or disproof. It implies dereliction of actual duties in favor of frivolous pursuits, not merely a commentator's subjective assessment of personality. In context, the merchandise allegations reinforce the Article's central thesis that Director Patel is professionally unfit, distracted, and unserious about national security. The question is what a reasonable reader would understand the Article to be saying about the Director's conduct and competence. That contextual implication is plainly capable of defamatory meaning.

**b. Defendants published the statements without any privilege.**

Defendants challenge one statement under the fair report privilege, purporting to summarize congressional testimony. Dkt. No. 15.1 at 32. The statement involves the Article's lie that Dir. Patel left the country vulnerable because "Days before the United States launched its war with Iran, Patel fired members of a counterintelligence squad that was devoted, in part, to Iran." Because the Article distorts and recharacterizes that testimony, however, the privilege does not apply.

Under the fair report privilege, "a defendant must 'clear[ ] *two major hurdles*' to qualify for the fair report privilege." *Jankovic v. Int'l Crisis Grp.*, 593 F.3d 22, 26 (D.C. Cir. 2010) (quoting *Phillips v. Evening Star Newspaper Co.*, 424 A.2d 78, 89 (D.C. App. 1980)) (emphasis added). Defendants must show: (1) "that its publication was a 'fair and accurate report' of a qualified government source," and (2) "that the publication properly attributed the statement to the official source." *Id.* Reports are "unfair and inaccurate" when they are "garbled or fragmentary to the point where a false imputation is made about the plaintiff which would not be present had a full and accurate report been made." *Dameron v. Washington Magazine, Inc.*, 779 F.2d 736, 739 (D.C. Cir. 1985) (quoting *Curtis Publishing Co. v. Vaughan*, 278 F.2d 23, 29 (D.C. Cir. 1960)).

Here, Defendants fail to clear the first hurdle. The Article did not fairly and accurately summarize any official proceeding. Defendants selectively cited fragments of congressional testimony and wove in their own narrative throughout the article to

make it appear as if Dir. Patel had committed a wrongdoing that left the country vulnerable, when the testimony presents an opposite conclusion.

Defendants wrote about Dir. Patel firing persons connected to working on Iran matters and juxtaposed this in an article fraught with alleged wrongdoing and then indicated that these decisions left the country vulnerable. The actual portion of the testimony reads:

> Dir. Patel: "As I said earlier, Congressman, I don't work on timelines when these terminations occur. There are internal investigations conducted by the careers at the FBI that highlight unethical or inappropriate conduct, and it's up to me to make the decision. But our Iran threats mission center has never been more resource. As I've highlighted, a 43% increase in counter espionage arrests from Iran alone and 360 ongoing terrorism investigations with Iran affiliated."
>
> Congressman Cohen: "And the people you fired, those 12 people, they were experts on Iran, were they not?"
>
> Dir. Patel: "I don't believe so."

Dkt. No. 15.1 at 33 n.23. Defendants' insinuation is that Dir. Patel was hellbent on retaliating against employees for political reasons to the extent where he was willing to put the country at risk to achieve his political aims. The actual testimony illustrates that Dir. Patel did not retaliate against anyone for political means. There were internal investigations, conducted by other persons, that led to the termination of several individuals who were not pertinent to our conflict with Iran. Instead, the testimony illustrates that, under Dir. Patel's leadership, the FBI has been very effective in combatting Iran—protecting the country, not leaving it vulnerable.

Selectively extracting a sentence that supports a predetermined narrative, while omitting the explanation that gives the testimony its meaning, is not fair and

accurate reporting. It is editorial manipulation. The privilege protects the public's ability to learn what occurred in an official proceeding; it does not protect a publisher that uses one sentence of a proceeding as a prop for an independent defamatory conclusion. *See Dameron*, 779 F.2d at 739. Whether the Article fairly conveyed the testimony is, minimally, a factual dispute that cannot be resolved in Defendants' favor on the pleadings.

