**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| KASHYAP P. PATEL,<br><br>Plaintiff,<br><br>v.<br><br>ATLANTIC MONTHLY GROUP LLC;<br>SARAH FITZPATRICK,<br><br>Defendants. | Case No.: 1:26-cv-01329-EGS |

**DEFENDANTS' REPLY MEMORANDUM IN FURTHER SUPPORT**
**OF THEIR MOTION TO DISMISS THE COMPLAINT**

Katherine M. Bolger (Bar ID: NY0205)
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Telephone: (212) 489-8230
katebolger@dwt.com

Laura R. Handman (Bar ID: 444386)
Alison Schary (Bar ID: 1014050)
Meenakshi Krishnan (Bar ID: 1617229)
Azeezat Adeleke (Bar ID: 90011862)
1301 K Street, NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
laurahandman@dwt.com
alisonschary@dwt.com
meenakshikrishnan@dwt.com
azeezatadeleke@dwt.com

*Counsel for Defendants*

## TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ..... 1
ARGUMENT ..... 2
I. THE COMPLAINT FAILS TO PLAUSIBLY PLEAD ACTUAL MALICE ..... 2
A. The Prepublication Correspondence Does Not Show "Knowledge of Falsity" or "Purposeful Avoidance" By Defendants ..... 3
B. Plaintiff Does Not Plausibly Allege Any "Obvious Reason to Doubt" Defendants' Confidential Sources ..... 7
C. The Article Was Not "Inherently Improbable" ..... 8
D. Director Patel Cannot Avoid Dismissal By Combining His Various Failed Allegations of Actual Malice ..... 11
II. FIVE OF THE CHALLENGED STATEMENTS SHOULD BE DISMISSED FOR INDEPENDENT REASONS ..... 13
A. Statements 13 and 14 (Category 3) Are True ..... 13
B. Statements 15, 16 and 17 (Categories 4 and 5) Are Not Defamatory ..... 15
C. Statement 14 Is Protected By the Fair Report Privilege. ..... 16
CONCLUSION ..... 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arpaio v. Cottle*,
404 F. Supp. 3d 80 (D.D.C. 2019) ....12

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ....13

*Berisha v. Lawson*,
973 F.3d 1304 (11th Cir. 2020) ....8

*Biro v. Conde Nast*,
963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd*, 807 F.3d 541 (2d Cir. 2015),
*aff'd*, 622 F. App'x 67 (2d Cir. 2015) ....11, 12

*Block v. Matesic*,
789 F. Supp. 3d 1131 (S.D. Fla. 2025), *appeal dismissed*, 2026 WL 810430
(11th Cir. Mar. 24, 2026) ....10

*Brimelow v. N.Y. Times Co.*,
2021 WL 4901969 (2d Cir. Oct. 21, 2021). ....12

*Celle v. Filipino Rep. Enters. Inc.*,
209 F.3d 163 (2d Cir. 2000) ....11

*Cobb v. Time, Inc.*,
278 F.3d 629 (6th Cir. 2002) ....2, 8

*Dodds v. Am. Broad. Co.*,
145 F.3d 1053 (9th Cir. 1998) ....16

*Fairfax v. CBS*,
2 F.4th 286 (4th Cir. 2021) ....8

*Gray v. St. Martin's Press*,
221 F.3d 243 (1st Cir. 2000) ....2

*Harte-Hanks Commc'ns v. Connaughton, Inc.*,
491 U.S. 657 (1989) ....5, 12

*Harvey v. Cable News Network, Inc.*,
48 F.4th 257 (4th Cir. 2022) ....8

*Hunt v. Liberty Lobby*,
720 F.2d 631 (11th Cir. 1983) ....6, 10, 11

*Jankovic v. Int'l Crisis Grp.*,
72 F. Supp. 3d 284 (D.D.C. 2014), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016) .............................2

*Kareem v. Haspel*,
986 F.3d 859 (D.C. Cir. 2021) .............................7

*Klayman v. Kaiser*,
2023 WL 8890505 (D.C. Cir. Dec. 26, 2023) .............................13

*Levan v. Capital Cities/ABC, Inc.*,
190 F.3d 1230 (11th Cir. 1999) .............................2

*Lohrenz v. Donnelly*,
350 F.3d 1272 (D.C. Cir. 2003) .............................2, 6, 8

*Lovingood v. Discovery Commc'ns, Inc.*,
275 F. Supp. 3d 1301 (N.D. Ala. 2017), *aff'd*, 800 F. App'x 840 (11th Cir. 2020) .............................6

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991) .............................14

*McFarlane v. Sheridan Square Press, Inc.*,
91 F.3d 1501 (D.C. Cir. 1996) .............................8, 11

*Nunes v. WP Co. LLC*,
513 F. Supp. 3d 1 (D.D.C. 2020), *aff'd*, 2022 WL 997826 (D.C. Cir. Apr. 1, 2022) .............................12

*OAO Alfa Bank v. Ctr. for Pub. Integrity*,
387 F. Supp. 2d 20 (D.D.C. 2005) .............................7

*Prins v. Int'l Tel. and Tel. Corp.*,
757 F. Supp. 87 (D.D.C. 1991) .............................14