**c. Defendants acted with actual malice.**

The First Amendment does not immunize the deliberate publication of known falsehoods. A public-figure plaintiff must show that the defendant published a statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). Reckless disregard requires that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968).

The Supreme Court directs that a plaintiff may prove to stay of mind by assessing the circumstantial evidence. *Harte-Hanks Communications, Inc. v. Connaughton*, 491 U.S. 657, 668, 681–82, 683–84 (1989). Actual malice may rest on the "sum total of the inferences" from the evidence. *Hunt v. Liberty Lobby*, 720 F.2d 631, 645–46 (11th Cir. 1983). Courts may infer it from "objective facts" that "provide evidence of 'negligence, motive and intent such that an accumulation of the evidence and appropriate inferences supports the existence of actual malice.'" *Celle v. Filipino Reporter Enterprises, Inc.*, 209 F.3d 163, 183 (2d Cir. 2000) (quoting *Bose Corp. v. Consumers Union of United States, Inc.*, 692 F.2d 189, 196 (1st Cir.1982)). "There is

no doubt that evidence of negligence, of motive and of intent may be adduced for the purpose of establishing, by cumulation and by appropriate inferences, the fact of a defendant's recklessness or of his knowledge of falsity." *Goldwater v. Ginzburg*, 414 F.2d 324, 342 (2d Cir. 1969). Likewise, the D.C. Circuit noted, "reason and the weight of precedent suggest that, *under some circumstances*, the probative value of ill-will evidence in establishing 'intent to inflict harm through falsehood' outweighs the risk that admitting such evidence will chill honestly believed speech." *Tavoulareas*, 817 F.2d at 795 (emphasis in original).

In *St. Amant*, the Supreme Court laid out three general categories of the kinds of proof that would likely support a finding of actual malice: "evidence establishing that the story was (1) 'fabricated'; (2) 'so inherently improbable that only a reckless man would have put [it] in circulation'; or (3) 'based wholly on an unverified anonymous telephone call' or some other source that the defendant had 'obvious reason[] to doubt.'" *Tavoulareas*, 817 F.2d at 790. (citing *St. Amant*, 390 U.S. at 732). The D.C. Circuit has been clear that "[t]he examples provided . . . are by no means exhaustive, but, as numerous courts have recognized, constitute useful benchmarks for lower courts to employ in determining whether a record is sufficient to sustain a finding of constitutional malice." *Id.* at 790. Here, all three factors are met. Defendants were aware of their fabrications, their allegations were inherently improbable, and they had reason to doubt the allegations. This, combined with Defendants' ill will and the overall timeline of events—mainly that this was not a hot

news story, yet they failed to take appropriate action to verify the allegations, despite having reason to doubt the allegations—provides sufficient evidence of actual malice.

### *1. Defendants were aware of the falsity in their statements, or, minimally, acted with reckless disregard.*

As the Supreme Court made clear in *St. Amant*, "[p]rofessions of good faith will be unlikely to prove persuasive, for example, where a story is fabricated by the defendant, is the product of his imagination, or is based wholly on an unverified anonymous telephone call." 390 U.S. at 732. Furthermore, a defendant will be unlikely to prevail "when the publisher's allegations are so inherently improbable that only a reckless man would have put them in circulation." *Id*.

The Seventh Circuit built on this holding in *Carson v. Allied News Co.*, 529 F.2d 206 (7th Cir. 1976). There, the Seventh Circuit noted that "*St. Amant* expressly gives as another example of reckless disregard for the truth any 'product of (one's) imagination.'" *Carson*, 529 F.2d at 213 (quoting *St. Amant*, 390 U.S. at 732). The court continued:

> If a writer can sit down in the quiet of his cubicle and create conversations as 'a logical extension of what must have gone on' and dispense this as news, it is difficult to perceive what First Amendment protection such fiction can claim.

*Id*.