*Reuber v. Food Chem. News*,
925 F.2d 705 (4th Cir. 1991) .............................2, 8

*SGCI Holdings III LLC v. FCC*,
2026 WL 2482614 (D.C. Cir. Aug. 25, 2026) .............................3

*St. Amant v. Thompson*,
390 U.S. 727 (1968) .............................2, 8, 9, 10

*Tah v. Glob. Witness Publ'g, Inc.*,
413 F. Supp. 3d 1 (D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021) .............................2, 12

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987) .............................11

*Tucker v. Fischbein*,
237 F.3d 275 (3d Cir. 2001)........................................................................................2, 10

**PRELIMINARY STATEMENT**

As Defendants explained in their opening brief ("Mot.")[1], this case directly attacks what the First Amendment was specifically designed to protect: the right to criticize powerful government officials without fear or penalty. Rather than disputing that charge, Director Patel embraces it, asserting in the opening lines of his Opposition ("Opp.") that the Article is not "legitimate journalism" because Defendants received denials from "multiple official sources" but "published it anyway."

This pronouncement, coming from the country's top law enforcement official, is profoundly disturbing, and coupled with reports that Director Patel has initiated a criminal investigation into the journalist who wrote the Article, raises serious First Amendment concerns.[2] But beneath its bellicose public messaging, the Opposition only confirms that this Court has all it needs to dismiss the Complaint as a matter of law on this Motion.

Director Patel's failure to plead actual malice is fatal to his entire case, and this Court can and should dismiss the Complaint on that basis alone. His Opposition also fails to effectively rebut the additional, independent bases for dismissing five of the challenged statements, which are substantially true and/or privileged based on Director Patel's own testimony and public statements (Statements 13 and 14) and not defamatory (Statements 15, 16, 17). Given these fundamental

---

[1] This Reply incorporates the same abbreviations and capitalized terms used in Defendants' Motion.

[2] *See* Ken Dilanian & Carol Leonnig, "FBI Probing Leaks to Journalist Who Wrote Explosive Article on Kash Patel, Sources Say," MS NOW (May 6, 2026), https://www.ms.now/news/fbi-investigating-leaks-to-journalist-who-wrote-explosive-article-on-kash-patel-sources; "FBI Reportedly Investigates Journalist Who Wrote About Kash Patel's Heavy Drinking," PBS News Hour (May 6, 2026), https://www.pbs.org/newshour/show/fbi-reportedly-investigates-reporter-who-wrote-about-kash-patels-heavy-drinking.

deficiencies in the Complaint, and mindful of the serious First Amendment concerns raised by its very filing, the Court should dismiss it in its entirety and with prejudice at this earliest opportunity.

## ARGUMENT

## I. THE COMPLAINT FAILS TO PLAUSIBLY PLEAD ACTUAL MALICE

Director Patel does not dispute that in order to survive this Motion, his Complaint must contain well-pleaded, non-conclusory facts that, if proven, could "provide clear and convincing evidence that would permit the conclusion that [Defendants] in fact entertained serious doubts" about the truth of the Article. *Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 12 (D.D.C. 2019) (cleaned up), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021). *See* Mot. at 12-13; Opp. at 31. He does not challenge any of the Motion's numerous cases explaining that actual malice is a deliberately high bar for public-official plaintiffs to meet, and he effectively concedes that none of his various theories of actual malice would be sufficient on its own. Opp. at 30-31. Most notably, he does not cite *a single case* where a court found similar allegations of actual malice sufficient to survive a motion to dismiss.[3] Nor does he attempt to distinguish his case from the myriad others where

---

[3] Even at the summary judgment stage, courts routinely find evidence far more damning than the allegations here insufficient to demonstrate actual malice. *See, e.g.*, *St. Amant v. Thompson*, 390 U.S. 727, 730 (1968) (no actual malice where plaintiff relied on single source of unknown veracity and failed to verify the source's information); *Lohrenz v. Donnelly*, 350 F.3d 1272, 1285-86 (D.C. Cir. 2003) (no actual malice where plaintiff was told by other sources that her conclusion about the plaintiff was wrong and her sources were "working their own agenda"); *Jankovic v. Int'l Crisis Grp.*, 72 F. Supp. 3d 284, 309-10 (D.D.C. 2014) (no actual malice where defendant "fail[ed] to investigate" certain information, cited "questionable" foreign press articles, relied on "shadowy" confidential sources, and followed a "pre-conceived story line"), *aff'd*, 822 F.3d 576 (D.C. Cir. 2016); *Reuber v. Food Chem. News*, 925 F.2d 705, 714-18 (4th Cir. 1991) (no actual malice where defendant relied on source with a "strong incentive" to harm plaintiff's reputation); *Cobb v. Time, Inc.*, 278 F.3d 629, 638-40 (6th Cir. 2002) (no actual malice where defendant relied on source with a criminal background who was paid for his information (some of which was "bizarre") and did not "act[] as a prudent reporter would have acted"); *Gray v. St. Martin's Press*, 221 F.3d 243, 251-52 (1st Cir. 2000) (no actual malice where defendant relied on sources with "axe to grind" against plaintiff, failed to "seek out decisive witnesses" who would have denied the allegations,

courts in this Circuit granted Rule 12(b)(6) motions for failure to plead actual malice based on allegations that are nearly identical to his. *See* Mot. at 12-14 & n.8 (collecting cases).