Here, the Complaint alleges that the Article's narrative was not good-faith journalism gone awry—it was manufactured from whole cloth, relying on anonymous sources with no firsthand knowledge and ignoring key pieces of contradictory evidence. Compl. ¶¶ 28–49. Defendants were told that central allegations were

"totally false," "made up," and "made up to the point of satire," yet they published them anyway. Compl. ¶¶ 20–25. Defendants constructed a sensational narrative first and then selected material to fit it.

The "breaching equipment" allegation is a paradigmatic example. *St. Amant* recognizes that allegations "so inherently improbable that only a reckless man would have put them in circulation" may themselves establish actual malice. 390 U.S. at 732. The Article claims that breaching equipment was "requested" because Dir. Patel "had been unreachable behind locked doors." Compl. ¶ 21. But as the Complaint alleges, breach equipment is already provided to all FBI protection details as standard protocol—a fact easily verified and known to any credible FBI source. *Id.* One would not "request" what one already possesses. That Defendants' sources did not know this basic operational fact—or that Defendants invented the "request" themselves—supports the inference that the story was fabricated.

Defendants' reliance on congressional scrutiny and other public controversy does not cure these defects. Dkt. No. 15-1 at 24–27. *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1512–13 (D.C. Cir. 1996), held that allegations were not inherently improbable where "the Senate Foreign Relations Committee was taking [the] allegation . . . seriously enough to hold hearings on the matter, and the House of Representatives commissioned [a] Task Force specifically to investigate [the] story." Defendants point to Dir. Patel's Poodle Room membership disclosure, whiskey bottles referenced in the Driscoll litigation, and the Milan Olympics beer video. Dkt. No. 15-1 at 24 n.14. But none of that corroborates the Article's specific claims—that

Dir. Patel was so intoxicated his security detail could not reach him, that they requested SWAT-style breaching equipment because he was unreachable behind locked doors, or that he was functionally absent from his duties. The leap from disclosed a club membership, to too drunk for his detail to wake him is not an inference supported by the public record.

The Olympics beer video is similarly no corroboration. A beer at a sporting celebration does not make it plausible that Director Patel was an alcoholic, regularly intoxicated, or incapacitated at work. The leap from drank a beer at the Olympics to cannot perform the duties of FBI Director, and then to a claim that his drinking threatened public safety and national security, is a bad faith inference not protected under the law. *See Carson*, 529 at 213.

Defendants' plausibility arguments for their remaining categories fail for similar reasons. For absences (Category 2), Defendants cite congressional letters about FBI jet use and an NBC report about altered briefing schedules. Dkt. No. 15-1 at 24–25 n.15. But using the FBI jet to visit field offices—which Dir. Patel has done more frequently than any predecessor, Compl. ¶ 24—is not "being MIA." As alleged, he took only seventeen personal days in 2025. Compl. ¶ 26. Altered briefing schedules and jet travel do not corroborate the specific claims that Director Patel was "often away or unreachable" to the point that agents were "los[ing] their shit," or that he was locked behind doors requiring breaching equipment.

For retaliatory firings (Category 3), Defendants point to Dir. Patel's congressional testimony about personnel decisions and his book Government

Gangsters. Dkt. No. 15-1 at 24, 26 & n.16. But publicly acknowledged personnel actions taken against employees who “acted unethically or undermined the mission,” Compl. ¶ 25, are not the same as using the FBI to “target political or personal adversaries of the president.” Congressional criticism of lawful personnel decisions does not make the Article’s specific allegation—that Dir. Patel weaponized the Bureau for personal vendettas—plausible.

For job insecurity (Category 4), Defendants cite their own prior reporting on their own speculation about Dir. Patel’s job security. Dkt. No. 15-1 at 24. Even if this were sufficient, the Complaint does not merely allege that job-security speculation was false. It alleges that on April 10, 2026, Director Patel “panicked, frantically calling aides and allies to announce that he had been fired by the White House”—a specific, dramatic episode that the Complaint alleges never occurred. Dir. Patel Prior editorial speculation about job security does not make a fabricated panic attack plausible.