Instead, the Opposition simply repeats the same failed theories of actual malice that Director Patel alleged in the Complaint, albeit with more adverbs and outrage. But no amount of heated rhetoric can transform his conclusory assertions into well-pleaded facts, and no combination of these meritless allegations can satisfy the high bar to plead actual malice.

### A. The Prepublication Correspondence Does Not Show "Knowledge of Falsity" or "Purposeful Avoidance" By Defendants

First, Director Patel claims Defendants had knowledge of falsity because they received not only "categorical denials" but also "detailed, specific, and substantive refutations" of the Article's planned reporting from the FBI, White House, DOJ, and Plaintiff's counsel prior to publication. Opp. at 28-29. But Director Patel is wrong on the facts and the law. As to the facts, the Court need not accept Director Patel's self-serving characterization of these prepublication communications: they are in the record, and they speak for themselves.[4] *See SGCI Holdings III LLC v. FCC*, 2026 WL 2482614, at *9 (D.C. Cir. Aug. 25, 2026) (affirming dismissal, holding that plaintiff's characterization of and selective quotations from defendants' written statements were not plausibly pleaded where the statements themselves were before the court on Rule 12(b)(6) motion and did not support plaintiff's allegations about them).

---

and failed to include statements favorable to plaintiff); *Levan v. Capital Cities/ABC, Inc.*, 190 F.3d 1230, 1241 n.33, 1243 (11th Cir. 1999) (no actual malice where reporter stated "[the] truth is irrelevant to me," chose not to include statements favorable to the plaintiff, and knew there was a "[d]ifference of opinion as to the truth" of the allegations); *Tucker v. Fischbein*, 237 F.3d 275, 311-12 (3d Cir. 2001) (Alito, J.) (no actual malice where defendants engaged in "poor journalistic practices," had "a preconceived story line," "did not follow ... editorial guidelines," and "failed to conduct a thorough investigation").

[4] Director Patel does not dispute that the prepublication correspondence (Bolger Decl. Exs. 3-7) is incorporated by reference and properly before the Court on this Motion. Mot. at 6 n.3.

And on its face, the prepublication correspondence does not say what Director alleges: neither the Demand Letter (Bolger Decl. Ex. 7) nor the responses from the FBI, the DOJ, or the White House (*id.* Exs. 3-5) contains any "substantive refutation" of Defendants' reporting whatsoever. They include only bare denials, *ad hominem* attacks, and general praise for Director Patel. *See also* Mot. at 15-17.[5] And Director Patel's so-called "counter-evidence" is simply the list of his purported "documented operational successes," none of which provide any reason to doubt the truth of any of the challenged statements. Mot. at 20 n.12; Opp. at 3, 26-27. As to the law, the Motion established (and Director Patel failed to address) that such bare denials are insufficient as a matter of law to establish actual malice. Mot. at 23-24. Director Patel's fictional claims about the prepublication correspondence carry no weight, and the correspondence itself provides no basis to allege actual malice.

Next, Director Patel claims that by seeking comment from official government sources a few hours before publication, Defendants "purposefully avoided the truth" in their reporting. Opp. at 25. Not so. As he concedes, Defendants were not obligated to seek comment at all. Opp. at 29; Mot. at 17-18. And Director Patel does not cite a single case where a court pointed to a defendant seeking comment shortly before publication as even circumstantial evidence of actual malice. He also ignores the many cases finding a *lack* of actual malice where the defendants sought comment and included the plaintiff's denials, as Defendants did here. Mot. at 17.

Instead, Director Patel tries to paint these standard interactions between an experienced journalist and the press liaisons for multiple federal government agencies as a "staged opportunity

---

[5] As Defendants noted, the Demand Letter fails to offer even perfunctory denials of the statements in Categories 3, 4, and 5 (Statements 13-17). Mot. at 17 n.10. The Opposition ignores (and thus concedes) this point.

to claim that comment had been sought" while "purposefully avoid[ing]" the truth. Opp. at 25-26. But Director Patel is wrong. As the correspondence shows (and Director Patel concedes), each agency responded promptly to Ms. Fitzpatrick's email request, she agreed to provide more time to the only recipient (DOJ) who requested it, and their comments were included in the Article.[6]

This is not remotely similar to the "purposeful avoidance" fact pattern in *Harte-Hanks Commc'ns v. Connaughton, Inc.*, 491 U.S. 657 (1989). In *Harte-Hanks*, the Supreme Court affirmed a jury's finding of actual malice where a newspaper reported allegations that a prosecutor had offered bribes to a grand-jury witness and her sister in exchange for favorable testimony. *Id.* at 692-93. The newspaper chose to interview every witness to that meeting *except* the grand-jury witness's sister, even though she was the "most important witness to the bribery charges" and arguably most likely to *corroborate* the story. *Id.* at 668, 692. Based on these "bewildering" facts, the court posited that a jury could infer the publisher had "serious doubts" about its reporting and deliberately avoided interviewing the sister because it believed she would "quickly put an end to the story." *Id.* at 682; *see id.* at 692.