For merchandise (Category 5), Defendants cite Dir. Patel’s public statement that the FBI should be “fierce,” and a supposed jacket incident. Dkt. No. 15-1 at 24, 26 n.18. But publicly saying the FBI should project strength is not the same as the Article’s implication that Dir. Patel is more concerned with image than performing the job. *St. Amant* does not immunize a publisher that invents a specific narrative as what they might deem as a logical conclusion.

Defendants were put on notice of the falsity of their allegations by multiple official sources. Public evidence contradicted Defendants' allegations. Defendants cannot now cherry-pick public record to support their narrative jump.

#### *2. Defendants' supposed sources reliance does not change the conclusion.*

The fact that Defendants cite unnamed and anonymous sources does not change the conclusion. *St. Amant* explicitly notes, "recklessness may be found where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732. The Article's own descriptions underscore the problem: "nine people familiar with his outreach," "multiple people familiar with the request," "current and former FBI officials," "people familiar with the matter," and "former officials who have stayed close to him." *See* Dkt. No. 15.5. The descriptions signal hearsay, not personal observation. Indeed, as alleged, these sources (1) lacked firsthand knowledge; (2) harbored animus toward Director Patel; (3) had axes to grind based on personnel decisions affecting them or their allies; and (4) were disgruntled former officials whose accounts required independent verification. Compl. ¶¶ 43–45. It further alleges that Defendants knew the sources' issues, yet relied on them for allegations about private habits, security procedures, schedules, and internal personnel decisions that the sources were not positioned to observe. Those are sufficient reasons, accepted as true for purposes of this motion, to doubt the accounts.

Whether Defendants call the sources "unnamed" or "anonymous" is irrelevant. Dkt. No. 15-1 at 19–20. *St. Amant* instructs that "recklessness may be found where

there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." 390 U.S. at 732. Nor does a source count solve the problem. Defendants' "more than two dozen" source count do not substitute for quality, personal knowledge, or independent corroboration. Compl. ¶¶ 43–45. No case has adopted a head-count rule. The question is reliability of each source. *See Perk v. Reader's Digest Ass'n, Inc.*, 931 F.2d 408, 411 (6th Cir. 1991) (instructing courts to examine "each source to determine whether it was reliable and whether it indicated that more research was required to determine what the truth was.").

*Fairfax v. CBS Corp.*, 2 F.4th 286, 294 (4th Cir. 2021), does not save Defendants. Dkt. No. 15-1 at 20. *Fairfax* held that "self-interest and politics motivate many news sources" and that "dealing with such persons" does not alone "constitute evidence of actual malice." *Id*. But in *Fairfax*, the sources were the two accusers themselves—persons with direct, personal knowledge of the events they described—and the defendant included the plaintiff's denials, sought his response, and attempted to contact witnesses he identified. 2 F.4th at 291–95. Here, the Complaint does not allege mere political bias. It alleges that the sources lacked firsthand knowledge of the events they purported to describe, were outside the operational settings necessary to observe them, and were known to Defendants to be hostile and derivative. Compl. ¶¶ 43–44. Fairfax's holding that political motivation alone does not establish malice does not excuse reliance on sources who lack both knowledge and access.

*Harvey v. CNN, Inc.*, 48 F.4th 257, 274 (4th Cir. 2022), is likewise distinguishable. There, the defendant disclosed any reasons to doubt the sources

within the publication. *Id*. Here, Defendants give no such warning, and do not provide background as to how these alleged sources would have any firsthand knowledge of the events. Instead, it appears that Defendants merely presented gossip as fact.