There are no similar allegations here. In fact, Director Patel does not even explain what sources or facts Defendants supposedly "purposefully avoided." While he claims Defendants should have reviewed "FBI attendance records," "operational protocols," and "security detail protocols," it is undisputed that neither he nor his agency provided any of these documents or indicated any intent to do so, despite being a "custodian" of such materials. Opp. at 27. To this

[6] Director Patel tries to claim that the FBI's timely response to the comment request does not show it actually had sufficient time, but rather that "the allegations were so false and urgent that it compelled an immediate response." Opp. at 26. Notably, none of the agencies said they needed additional time to gather information, nor did they indicate that further information would be forthcoming. And Director Patel has not identified any specific information that any of the agencies could or would have provided with more time that would demonstrate falsity.

day, Director Patel still has not identified any information in these materials that would show the Article to be false. Nor does he grapple with the D.C. Circuit's decision in *Lohrenz*, which makes clear that publishers are not obligated to delay or abandon publication "merely because they have not consulted particular documents" in the plaintiff's possession—exactly what Director Patel demands here. 350 F.3d at 1286.[7]

Finally, Director Patel cannot conjure actual malice from the timing of Defendants' comment requests by claiming the Article was not "hot news." *Hunt v. Liberty Lobby*, 720 F.2d 631, 643 (11th Cir. 1983), does not lower the bar of actual malice whenever the plaintiff insists that a story was not time sensitive. Opp. at 24. Rather, the *Hunt* court considered the nature of the report as part of the totality of the circumstances, where a publisher chose not to verify information that was inherently improbable from a source whose reliability the publisher actually questioned. 720 F.2d at 645-46. There are no analogous facts here. *See infra* n.14; Mot. at 23-27. And it goes without saying that permitting the FBI Director or any other government official to decide certain reporting is not sufficiently "time sensitive" to enjoy the full protection of the First Amendment would raise grave constitutional concerns.[8]

---

[7] Director Patel's complaint that Defendants "never contacted Ned's or the Poodle Room" (two private clubs where he is, undisputedly, a member) for unspecified "corroboration," and that they did not obtain "credit card records" or "witness statements" from unidentified individuals, fares no better. Not only is this rank and unsupported speculation, it is also irrelevant, since failure to investigate the plaintiff's preferred sources cannot show actual malice as a matter of law. Mot. at 20 (citing cases). Once again, Director Patel offers no rebuttal to this well-established law, nor does he identify a single fact from these various sources that would demonstrate falsity.

[8] Director Patel's assumption that the Article was not "hot news" also strains credulity. This was not a retrospective account of some historical event, but a report about active, ongoing concerns among current and former government officials about the FBI Director's behavior and temperament, implicating his ability to uphold the law and protect national security in wartime. *Compare Lovingood v. Discovery Commc'ns, Inc.*, 275 F. Supp. 3d 1301, 1311 (N.D. Ala. 2017), (film about historical event that happened two decades ago not "hot news," citing *Hunt*), *aff'd*, 800

Accordingly, neither the content nor the timing of Defendants' prepublication correspondence provides any basis to plausibly plead actual malice.

**B. Plaintiff Does Not Plausibly Allege Any "Obvious Reason to Doubt" Defendants' Confidential Sources**

Next, Director Patel criticizes the Article's confidential sources, insisting that Defendants had "obvious reasons to doubt [their] veracity." Opp. at 22-23 (quoting *St. Amant*, 390 U.S. at 732). Director Patel is wrong again.

As Defendants explained (Mot. at 19-20), the Article cited dozens of confidential sources of various backgrounds, noting their specific basis for knowledge of the facts reported. Mot. at 4. Yet despite not knowing their identities, Director Patel somehow insists that *all* of these confidential sources "lack[] firsthand knowledge" and "harbor[] animus" against him. Opp. at 22. Similarly, even though the confidential sources are described as including "current" FBI officials, "members of Congress," and "hospitality-industry workers" (Article at 3), he dismisses them uniformly as "disgruntled former officials" with "axes to grind based on personnel decisions." Opp. at 22.

Director Patel does not dispute that reliance on confidential sources cannot, on its own, support an inference of actual malice. Mot. at 19 (collecting cases). And his unsupported conjecture about the knowledge and motivations of the Article's confidential sources carries no weight on this Motion.[9] But even if it did, there is "no authority for the proposition that anything short of interviewing those with first-hand knowledge amounts to 'willful blindness.'" *OAO Alfa*

F. App'x 840 (11th Cir. 2020). There is no plausible definition of "hot news" that does *not* include such reporting.

[9] At most, these should be treated as allegations "on information and belief," which are not credited on a motion to dismiss without supporting factual allegations (that are not present here). *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021).