Instead, the Eleventh Circuit decision in *Hunt v. Liberty Lobby* is particularly illustrative. There, the defendant relied on a source that was directly at odds with the plaintiff. *Hunt*, 720 F.2d at 645. There were "obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *Id*. (quoting *St. Amant*, 390 U.S. at 732). Thus, it remained a question for the jury as to whether the defendant satisfactorily followed up on the doubts they had about the source. *Id*. This was coupled with the fact that the news story was not "hot." *Id*. "When a story is not 'hot news,' 'actual malice may be inferred when the investigation . . . was grossly inadequate in the circumstances.'" *Id*. (quoting *Vandenburg v. Newsweek Inc.*, 441 F.2d 378, 380 (5th Cir. 1971)). A defendant cannot "feign ignorance" in such situations. *Hunt*, 720 F.2d at 644 (quoting *Gertz v Robert Welch, Inc.*, 680 F.2d 527, 538 (7th Cir. 1982)).

Here, as alleged, Defendant's supposed sources had obvious credibility issues. Furthermore, like *Hunt*, the news story here was not "hot" news. Still, Defendant relied on its troubled source without conducting an adequate investigation by going to sources with actual firsthand knowledge and providing them with sufficient time to respond, issuing public records requests, or simply researching publicly available information. This was despite the fact that Defendants had the time to do so. Simply put, Defendant avoided the truth.

While "failure to investigate will not alone support a finding of actual malice," "purposeful avoidance of the truth is in a different category." *Harte-Hanks*, 491 U.S. at 692 (quoting *St. Amant*, 390 U.S. at 731-33). As discussed in the following section, that is precisely the case here.

#### ***3. Defendants purposefully avoided the actual truth.***

Defendants received categorical denials from four independent institutional sources: the FBI Office of Public Affairs, the White House, the Acting Attorney General, and Plaintiff's counsel. Compl. ¶¶ 32, 37–40. The FBI responded almost immediately; Assistant Director Williamson called the allegations "completely false at a nearly 100% clip" and annotated each allegation "false." Compl. ¶ 32. The White House and DOJ statements were separate institutional rejections with independent access to the relevant officials, operations, and information, followed by counsel's pre-publication letter identifying specific falsehoods and counterevidence. This was not a vague "no comment"; it was a contemporaneous record directly contradicting the story's factual foundation.

Defendants' compressed timeline reinforces the inference that they had no interest in discovering the truth; rather, they avoided it. Defendants presented nineteen complex allegations concerning alcohol consumption, absences, unreachability during national-security events, personnel decisions, job insecurity, and personal merchandise, then chose 2:09 p.m. on publication day and a 4:00 p.m. deadline. Compl. ¶¶ 30–31. A two-hour window could not permit meaningful investigation of months of alleged conduct, internal records, security-detail practices,

consultation with relevant officials, and national-security and legal analysis. The process functioned as a staged opportunity to claim that comment had been sought while protecting a predetermined narrative. The FBI nevertheless responded within minutes with a detailed refutation, demonstrating not that two hours was reasonable but that the allegations were so false and urgent that it compelled an immediate response.

At 3:53 p.m., Plaintiff's counsel sent a demand letter identifying specific falsehoods, demanding a retraction, and supplying additional counterevidence. Compl. ¶¶ 33–36. Defendants did not acknowledge the letter, follow up, pause publication, or assess its factual assertions. They published as though it did not exist.

And beyond the denials they received, Defendants ignored a substantial body of publicly available evidence that directly contradicted their narrative. Compl. ¶ 41. This included press releases on the numerous FBI successes that have made this country safer. It also included Dir. Patel's robust public schedule—documented through FBI public communications, photographs, video, and contemporaneous press coverage of his presence at headquarters, field offices, joint operations, press conferences, congressional appearances, and on-the-ground deployments—and could have been tested against the "MIA" narrative by any reporter willing to look.

Furthermore, Defendants took none of the basic investigative steps that a minimally competent journalist would have pursued before publishing allegations this serious. Compl. ¶ 42. Defendants never reviewed FBI security-detail protocols that would have shown the "waking the Director" story was operationally impossible.