*Bank v. Ctr. for Pub. Integrity*, 387 F. Supp. 2d 20, 54 (D.D.C. 2005) (quoting *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1510 (D.C. Cir. 1996)). Nor does a source's motivation or bias demonstrate actual malice. Mot. at 19-20 (collecting cases).[10] *See also, e.g.*, *Berisha v. Lawson*, 973 F.3d 1304, 1313 (11th Cir. 2020) (no actual malice where publisher relied on source who provided information "to further his own interests"); *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 715 (4th Cir. 1991) ("self-interest" and "the related desire to place opposing views and persons in an unfavorable light" is not evidence of actual malice); *Cobb*, 278 F.3d at 638 (no actual malice where publisher relied on paid source who was a drug user with a "criminal background"). Once again, Director Patel does not point to a single case where a court inferred actual malice from similar allegations. The Article's confidential sources provide no basis to infer actual malice.

### C. The Article Was Not "Inherently Improbable"

Finally, Director Patel claims Defendants "manufactured" the Article "from whole cloth" (Opp. at 18), declaring it "so inherently improbable that only a reckless [publisher] would have put [it] in circulation." *St. Amant*, 390 U.S. at 732. That is obviously not the case. The extensive backdrop of Congressional inquiries, news articles, Director Patel's own statements, and public lawsuits predating the Article shows an ongoing public conversation about the core claims in the

[10] Director Patel's attempt to distinguish *Fairfax v. CBS*, 2 F.4th 286 (4th Cir. 2021), falls flat. In *Fairfax*, the court dismissed a public official's defamation claim over a broadcaster's interview with two women who accused him of sexual assault. Contrary to Director Patel's gloss, the court did not consider "political motivation alone"; it rejected a panoply of allegations as insufficient to plead actual malice, including (but not limited to) one woman's alleged "political motivation" for coming forward when she did. *Id.* at 291-95. Director Patel does not address the other two cases Defendants cited (*Montgomery* and *Lohrenz*, Mot. at 19-20), and he claims to "distinguish" a different case (*Harvey v. Cable News Network, Inc.*, 48 F.4th 257 (4th Cir. 2022)) that Defendants did *not* cite. Opp. at 23-24.

Article, including whether Patel was taking his role seriously, spending too much time on social pursuits, and using his office to target President Trump's enemies. Mot. at 23-27.

Director Patel does not dispute that the Court may take judicial notice of these materials for their existence, even if not for their truth. Mot. at 24 n.13; Opp. at 5. And he does not attempt to explain how the Article is "inherently improbable" against this tsunami of consistent prior reporting and investigation. Instead, Director Patel complains that various examples do not "corroborate[] the Article's specific claims." Opp. at 19-20. That argument misses the mark. *St. Amant* does not hold that a report is "inherently improbable" unless the journalist can "corroborate" each "specific claim" to the plaintiff's satisfaction. Instead, it outlines a narrow exception to the general principle that a failure to investigate does not demonstrate actual malice, permitting the inference of actual malice where a report's claims are "so inherently improbable that only a reckless [publisher] would have put them in circulation." 390 U.S. at 732.

That is not remotely the case here. Director Patel does not challenge any of the publicly reported facts that makes the Article wholly plausible. As to his alcohol consumption (Category 1), he admits his Poodle Room membership, that he kept whiskey on his office desk, and that he publicly chugged beers with the U.S. men's Olympic hockey team in their locker room while ostensibly in Italy on official business.[11] Opp. at 19.[12] As to his absences and unreachability

[11] And notably, neither he nor the FBI disputed *The Atlantic*'s subsequent reporting that Director Patel has commissioned and distributed personalized whiskey bottles emblazoned "Director Ka$h Patel," with a rendering of the FBI seal. *See* Sarah Fitzpatrick, "Kash Patel's Personalized Bourbon Stash," The Atlantic (May 6, 2026), https://www.theatlantic.com/politics/2026/05/kash-patel-fbi-bourbon/687066/.

[12] Patel argues that "a beer at a sporting celebration does not make it plausible that Director Patel was an alcoholic, regularly intoxicated, or incapacitated at work." Opp. at 20. But the FBI Director's choice to "chug" beer on camera in a locker room during an alcohol-soaked celebration, as though it were a fraternity party, is undeniably unusual behavior for the holder of that office—and certainly does not make the reporting about his alcohol consumption "inherently improbable."

(Category 2), he does not dispute his extensive use of the FBI jet and that his staff had to change his briefing schedule to shift his meetings later. *Id.* at 20.[13] As to the retaliatory firings (Category 3), there is no dispute that his *Government Gangsters* book contained a list of officials he viewed as corrupt or disloyal and that he publicly acknowledged firing FBI officials because they had investigated President Trump. Mot. at 31. Regarding his job security concerns (Category 4), he does not dispute that it was widely rumored that the White House was considering firing him. Opp. at 21. And as to his focus on image (Category 5), he admits that he publicly proclaimed the FBI should appear "fierce" and does not dispute the reported incident with the raid jacket. *Id.*; *see* Mot. at 26 n.18. These unchallenged facts make clear that the Article was not "so inherently improbable that only a reckless [person] would have put them in circulation," *St. Amant*, 390 U.S. at 732; to the contrary, they were entirely *consistent* with Defendants' reporting.

Not surprisingly, the Opposition does not cite a single case where a court found similar reporting to be "inherently improbable" under *St. Amant.*[14] Nor does he distinguish the multiple cases cited by Defendants where courts held that challenged statements were not "inherently improbable" based on pre-existing reporting, government investigations, and public testimony.