They never asked for any documentation of the supposed need to breach the Director's office, even though such an incident would have generated multiple written records. They never contacted Ned's or the Poodle Room for corroboration, nor sought credit-card records, photographs, or witness statements. They never cross-checked Director Patel's public schedule against the claim that meetings had to be rescheduled for "alcohol-fueled nights." They made no serious effort to determine whether their unnamed sources had been disciplined or removed by Dir. Patel—and therefore had obvious motives to lie. These were deliberate choices—in light of the issues with their sourcing and the categorical denials they had received—to avoid readily available evidence that would have demolished the narrative. *See Hunt*, 720 F.2d at 645. While Defendants argue that requiring them to obtain these records would grant Dir. Patel "veto power" over their reporting, Dkt. No. 15-1 at 21, Dir. Patel is not the sole custodian of FBI attendance records, operational protocols, or security-detail practices. The point remains that Defendants ignored independent avenues that could have tested the most damaging allegations.

Moreover, Defendants also had specific notice that this narrative was contested and litigated. In May 2025, MSNBC broadcast a suspiciously similar claim—that Dir. Patel had been "visible at nightclubs far more than he has been on the seventh floor of the Hoover building." MSNBC itself acknowledged the claim was a "misstatement" that had not been "verified," and Director Patel filed defamation litigation over it. Compl. ¶¶ 46–48. AD Williamson publicly rebutted that claim. Compl.. ¶ 46. Defendants knew both facts before publication. Compl. ¶ 47. The

parallel between the Article's "drink to excess at the Poodle Room in Las Vegas" narrative and the prior Morning Joe claim was unmistakable—yet Defendants recycled the allegations without independent verification.

Like the "tape recordings" and failure to interview key sources in *Harte-Hanks*, the FBI's annotations, demand letter, attendance records, leave history, and operational protocols were readily available evidence that could test or disprove the narrative. *Harte-Hanks*, 491 U.S. at 692. A publisher's deliberate refusal to pursue such information, under these circumstances, is powerful circumstantial evidence of actual malice.

Defendants' reliance on *Lohrenz v. Donnelly*, 350 F.3d 1272 (D.C. Cir. 2003), and *Tah v. Global Witness Publishing, Inc.*, 991 F.3d 231, (D.C. Cir. 2021), is misplaced and does not alter this conclusion. Dkt. No. 15-1 at 15–17. In *Lohrenz*, the publisher had a knowledgeable, non-anonymous source with firsthand observations, corroborating documentary evidence from the Navy's own training records, and included information contrary to its general conclusion. 350 F.3d at 1284–85. In *Tah*, the denials were generic and conclusory, and failed to actually contradict the allegations. 991 F.3d at 242. Here, as the Complaint illustrates, Defendants had no countervailing firsthand source, no corroborating documents supporting the allegations, and multiple independent institutional sources gave substantive responses, including point-by-point annotations from the FBI and counsel, describing the allegations as false, and also providing explanations of why.

Defendants argue that reporting Director Patel's denials "weighs against, rather than for, a finding of actual malice." Dkt. No. 15-1 at 17 (quoting *Lohrenz*, 350 F.3d at 1286). But that principle presupposes meaningful inclusion—not a truncated reference stripped of its substance. Defendants did not meaningfully include the FBI's specific refutations; they reduced them to a generic statement and buried the substance. Dir. Patel does not claim that Defendants had to include positive spin or every favorable fact. The issue is their suppression of detailed, substantive refutations of the specific allegations while publishing those allegations in comprehensive detail.

Defendants also cite *Secord v. Cockburn*, 747 F. Supp. 779, 789 (D.D.C. 1990), and *OAO Alfa Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 54–55 (D.D.C. 2005), for the proposition that a publisher has no freestanding duty to seek comment. Dkt. No. 15-1 at 17–18. Dir. Patel does not dispute that rule. But once it was established that Defendants had reason to doubt their sources—especially after three official governmental offices refuted the claims—Defendants were not permitted to simply feign ignorance.