---

[13] Director Patel singles out the "breaching equipment" incident as a "paradigmatic example" of information that is "inherently improbable" under *St. Amant.* Opp. at 19. It is not. Director Patel concedes that FBI protection details would generally have access to some form of "breaching equipment," and the Article does not specify the *type* of equipment requested—only that it was "normally used by SWAT and hostage-rescue teams to quickly gain entry into buildings." Article at 4. It is not remotely "inherently improbable" that the FBI Director's security detail would want enhanced equipment if they were unable to access their protectee behind locked doors.

[14] In fact, the Article is nothing like the far-fetched claims that courts have found potentially "inherently improbable" under *St. Amant*. *Compare, e.g.*, *Hunt*, 720 F.2d at 645 (claim that CIA was going to frame the plaintiff for JFK's assassination to cover up its own involvement); *Block v. Matesic*, 789 F. Supp. 3d 1131, 1180 (S.D. Fla. 2025), (claim that 80-year-old federal judge hacked into neighbor's email), *appeal dismissed*, 2026 WL 810430 (11th Cir. Mar. 24, 2026); *Tucker*, 237 F.3d at 283 (claim that rap lyrics caused "millions of dollars of damage to a couple's sexual relationship").

Mot. at 25-26.[15] Director Patel's conclusory allegations that the Article was "inherently improbable" are insufficient to plead actual malice.

### D. Director Patel Cannot Avoid Dismissal By Combining His Various Failed Allegations of Actual Malice

As set forth above and in the opening memo, Director Patel's allegations do not cross the plausibility threshold.[16] Tacitly acknowledging this failure, Director Patel attempts to stack his conclusory, nonviable allegations of actual malice atop one another in hopes of surmounting the high bar of pleading actual malice.[17] But that does not work either.

Initially, Director Patel argues that actual malice can be shown by objective, circumstantial evidence. Opp at. 16. And while that is true, the very cases he cites emphasize that the actual malice standard is, in fact, a "demanding burden." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 182 (2d Cir. 2000); *see also Hunt*, 720 F.2d at 643 (referring to actual malice as a "heavy

---

[15] The only case Director Patel even attempts to distinguish is *McFarlane v. Sheridan Square Press, Inc.*—and his attempt fails. 91 F.3d 1501. *McFarlane* does not, as Director Patel claims, require an exact match between an alleged defamatory statement and the Congressional inquiry; the court instead held that reporting is *not* inherently improbable where Congress was taking the broader allegations seriously. *See id.* at 1512-13. That is precisely the case here.

[16] None of Director Patel's other arguments rescue his failed attempt to plead actual malice. Patel repeats allegations about the *Figliuzzi* lawsuit, Opp. at 27, without responding to Defendants' showing that this unrelated (and now dismissed) lawsuit has no bearing on actual malice. Mot. at 22 (citing *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 283 (S.D.N.Y. 2013)). And he repeats his claim that Defendants acted with "editorial animus," departed from journalistic standards, and "ignored their own policies and procedures," Opp. at 29-30, but still identifies no basis for these unsupported allegations—or responds to the Motion's many cases demonstrating that these allegations are irrelevant to actual malice. Mot. at 22-23.

[17] Director Patel attempts to support this argument by citing case law that permits plaintiffs to prove actual malice "through the cumulation of circumstantial evidence." *Tavoulareas v. Piro*, 817 F.2d 762, 789 (D.C. Cir. 1987). But those cases do not help Director Patel. The issue is not that he fails to plead *enough* facts, or that he pleads facts that would constitute "circumstantial" instead of "direct" evidence; his Complaint fails as a matter of law because it contains *no plausibly pleaded allegations whatsoever* that could demonstrate actual malice.

burden of proof"). They also emphasize that this Court "must be careful not to place too much reliance on such factors." *Harte-Hanks*, 491 U.S. at 668. It is not enough, then, for Director Patel to plead, in theory, that actual malice is cumulative; he was required to plead facts (not conclusions) which plausibly alleged that Defendants subjectively doubted the truth of what they published.

Director Patel has not plausibly alleged sufficient facts even through circumstantial evidence to nudge his Complaint over the threshold of plausibility, *see Biro*, 963 F. Supp. 2d at 285, because all of his allegations, taken separately or together, are too conclusory. *See id.* (affirming dismissal for failure to plead actual malice where defendant allegedly "failed to investigate," "relied on anonymous and biased sources," "ignore[d]" the plaintiff's other successful projects and "satisfied clients," "failed to retract a statement," and had "defamatory propensities"), *aff'd,* 807 F.3d 541 (2d Cir. 2015), and *aff'd,* 622 F. App'x 67 (2d Cir. 2015). *See* Mot. at 27. For example, in *Brimelow v. N.Y. Times Co.*, the Second Circuit affirmed dismissal for failure to plead actual malice where the plaintiff alleged that the New York Times ignored his "repeated and persistent denials," departed from accepted newsgathering standards, acted with ill-will, and failed to act impartially. 2021 WL 4901969, at *2-3 (2d Cir. Oct. 21, 2021). And in *Tah*, the D.C. Circuit affirmed dismissal for failure to plead actual malice despite the plaintiffs' "several interlocking theories" of actual malice, including that defendants had a preconceived storyline, did not credit plaintiffs' prepublication denials, and were biased against the plaintiffs, since none were viable as a matter of law. 991 F.3d at 241.[18]