#### *4. Additional circumstantial evidence supports a finding of actual malice.*

"Although failure to adequately investigate, a departure from journalistic standards, or ill will or intent to injure will not singularly provide evidence of actual malice, the court believes that proof of all three is sufficient to create a genuine issue of material fact." *Eramo v. Rolling Stone, LLC*, 2016 WL 5234688, at *5 (W.D. Va.

2016). And, as the plaintiff in *Eramo*, Dir. Patel's evidence even "goes further," as illustrated above. *Id*. The Complaint details the animus Defendants have toward Dir. Patel. Compl. ¶¶ 11–14. They have "for months pursued a demonstrable editorial campaign to damage Director Patel's reputation and force him from office." Compl. ¶ 11. Furthermore, in "rushing the story to print without substantively fact-checking the allegations or giving Director Patel a meaningful opportunity to respond," Defendants "ignored their own policies and procedures." Compl. ¶ 29. While under D.C. precedent these factors would be insufficient on their own, they provide sufficient additional, circumstantial evidence of Defendants' actual malice–illustrating a motive to lie, and their recklessness in doing so.

#### ***5. The totality of the evidence supports actual malice.***

The D.C. Circuit instructs, "a plaintiff may prove the defendant's subjective state of mind through the cumulation of circumstantial evidence, as well as through direct evidence." *Tavoulareas*, 817 F.2d at 789; *see also Harte-Hanks*, 491 U.S. at 668 (looking at the cumulation of the evidence in making an actual malice determination). The cumulative allegations show that Defendants: (1) received categorical denials from four independent sources; (2) relied exclusively on hostile sources lacking firsthand knowledge; (3) purposefully avoided readily available evidence to the contrary, despite time permitting them to do so; (4) published implausible allegations; and (5) acted pursuant to editorial hostility toward Director Patel, violating their own standards.

Taken together, these allegations present a compelling case that Defendants knew the story was false or entertained serious doubts and published anyway. Accepting all reasonable inferences in Dir. Patel's favor, his Complaint plausibly alleges enough facts that, if proven true, can carry his burden of proving actual malice. *See Couch v. Verizon Communications Inc.*, 105 F.4th 425, 432 n.2 (D.C. Cir. 2024) ("legal standards require a plaintiff to ultimately prove his case by clear and convincing evidence and then looked to see if the plaintiff plausibly alleged any facts that could, if proven, carry that burden.").

Contrary to Defendants' assertions, this is not a case such as *Brimelow v. New York Times Co.*, 2021 WL 4901969 (2d Cir. Oct. 21, 2021), where the allegations included only: (1) repeated denials from the plaintiff himself, and (2) allegations of ill will and departure from journalistic standards. As discussed above, Dir. Patel's Complaint goes much further.

## CONCLUSION

While defamation law has evolved over time, "the basic theory of libel has not changed." *See Curtis Pub. Co. v. Butts*, 388 U.S. 130, 151–52 (1967). "[W]ords defamatory of another are still placed in the same class with the use of explosives or the keeping of dangerous animals." *Id.* (internal quotation omitted). As Chief Justice Warren observed, "[f]reedom of the press under the First Amendment does not include absolute license to destroy lives or careers." *Butts*, 388 U.S. at 170 (Warren, C.J., concurring). For the foregoing reasons, as each of Defendants' defenses fail,

Defendants' lies are not protected, and Plaintiff, Kashyap Patel, respectfully requests that this Court deny Defendant's motion in its entirety.

Dated: August 17, 2026

Respectfully submitted,

*/s/ Jason C. Greaves*

Jason C. Greaves, DC1033617
Jesse R. Binnall, VA022
Jared J. Roberts, FL00153
BINNALL LAW GROUP
717 King Street, Suite 200
Alexandria, Virginia 22314
Phone: (703) 888-1943
Fax: (703) 888-1930
jason@binnall.com
jesse@binnall.com
jared@binnall.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that on August 17, 2026, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/ Jason C. Greaves*
Jason C. Greaves

*Counsel for Plaintiff*