---

[18] *See also, e.g.*, *Nunes v. WP Co. LLC*, 513 F. Supp. 3d 1, 8 (D.D.C. 2020) (dismissing for failure to plead actual malice where plaintiff alleged defendant "published the Article due to animus" and "abandoned all journalistic standards and integrity), *aff'd*, 2022 WL 997826 (D.C. Cir. Apr. 1, 2022); *Arpaio v. Cottle*, 404 F. Supp. 3d 80, 84-85 (D.D.C. 2019) (dismissing for failure to plead

At the end of the day, zero plus zero still equals zero. This Court should not "unlock the doors of discovery" where Director Patel fails to plead this essential element of his claim at the outset. *Klayman v. Kaiser*, 2023 WL 8890505, at *2 (D.C. Cir. Dec. 26, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662 678-69 (2009)). His Complaint should be dismissed on this basis alone.

## II. FIVE OF THE CHALLENGED STATEMENTS SHOULD BE DISMISSED FOR INDEPENDENT REASONS

As explained in Defendants' opening brief, Statements 13-17 (Categories 3, 4, and 5) are also subject to dismissal on independent grounds, in addition to the failure to plead actual malice. Mot. at 28-33. Director Patel spends the first 10 pages of his brief trying to salvage these claims, but fails to do so.

### A. Statements 13 and 14 (Category 3) Are True

First, it is substantially true that Director Patel displayed a "commitment to using the federal government to target political or personal adversaries of the president." Article at 6 (Statement 13). Director Patel does not meaningfully challenge any of the facts reported in the Article that support the Challenged Statement, which include: the checklist of "corrupt" or "disloyal" officials in his *Government Gangsters* book; his statement on a podcast that he planned to "come after" journalists for their 2020 election coverage; and reporting in another news outlet that he had "led a purge of people who he believes are anti-Trump 'conspirators' or 'enemies' within the FBI." *Id.* (linking to *New York Times* article about retaliatory firings). Nor does he deny that he dismantled a public corruption unit comprised of prosecutors who supported the

---

actual malice where defendant alleged that report was "self-evidently false" and that defendants were motivated by "political partisanship and liberal bias").

investigation into Trump's efforts to overturn the 2020 election—and then posted about it on social media. Mot. at 31.

Instead, the Opposition argues that even if these firings "may have occurred," they would have been "lawful personnel decisions" because the officials "acted unethically" or "undermined the mission." Opp. at 6, 8-9. This is a distinction without a difference. Director Patel does not deny firing these officials because they were involved in investigating or prosecuting President Trump; he is just calling it something else.[19]

It is also substantially true that Director Patel "fired members of a counterintelligence squad that was devoted, in part, to Iran." Article at 7 (Statement 14). The Opposition admits as much, conceding that "three affected individuals" worked on "matters involving Iran." Opp. at 9. That admission itself establishes the Article's truth. To avoid this, Director Patel quibbles with the word "counterintelligence," but this effort fails too: Director Patel fails to explain how the Article's use of "counterintelligence" instead of his preferred term, "counterterrorism," carries some unique defamatory sting. To the contrary, it is black-letter law that "[m]inor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 517 (1991) (citation omitted). Statements 13 and 14 (Category 3) are not actionable as a matter of law.

---

[19] *Prins v. Int'l Tel. and Tel. Corp.*, 757 F. Supp. 87 (D.D.C. 1991), is entirely distinguishable: in that case, the terminated employee alleged that the newspaper's description implied that *he* was fired for misconduct. *Id.* at 92. Here, the terminated employees *themselves* asserted in court filings that they were fired for political reasons, which the Article accurately reports. Mot. at 31.

### B. Statements 15, 16 and 17 (Categories 4 and 5) Are Not Defamatory.

Director Patel's attempt to salvage Statements 15,[20] 16,[21] and 17[22] also fails. In an attempt to bolster the defamatory nature of these specific statements, he claims each is defamatory because it portrays him as "unfit for office." But the Article never uses those words, and the Complaint does ***not*** assert a claim for defamation by implication over the Article's alleged "thesis" that "Director Patel is unfit for office." Director Patel cannot use his Opposition to change the theory of the case. And notably, Director Patel declined to challenge other statements in the Article that make this critique far more directly. *See, e.g.*, Article at 3 ("[Patel] is erratic, suspicious of others, and prone to jumping to conclusions before he has necessary evidence."); *id.* ("[Sources] described Patel's tenure as a management failure and his personal behavior as a national-security vulnerability.").

More broadly, even if Director Patel had alleged that theory of defamation by implication, it would also fail as a matter of law. Whether the FBI Director has the appropriate temperament

---

[20] Challenged Statement 15 quotes the bolded language from this passage of the Article: "On Friday, April 10, as FBI Director Kash Patel was preparing to leave work for the weekend, he struggled to log on to an internal computer system. He quickly became convinced that he had been locked out, and he **panicked, frantically calling aides and allies to announce that he had been fired by the White House**, according to nine people familiar with his outreach. Two of these people described his behavior as a **'freak-out.'**" Article at 2; Compl. ¶ 18(h).

[21] Challenged Statement 16 quotes the bolded language from this passage of the Article: "But Patel, according to multiple current officials, as well as former officials who have stayed close to him, **is deeply concerned that his job is in jeopardy**. He has good reasons to think so—including some having to do with what witnesses described to me as bouts of excessive drinking." Article at 2; Compl. ¶ 18(o).

[22] Challenged Statement 17 quotes the bolded language from this passage of the Article: "Patel has publicly proclaimed that the FBI needs to demonstrate that it is "fierce," and officials I spoke with said that he is fixated on that image in private as well. He **recently expressed frustration with the look of FBI merchandise, complaining that it isn't intimidating enough.**" Article at 7; Compl. ¶ 18(g).

for office is not provably false—and therefore not actionable. To the contrary, "a statement that someone who holds high public office … is unfit to serve in that position clearly reflects a subjective opinion regarding an important public policy matter and is part of the ongoing political debate that is protected by the First Amendment." *Dodds v. Am. Broad. Co.*, 145 F.3d 1053, 1068 (9th Cir. 1998). Statements 15, 16, and 17 are not actionable and should be dismissed on this independent ground.

### C. Statement 14 Is Protected By the Fair Report Privilege.

Finally, Statement 14 is fully protected by D.C. law as a "fair and accurate" report of Director Patel's testimony before the House Permanent Select Committee on Intelligence and the fair report privilege therefore applies. Mot. at 32. Statement 14 (identified in bold below) is part of a passage in the Article describing that hearing:

> **Days before the United States launched its war with Iran, Patel fired members of a counterintelligence squad that was devoted, in part, to Iran.** The director said in testimony before Congress that the agents had been let go because their work investigating Trump's handling of classified documents had placed them in violation of the bureau's ethics rules. But multiple officials told me that they were concerned that the firings had been rushed and would leave the U.S. shorthanded at a crucial moment.

Article at 7. In his Opposition, Director Patel claims that Defendants "selectively cited" and therefore misrepresented the hearing colloquy about these firings. Opp. at 14-15. But it is *Director Patel* who selectively quotes from the hearing testimony, by omitting the questions from Rep. Cohen that he was responding to in the first place. Their exchange was as follows:

> **REP. COHEN:** [W]hy did you fire at least a dozen agents in Counterintelligence Unit 12 that specializes in Iran counterintelligence, which makes us much less secure and safe with this war going on from Iranian attacks, potentially against our country?
>
> **DIR. PATEL:** As I said earlier, Congressman, I don't work on timelines when these terminations occur. There are internal investigations conducted by the careers of the FBI that highlight unethical or inappropriate conduct, and it's up to me to make the decision.

[…]

**REP. COHEN:** And the people you fired, those 12 people, they were experts on Iran, were they not?

**DIR. PATEL:** I don't believe so.

**REP. COHEN:** They worked in counterintelligence, did they not?

**DIR. PATEL:** I'm taking you at your word, sir. I'm not familiar with every single word.

**REP. COHEN:** You're the chief director. I'm not. You should know the answer. You fired the people. Where did they work?

**DIR. PATEL:** People were terminated for violating their ethical obligations and the high standards that they have.

**REP. COHEN:** Was the ethical violations that they dealt with the case of the classified documents that were found in the bathroom in Mar-a-Lago? Was that the ethical issue?

**DIR. PATEL:** As I said earlier, all those matters are pending litigation, so I'm not going to comment on them.[23]

As the public record shows, Director Patel was questioned about his decision to fire the agents in this unit, which "specializes in Iran counterintelligence," and whether that decision would leave the U.S. vulnerable in wartime—just as the Article shows. In response, he suggested those agents were fired due to FBI internal investigations into their "unethical or inappropriate conduct." Statement 14 is a "fair and accurate" report of the cited exchange from this hearing.

[23] Testimony of FBI Director Kash Patel, HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE, *HPSCI Open Hearing: 2026 Annual Threat Assessment Hearing* (Mar. 19, 2026), at 2:27:55, https://intelligence.house.gov/event/2026-worldwide-threats-hearing-open/.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in Defendants' opening brief, the Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Dated: August 31, 2026

Respectfully submitted,

DAVIS WRIGHT TREMAINE LLP

By: */s/ Katherine M. Bolger*

Katherine M. Bolger (Bar ID: NY0205)
1251 Avenue of the Americas, 42nd Floor
New York, NY 10020
Telephone: (212) 489-8230
katebolger@dwt.com

Laura Handman (Bar ID: 444386)
Alison Schary (Bar ID: 1014050)
Meenakshi Krishnan (Bar ID: 1617229)
Azeezat Adeleke (Bar ID: 90011862)
1301 K Street NW, Suite 500 East
Washington, D.C. 20005
Telephone: (202) 973-4200
laurahandman@dwt.com
alisonschary@dwt.com
meenakshikrishnan@dwt.com
azeezatadeleke@dwt.com

*Counsel for Defendants*